**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal Number: 3:18CR18-MHL** |
| ) | **Hon. M. Hannah Lauck** |
| **MOHAMED ABDELLAHI HORMA,** ) | |
| **Defendant.** ) | |
| ) | |
| ) | |

## DEFENDANT'S MOTION TO DISMISS COUNTS 1-4 OF THE INDICTMENT

COMES NOW the Defendant, Mohamed Abdellahi Horma, by and through his counsel Robert Wagner and Joseph Camden, and hereby moves this Court to dismiss Counts One, Two, Three and Four of the Indictment.

## I.      Introduction

The charges for possession of a firearm while under indictment should be dismissed. First, the indictment pending at the time was for transporting unstamped cigarettes, which is a business regulation offense exempted from the operation of 18 U.S.C. § 922(n).  *See* 18 U.S.C. § 921(a)(20).  Second, and in the alternative, § 922(a)(20) is void for vagueness under *United States v. Johnson*, because it gives no notice about what conduct is and is not prohibited. Last, § 922(n) is an unconstitutional infringement on the Second Amendment.

Likewise, the charges in the indictment for possession of a firearm while unlawfully or illegally present in violation of 18 U.S.C. § 922(g)(5)(A) should be dismissed.  Mr. Horma has only ever been present in the United States on a valid visa, or later under a period of authorized

stay due to a pending bona fide asylum application.  This is not unlawful or illegal presence as a matter of law.

## II.    Facts

Mohamed Horma was born in Casablanca, Morocco in 1994, but has been a citizen of the Islamic Republic of Mauritania since birth.  As a teenager in Mauritania, he was subjected to arrest, beating, and persecution for reasons he later described in his asylum application, submitted separately under seal.

Mr. Horma was able to obtain a valid B2 visa to the United States, and arrived at JFK airport, a designated port of entry, on December 29, 2013 at age 19.  He entered the United States after being inspected and admitted by customs officials, and has not left the United States since then.  His visa was to expire on June 28, 2014, six months after his entry.  While his visa was still in effect (sometime before April 9, 2014), Mr. Horma filed an I-589 (Application for Asylum) with United States Citizenship and Immigration Services (USCIS).  He was represented in those proceedings by an immigration attorney.  He submitted to biometrics administered by immigration officials; he attended all scheduled interviews; and after a certain amount of time had passed, he was given authorization to work in the United States.

Although USCIS initially expressed an intent to deny his application, his attorney submitted a rebuttal arguing that his testimony and the evidence were consistent and credible.  USCIS then referred his asylum application to an Immigration Court on September 21, 2015, along with a Notice to Appear.  No court date was initially scheduled.  Mr. Horma has been compliant with immigration officials and in touch with his immigration attorney.  Mr. Horma has not yet appeared before the Immigration Judge.  After Mr. Horma was unable to attend the

scheduled immigration court hearing because he was detained in this case, the proceedings

before the Immigration Court were continued to August 2, 2018 at 9:00 a.m., and his asylum

application has not been adjudicated by the Immigration Court.[1]  He is currently represented by

an immigration attorney in those proceedings.

Discovery provided by the government indicates that Mr. Horma was indicted in Howard

County, Maryland on July 27, 2016 for transportation of unstamped cigarettes in violation of

Maryland Statutes, Tax-General Article, § 13-1015.  Police reports indicate Mr. Horma was

pulled over while driving in a car that contained 717 cartons of cigarettes.  Records indicate that

Mr. Horma pled guilty[2] on November 15, 2016, with a sentence of 11 months.  The government

alleges in Counts One and Three that Mr. Horma went to a gun range and rented a gun, which he

used only at the range and returned to the owner, on September 21, 2016 while the indictment

was pending.

---

[1] A conviction on any of the counts alleged under 18 U.S.C. § 922 in this case would constitute
an aggravated felony.  *See* 18 U.S.C. § 1101(a)(43)(E)(ii) (designating convictions under §
922(g)(5) and (n) as aggravated felonies).  Conviction for an aggravated felony would pretermit
his asylum application.  *See* 8 U.S.C. § 1158(b)(2)(A)(ii) (prohibit asylum for those convicted of
particularly serious crime) and (B)(i) (defining aggravated felony as particularly serious crime).
[2] Significantly, the Maryland offense punishes "willful[]" violations.  But Maryland courts have
held "that the term "willful[ ]" in the context of T.G. § 13–1015 denotes only an intentional and
deliberate violation of that provision and does not require that the State prove that appellant
knew that what he was doing was illegal."  *Chen v. State*, 141 Md. App. 123, 126, 784 A.2d 641,
642 (2001), aff'd, 370 Md. 99, 803 A.2d 518 (2002).

3

Mr. Horma also suffered convictions in Virginia related to possession of cigarettes.[3]  A search warrant executed on November 12, 2016 yielded the firearm alleged in Counts Two and Four.  Mr. Horma was transferred from state custody from Henrico County directly to federal court on the indictment, where he has been detained since his initial appearance.  An immigration detainer has been filed so that Mr. Horma can finally resume his asylum application when he is released from federal custody.

### III.     Counts Three and Four Should Be Dismissed.

In Counts Three and Four, Mr. Horma is charged with receipt of a firearm while "under indictment for a crime punishable by a term of imprisonment exceeding one year, to wit: Felony Transport Unstamped Cigarettes[,]" in violation of 18 U.S.C. § 922(n).[4]  ECF No. 9 at 2-3. Count Three alleges receipt of a Smith & Wesson 9mm handgun on September 21, 2016; Count Four alleges receipt of a Ruger 9mm handgun on November 12, 2016.  These counts should be dismissed for failure to state an offense because the crime at issue – Maryland's crime of transportation of unstamped cigarettes -- is exempted from the definition of a "crime punishable

---

[3] The undersigned has been informed by immigration counsel that none of his prior convictions constitute crimes involving moral turpitude or aggravated felonies such as would impact his immigration case or affect his asylum claim.

[4] Count Four alleges the full description as "Felony Transport Unstamped Cigarettes" while Count Three alleges "Felony Transport Unstamped [sic]" but appears to refer to the same Maryland indictment.  The omission of the word "Cigarettes" in Count Three appears to be a clerical omission, and would appear to be harmless under Fed. R. Crim. P. 7(c)(2)("Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction.").

by imprisonment for a term exceeding one year" under 18 U.S.C. § 921(a)(20).  In the

alternative, the definition of "crime punishable by imprisonment for a term exceeding one year"

in 18 U.S.C. § 921(a)(20) is void for vagueness and violates equal protections principles.  Last,

the prohibition on receipt (and therefore any new possession) of firearms while under indictment

violates the Second Amendment.

A. **The Maryland Crime of Transportation of Unstamped Cigarettes (Md. Tax-Gen § 13-1015) is Exempted from The Definition of A Crime Punishable By Imprisonment For a Term Exceeding One Year Under 18 U.S.C. § 921(a)(20).**

Mr. Horma is charged under 18 U.S.C. § 922(n).  That statute provides:

It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

However, for purposes of § 922(n), the term "a crime punishable by imprisonment for a term

exceeding one year" is further defined at 18 U.S.C. § 921(a)(20), which provides:

(20)    The term "crime punishable by imprisonment for a term exceeding one year" does not include—

(A)    any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B)    any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

Mr. Horma admits that the Maryland indictment provided in discovery alleges a violation

of Md. Tax-Gen § 13-1015, which provides for a statutory maximum of two years.  However,

because it "relat[es] to the regulation of business practices" and is "similar" to the enumerated

offenses at § 921(a)(20)(A), it is not a proper predicate for prosecution under § 922(n).

The Fourth Circuit has apparently considered this provision in only two cases. In *United States v. Parker*, 262 F.3d 415 (4th Cir. 2001), the defendant argued that the jury should have been allowed to determine whether a prior conviction for possession of cocaine with intent to distribute qualified for one of the exceptions listed at 18 U.S.C. § 921(a)(20). *Id*. at 423. The Fourth Circuit held:

> While the trial court is under a duty to instruct the jury on all of the elements of an offense in a criminal trial, it is certainly not required to instruct the jury on a defense for which there was no evidence adduced at trial. *United States v. Williams*, 604 F.2d 277, 281 (4th Cir.1979). We are not long detained by Parker's suggestion that a jury was entitled to find that her brother's conviction for possession of cocaine with intent to distribute was exempted as a predicate felony under § 921(20)(A) because it was an offense relating to the regulation of business practices. Nor does Parker maintain that her brother was actually convicted of a misdemeanor of the sort exempted by § 921(20)(B). Thus, we conclude that there was no foundation in law or fact supporting instructions under § 921(20)(A) & (B).

*Id*. at 423-24. Then in *United States v. Bokman*, 215 F. App'x. 203 (4th Cir. 2007) (unpublished), the defendant argued that the evidence was insufficient to convict him of sale of a firearm to a convicted felon. The evidence was that the buyer had told the defendant he was "a felon" before the sale. *Id*. at 205. He argued that this was insufficient to show knowledge that the purchaser's prior conviction did not fall within the exception at § 921(a)(20). *Id*. The Fourth Circuit rejected his argument, holding

> Even if Bokman did not "know" that the informant had been convicted of a "crime punishable by imprisonment for a term exceeding one year" based on the informant's statement that he was a felon, § 922(d)(1) requires only that a defendant know or "hav[e] reasonable cause to believe" that the buyer has been convicted of such a crime. The statements made by the informant during the firearm transactions fully support the jury's finding that Bokman had at least reasonable cause to believe that the informant had been convicted of a crime punishable by more than one year.

*Id*.

Thus, the decisions of the Fourth Circuit, although they acknowledge the exception, do little to clarify the scope of the "regulation of business practice" exception at 921(a)(20).

### 1.    Decisions from other courts

In *United States v. Meldish*, 722 F.2d 26, 27 (2d Cir. 1983), the defendant had been previously convicted of falsifying a customs declaration for an expensive watch. Regarding the definition of "unfair trade practice," the Second Circuit noted:

> Although it is almost impossible to formulate an all-inclusive definition of "unfair trade practice," see *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 240, 92 S.Ct. 898, 903, 31 L.Ed.2d 170 (1972), implicit in the term itself is the requirement that the practice adversely affect either competitors or consumers, *see id*. at 241-44, 92 S.Ct. at 903-05. Among the practices which may cause such an adverse effect are the suppression of competition, *Shakespeare Co. v. FTC*, 50 F.2d 758, 759-60 (6th Cir.1931), price discrimination, *Oliver Bros., Inc. v. FTC*, 102 F.2d 763, 767 (4th Cir.1939), deceptive advertising or labeling, *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 335-36, 59 S.Ct. 191, 201, 83 L.Ed. 195 (1938), and the exploitations of child purchasers, *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 313, 54 S.Ct. 423, 426, 78 L.Ed. 814 (1934).

*Id*. at 27-28. Because the customs violation at issue does not require an effect on competitors or consumers, the Second Circuit held that it did not qualify. *Id*. at 28. The Court did not appear to discuss the meaning of the phrase "other similar offenses relating to the regulation of business practices." The court also rejected the contention that the failure to exempt other nonviolent offenses was unconstitutionally irrational; but applied only rational basis review because, under its view, "the receiving and possessing of firearms is not a basic constitutional right." *Id*. at 28; *Cf. District of Columbia v. Heller*, 554 U.S. 570 (2008) (Second Amendment establishes individual right, requires heightened scrutiny).

In *United States v. McLemore*, 792 F. Supp. 96 (S.D.Ala. 1992), the defendant had a conviction for fraudulently rolling back odometer readings under 15 U.S.C. §§ 1984 and

1990c(a). *Id*. at 97. The district court held that a defendant must show that the practice at issue must have an adverse effect on competition and consumers. Noting that the odometer law was meant to protect consumers, the court held that it was meant to punish an unfair trade practice as defined by § 921(a)(20). *Id*. at 98.

In *United States v. Stanko*, 491 F.3d 408 (8th Cir. 2007), the Eighth Circuit held that a prior conviction under the Federal Meat Inspection Act (FMIA) did not qualify under the business practice exception. Interpreting § 921(a)(20)(A), the Court held that the phrase "relating to the regulation of business practices" only served to modify the phrase "other similar offenses." *Id*. at 413-14. Next it held that the words "similar offenses" "indicates an intent to limit the business practices clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses." *Id*. at 414 (citing *Webster's Third New International Dictionary* 2120 (2002)). In deciding whether an offense is similar to the enumerated offenses, the Court held that elements (and not incidental conduct) were the focus. *Id*. at 415. And it held that the elements must require proof of "an adverse economic effect on competition or consumers." *Id*. at 416 (citing *Dreher*, 115 F.3d at 332-22; *Meldish*, 722 F.2d at 28). Regarding FMIA convictions, the Eighth Circuit held that its primary purpose was protecting consumers from unsafe meet, and not primarily from unfair competition. *Id*. at 416-17. It further noted that no element of an FMIA violation required proof of "an effect on competition or consumers as an element of the offense." *Id*. at 417.

### B.     Maryland Transportation of Unstamped Cigarettes

Mr. Horma should prevail even under the standards announced in *Dreher*, *Meldish*, and *Stanko*.  His indictment was for a violation of Maryland Code Tax-Gen § 13-1015.  That statute provides:

> **§ 13-1015.  Fines and penalties for willful transportation of unstamped cigarettes or tobacco products**
>
> (a) A person who willfully ships, imports, sells into or within, or transports within, this State cigarettes or other tobacco products on which the tobacco tax has not been paid in violation of Title 12 of this article or § 16-219, § 16-222, § 16.5-215, or § 16.5-216 of the Business Regulation Article is guilty of a felony and, on conviction, is subject to the penalties set forth in subsections (b) and (c) of this section.

Md. Code Ann., Tax-Gen. § 13-1015 (West).[5]  Title 12 of the General Tax Article, in turn, restricts sales of tobacco tax stamps to licensed wholesalers, § 12-303, and prohibits the possession, sale or attempted sale of unstamped cigarettes, § 12-305.

A primary purpose of the ban on transporting unstamped cigarettes into Maryland is to protect in-state cigarette sellers and manufacturers subject to the tax.  Many of the statutes referenced in § 13-1015 restrict sales and stamps to licensed brand owners or wholesalers, or

---

[5] The referenced statutes are:
§ 16-219 and § 16.5-215: requires a delivery ticket or invoice while transporting cigarettes on a public road
§ 16-222 and § 16.5-216: restricts shipping, importation and selling into Maryland to licensed brand owners or importers; requires warning labels and other information, and forbids information or markings that are false, misleading, or contrary to trademark or tax laws.

restrict violations of trademark law.  *See* Md. Statutes Tax-Gen §§ 16-222 and § 16.5-216.  As Philip Morris states on its public website,

> **Preventing Unfair Competition**
> Law-abiding wholesalers and retailers face unfair competition when illicit cigarettes enter a market. We expect wholesalers and retailers of our products to comply with all applicable laws and regulations as well as the terms of our trade policies and programs. For example, retailers are obligated to collect and remit applicable state and local excise taxes.

Exhibit ("Protecting Our Cigarette Brands")( http://www.altria.com/our-companies/philipmorrisusa/protecting-our-cigarette-brands/Pages/default.aspx).

The prohibition on transportation of unstamped cigarettes therefore is closest by analogy to the odometer offense found to be within § 921(a)(20) in *McLemore*.  Like odometer manipulation, unstamped cigarette trafficking is meant to protect consumers from unlicensed tobacco sales, including false or misleading labeling; and it is clearly meant to protect legitimate Maryland tobacco brand owners and wholesalers from unfair competition by those who gain an economic advantage by failing to purchase stamps.  Thus, the statute punishes commercial activity which necessarily impacts competition and consumers, which satisfies the standard set out in *Stanko* and *Dreher*.  That is, it necessarily involves "an adverse economic effect on competition or consumers."  *Stanko*, 491 F.3d at 416.

1.  *In the alternative, 921(a)(20)(A) Should be Construed to Cover Business Regulation Offenses Generally*

If the Court believes that transportation of unstamped cigarettes is an offense "relating to the regulation of business practices," but does not fall within the narrow class of offenses approved by *Stanko*, *Dreher*, and *Meldish*, then the Court should reexamine how to construe §

921(a)(20)(A).  The structure and language of the provision point to a broad interpretation sufficient to encompass transportation of unstamped cigarettes.

### a)    *"Relating to" should be given broad meaning*

The residual clause here begins with the phrase "relating to the regulation of business practices."  18 U.S.C. § 921(a)(20)(A).  In other statutes, when Congress has used the phrase "relating to," courts have given it broad meaning.

> For purposes of the present case, the key phrase, obviously, is "relating to." The ordinary meaning of these words is a broad one—"to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with," Black's Law Dictionary 1158 (5th ed. 1979)—and the words thus express a broad pre-emptive purpose.

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (interpreting 49 App. U.S.C. § 1305(a)(1)).  Thus, the phrase "relating to the regulation of business practices" should likewise be given a broad meaning sufficient to cover transportation of unstamped cigarettes.

### b)    *"Relating to the regulation of business practices" must be given effect.*

One shortcoming of the statutory interpretation in *Stanko* and the other cases is that it essentially reads out the phrase "relating to the regulation of business practices."  The exemption is phrased as follows:

> any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices

18 U.S.C. § 921(a)(20)(A).  In *Stanko* and its predecessors, the courts read "other similar offenses" narrowly to mean offenses sharing a common element of an effect on consumers or competition.  *Stanko*, 491 F.3d at 416.  However, this renders meaningless the phrase "relating to

11

the regulation of business practices" in the statute. So by giving controlling narrowing effect to the word "similar," and interpreting "similar" with such a narrow focus, the *Stanko* court gave no effect to the words that followed: "relating to the regulation of business practices." This violates the rule against superfluity. "Where possible, we must give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous." *Scott v. United States*, 328 F.3d 132, 139 (4th Cir. 2003) (citing *Freytag v. Comm'r Internal Revenue*, 501 U.S. 868, 877 (1991)).

Instead, it seems reasonable to posit, given the purpose of the statute – keeping firearms out of the hands of the untrustworthy or dangerous – that Congress enumerated certain nonviolent felonies to be exempt as bad predictors of dangerousness. And the exemption includes other similar offenses; but then instead of leaving readers to hunt for or infer a common thread between the enumerated offenses, Congress expressed how it considered them related by specifying that they all "relat[e] to the regulation of business practices." 18 U.S.C. § 921(a)(20). That is, the phrase "other similar offenses relating to the regulation of business practices" should be read as a whole to refer to those offenses, like antitrust violations, unfair trade practices, and restraints of trade, that themselves also relate to "the regulation of business practices." Transportation of unstamped cigarettes in violation of industry-specific labeling requirements clearly relates to the regulation of business practices, and should be included in the exemption.

### c)   *The Rule of Lenity*

If the Court finds § 921(a)(20) to be susceptible to two plausible interpretations, it is ambiguous, and the Rule of Lenity should be considered.

> [B]ecause the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's

coverage. To the extent that the language or history of [the statute at issue] is uncertain, this time-honored interpretive guideline serves to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability.

*Crandon v. United States*, 494 U.S. 152, 158 (1990) (quotations omitted). Under the rule of lenity, therefore, if § 921(a)(20)(A) is ambiguous, it should be construed in Mr. Horma's favor.

**C.    In the Alternative, Title 21 U.S.C. § 921(a)(20)(A) is Void for Vagueness under *Johnson*.**

If the Court determines that the Maryland crime of transporting unstamped cigarettes does not clearly fall within the § 921(a)(20) exemption, then the Court should consider whether the definition of "crime punishable by imprisonment for a term exceeding one year," as defined by § 921(a)(20)(A), is void for vagueness under the Due Process Clause. The void-for-vagueness doctrine is founded in the Fifth Amendment. *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015). It invalidates "a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Id.*

By enumerating certain offenses, and then announcing a mismatched residual category, §921(a)(20)(A) is remarkably similar to the ACCA Residual Clause recently held void for vagueness in *Johnson*.

| ACCA Residual Clause, 18 U.S.C. § 924(e)(2)(B)(ii) (Void for Vagueness) | 18 U.S.C. § 921(a)(20)(A) |
|---|---|
| (ii) is burglary, arson, or extortion, involves use of explosives, or **otherwise involves conduct that presents a serious potential risk of physical injury to another**; and | (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, **or other similar offenses relating to the regulation of business practices**, or |

In *Johnson*, the Supreme Court held that two features of the ACCA residual clause make it unconstitutionally vague. First, it was vague because it provided no standard against which to guage "potential risk." *Id*. at 2557. Second, however, the Supreme Court noted the mismatch between the enumerated offenses and the residual category:

> At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. It is one thing to apply an imprecise "serious potential risk" standard to real-world facts; it is quite another to apply it to a judge-imagined abstraction. By asking whether the crime "*otherwise* involves conduct that presents a serious potential risk," moreover, **the residual clause forces courts to interpret "serious potential risk" in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives. These offenses are "far from clear in respect to the degree of risk each poses."** *Begay*, 553 U.S., at 143, 128 S.Ct. 1581. Does the ordinary burglar invade an occupied home by night or an unoccupied home by day? Does the typical extortionist threaten his victim in person with the use of force, or does he threaten his victim by mail with the revelation of embarrassing personal information? By combining indeterminacy about how to measure the risk posed by a crime with indeterminacy about how much risk it takes for the crime to qualify as a violent felony, the residual clause produces more unpredictability and arbitrariness than the Due Process Clause tolerates.

*Id*. at 2558 (italics in original; bold added). As Justice Scalia noted in a colorful analogy in his dissent in *James v. United States*, "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, navy blue, or colors that otherwise involve shades of red' assuredly does so." 550 U.S. 192, 231 n.7 (Scalia, J. dissenting).

Section 921(a)(20)(A) is susceptible to similar uncertainty. If the enumerated offenses are construed, as the courts in *Stanko*, *Dreher*, and *Meldish* did, to refer only to those offenses involving an effect on consumers or competition, then there is a serious mismatch between those offenses and the broad residual clause of "similar offenses relating to the regulation of business practices." Moreover, a proper interpretation of this phrase is necessary for an ordinary person

14

to know whether his conduct in possessing a firearm constitutes a serious felony conviction. Therefore the mismatch between the residual clause and the enumerated offenses "fails to give ordinary people fair notice of the conduct [the statute] punishes," and is void for vagueness. *Johnson*, 135 S.Ct. at 2556

Relying on the principles later vindicated in *Johnson*, Judge Bright of the Eighth Circuit published a prescient dissent in *Stanko*, relying in part on Justice Scalia's dissent in *James*. 491 F.3d at 419-421. Judge Bright wrote that the vagueness problem of § 921(a)(20)(A) "goes beyond, for example, the uncertainty inherent in defining a violent felony" under the ACCA. *Id.* at 420. The dissent noted that no court had ever construed the § 921(a)(20)(A) residual clause to actually include a crime. *Id.* And that for the eighteen years that the power to denominate such crimes was in the hands of the Secretary, no such crimes were designated. *Id.* at 419. He recognized that the enumerated offenses were not vague, *id.* at 420, but that the residual clause lacks the required specificity to satisfy due process. *Id.* "All persons, including those like Stanko, enjoy the right to live under a system of laws in which 'a penal statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 421 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

**D.     The Blanket Ban on Receipt of Firearms By a Person Under Indictment Violates the Second Amendment.**

*1.     Facial and As-Applied Challenges*

Under Fourth Circuit law, a defendant bringing a facial challenge against the constitutionality of a statute must show that it is unconstitutional in all of its applications. *See See United States v. Moore*, 666 F.3d 313, (4th Cir. 2012) (quoting *United States v. Salerno*, 481

15

U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.")). Mr. Horma challenges both the facial validity of § 922(n), as well as its particular application to him.

### 2. *Heller and the Scope of the Second Amendment Right*

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual's right to keep and bear arms. In so holding, the Court stated that the inherent right of self-defense, particularly in the home, is central to the Second Amendment right. *Id*. at 628. In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the right to keep and bear arms is a fundamental right and applies to the states pursuant to the incorporation doctrine of the Fourteenth Amendment. In so holding, the Court stated that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day . . ." and "that individual self-defense is the *central component* of the Second Amendment right." *Id*. at 767 (quotations, citations omitted; emphasis in original).

Of course, the right to acquire and possess weapons individually is not absolute:

> Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. (Citations omitted) . . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Heller*, 128 S.Ct. at 2816-17. The Court further noted that the foregoing identification of presumptively lawful regulatory measures did not purport to be exhaustive. *Id*. at 2817 n. 26.

In the wake of *Heller*, the Fourth Circuit has issued opinions clarifying the framework for considering Second Amendment claims. In *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit considered a claim that the ban on firearms possession by those convicted of a misdemeanor crime of violence violated the Second Amendment. The Court adopted a two-step inquiry.

> Thus, a two-part approach to Second Amendment claims seems appropriate under *Heller*, as explained by the Third Circuit Court of Appeals, *see* [*United States v.*] *Marzzarella*, 614 F.3d [85] at 89 [3d Cir. 2010)], and Judge Sykes in the now-vacated *Skoien* panel opinion, *see* [*United States v. Skoien*, ]587 F.3d [803] at 808–09 [(7th Cir. 2009)]. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." Id. This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. *See Heller*, 128 S.Ct. at 2816. If it was not, then the challenged law is valid. *See Marzzarella*, 614 F.3d at 89. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. See id. Heller left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

*Chester*, 628 F.3d at 680. However, in applying the first step, the Court found the evidence inconclusive, and so proceeded to the means-ends scrutiny analysis:

> The government has not contended that § 922(g)(9) is valid because Chester, having been convicted of a domestic violence misdemeanor, is wholly unprotected by the Second Amendment. Based on this and the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that Chester's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense.

*United States v. Chester*, 628 F.3d 673, 681-682 (4th Cir. 2010). The Fourth Circuit remanded the case to the district court to the hear evidence under an intermediate scrutiny analysis.

Then in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), the Fourth Circuit again addressed an argument under *Heller* – this time a challenge to Maryland's ban on assault weapons and large-capacity magazines. The Court, sitting en banc, blessed *Chester*'s two-part approach. *Id*. at 133. The Fourth Circuit first held that the assault weapons and large-capacity magazines were not the type of arms protected by the Second Amendment, in that they were essentially military weapons suited for use on the battlefield and not self-defense in the home. *Id*. at 136-137.

As an alternative holding, however, the Fourth Circuit proceeded to the second step of the analysis and held that the weapons ban was subject to, and survived, intermediate scrutiny. *Id*. at 138. In selecting between intermediate and strict scrutiny, the Court noted:

> First of all, intermediate scrutiny is the appropriate standard because the FSA does not severely burden the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home. *See N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 260 ("Heightened scrutiny need not ... be akin to strict scrutiny when a law burdens the Second Amendment—particularly when that burden does not constrain the Amendment's core area of protection." (internal quotation marks omitted)); *Chester*, 628 F.3d at 682 ("A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right ... may be more easily justified." (quoting *United States v. Skoien*, 587 F.3d 803, 813-14 (7th Cir. 2009), rev'd en banc, 614 F.3d 638 (7th Cir. 2010))).

> The FSA bans only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition. Those include magazines holding ten or fewer rounds, nonautomatic and some semiautomatic long guns, and—most importantly—handguns. The handgun, of course, is "the quintessential self-defense weapon." See Heller, 554 U.S. at 629, 128 S.Ct. 2783. In contrast, there is scant evidence in the record before us that the FSA-banned assault weapons and large-capacity magazines are possessed, or even suitable, for self-protection. See Kolbe, 42 F.Supp.3d at 791 (observing that, although the FSA prohibits "a class of weapons that the plaintiffs desire to use for self-defense in the home, there is no evidence demonstrating their removal will significantly impact the core protection of the Second Amendment" (emphasis and citation omitted)).

*Kolbe*, 849 F.3d at 138. Therefore the Court chose intermediate scrutiny because "[a]t bottom, the FSA's prohibitions against assault weapons and large-capacity magazines simple do not effectively disarm individuals or substantially affect their ability to defend themselves." *Id* at 139 (quotations, citations omitted).

### 3. Other Courts

Although it appears that the Fourth Circuit has not passed on the validity of § 922(n) after *Heller*, several courts have confronted the right to possess firearms while under indictment. In *United States v. Arzberger*, 592 F. Supp. 2d 590 (S.D.N.Y. 2008), the court confronted the Adam Walsh Act, which, like § 922(n), required as a condition of bail that a person facing certain child pornography charges be prohibited from possessing a firearm.

The court noted, "To the extent, then, that the Second Amendment creates an individual right to possess a firearm unrelated to any military purpose, it also establishes a protectible liberty interest. And, although the Supreme Court has indicated that this privilege may be withdrawn from some groups of persons such as convicted felons, there is no basis for categorically depriving persons who are merely accused of certain crimes of the right to legal possession of a firearm." *Arzberger*, 592 F. Supp. 2d at 602. In particular, it was the lack of an individualized determination that possession of firearms would pose a risk that offended due process: "Accordingly, the Adam Walsh Amendments violate due process by requiring that, as a condition of release on bail, an accused person be required to surrender his Second Amendment right to possess a firearm without giving that person an opportunity to contest whether such a condition is reasonably necessary in his case to secure the safety of the community. Because the

19

Amendments do not permit an individualized determination, they are unconstitutional on their face." *Id*. at 603.

On the other end of the spectrum, another New York district court upheld § 922(n) after *Heller* on an intermediate scrutiny standard of review in *United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011). The *Laurent* court chose intermediate scrutiny because § 922(n) prohibits receipt, not possession, and applies only for the time between indictment and acquittal or conviction. *Id*. at 104. On this point, *Laurent* seems to be inconsistent with the Fourth Circuit's analysis, which inquires whether the regulation burdens "the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc).

Proceeding under intermediate scrutiny, the *Laurent* court held that § 922(n) was not unconstitutional. *Id*. at 104 ("Because it is substantially related to an important government interest and is narrowly drawn to exclude the vast majority of gun holder, it survives intermediate scrutiny.") The court noted that § 922(n) was "less restrictive than other subsections of 18 U.S.C. § 922, which totally ban possession by particular categories of people, such as felons or misdemeanants convicted of domestic violence," which the court noted other courts had upheld. *Id*. at 104-105. It acknowledged that, "given the presumption of innocence, the government's categorical presumption that all individuals under indictment for a felony are more likely to misuse firearms is somewhat suspect." *Id*. at 105 (citations omitted). But, the defendant "was initially indicted in state court for crimes arising out of gun play in a residential building" and was "subsequently arrested after allegedly robbing another individual at gun point." *Id*. Therefore, the court held, "[t]he fact that Laurent was charged with the instant crime because he apparently committed a crime of violence while under indictment undermines any

claim he might have that § 922(n) is not substantially related to preventing him from engaging in further violence. He is hardly the law-abiding householder with a gun at home to protect his family. The statute is thus also not unconstitutional as applied to this defendant." *Id*.

*Laurent* is of limited use. First, its holding that only intermediate scrutiny applies, based on a temporal limitation, and a limitation on receipt, not possession, evades the threshold question the Fourth Circuit requires: whether the regulation burdens "the core protection of the Second Amendment, i.e., the right of law-abiding, responsible citizens to use arms for self-defense in the home." *Kolbe v. Hogan*, 849 F.3d 114, 138 (4th Cir. 2017) (en banc). By banning receipt, a person under indictment cannot even begin to exercise his fundamental Second Amendment right. And although the deprivation is time-limited, within the time it is in effect, it is total. It is not the temporal limit of the deprivation, but the degree of deprivation while it is in effect that matters. Even a one-day ban for a person otherwise entitled to possess a firearm would violate the Second Amendment.

Second, the *Laurent* court apparently based its decision on the particular defendant's violent history. This is, of course, a proper concern for pre-trial release conditions, *see* 18 U.S.C. § 3142, but does not explain why a blanket ban without regard to the nature of a defendant's indictment or individual characteristics is a narrowly tailored approach to advance the government's interest in public safety. Fourth Circuit precedent requires a more searching inquiry:

> We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. The government has offered numerous plausible reasons why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient

evidence to establish a substantial relationship between § 922(g)(9) and an important governmental goal.

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).

### 4.    *Strict Scrutiny Should Apply.*

The corollary of *Kolbe* is that, when a statute *does* effectively disarm individuals, and leaves them unable to acquire *any* firearm for protections, strict scrutiny should be the proper standard.  First, the prohibition in § 922(n) applies to all firearms, including handguns in the home for self-defense.  In fact, both of the firearms alleged in the indictment in this case were handguns.  As the Supreme Court has held, "[T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628; *see also Kolbe*, 849 F.3d at 138-139 (contrasting ban on unprotected assault weapons and high-capacity magazines with ban on handguns struck down in *Heller*).  One of the handguns was allegedly found in a bedroom dresser drawer, and so falls within the core of protected Second Amendment conduct sanctioned by *Heller* – possession of handguns suited to self-defense in the home.  The other handgun was allegedly rented at a gun range for a short time and never removed from the premises.  Although such possession is outside the home, it is still within the core of the Second Amendment.  The Amendment protects the right not only to keep arms, but to use them.  And proficient or effective use of a firearm in self-defense is impossible unless one has actual experience in using firearms.  It is impractical if not impossible to learn to operate a firearm when awoken in the middle of the night by a burglar.

Second, analogy to First Amendment cases confirms that strict scrutiny is appropriate.  *See Kolbe*, 849 F.3d at 133 ("In pinpointing the applicable standard of review, we may 'look[] to

the First Amendment as a guide.'") (quoting *Chester*, 628 F.3d at 682).  In the First Amendment

context, content-based restrictions on speech are presumptively invalid and subject to strict

scrutiny.  "On the other hand, so-called 'content-neutral' time, place, and manner regulations are

acceptable so long as they are designed to serve a substantial governmental interest and do not

unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres*,

Inc., 475 U.S. 41, 47 (1986).  The rule of scrutiny of Second Amendment claims, by analogy,

should be that complete deprivation of the right to arms (like the handgun ban in *Heller* or §

922(n)) burdens the core of the Second Amendment right and is subject to strict scrutiny; but

regulations that prescribe the manner in which the right can be exercised, but do not prohibit the

exercise of the right (such as licensing requirements, concealed carry laws, etc.) are subject to

intermediate scrutiny.  As a blanket ban on receipt of any firearms while under indictment, §

922(n) leaves no alternative means of exercising the fundamental Second Amendment right, and

is subject to strict scrutiny.

### 5.    *Title 18 U.S.C § 922(n) Fails Strict Scrutiny.*

"To satisfy strict scrutiny, the government must prove that the challenged law is

'narrowly tailored to achieve a compelling governmental interest.'" *Kolbe v. Hogan*, 849 F.3d

114, 133 (4th Cir. 2017) (en banc) (quoting *Abrams v. Johnson*, 521 U.S. 74, 82 (1997). There is

a poor fit between the blanket ban on receipt (and therefore new possession) of firearms

mandated by § 922(n), and the simple fact of the filing of a charge which triggers the ban.

Section 922(n) is not narrowly tailored; that is, it is not the least restrictive means to achieve the

goal of public safety.

Individuals charged with a crime by indictment or information are subject to court process – either a summons or an arrest warrant. *See* Fed. R. Crim. P. 9. Although the Fifth Amendment requires that federal felony charges only be issued on presentment by a grand jury, U.S. CONST. Am. V, states are free to charge individuals with crimes simply upon the signature of a prosecutor, with no independent review. *See generally Hurtado v. California*, 110 U.S. 516 (1884) (holding that grand jury clause of Fifth Amendment was not incorporated against the states); *see, e.g.*, Cal. Penal Code § 737 (authorizing felony charge by information). And the ban on firearms acquisition in § 922(n) is triggered by informations as well as indictments. *See* 18 U.S.C. § 921(a)(14) (defining "indictment" as "an indictment or information in any court under which a crime punishable by imprisonment for a term exceeding one year may be prosecuted."). Therefore, the trigger for disabling a person's fundamental Second Amendment right to acquire (a prerequisite for keeping) a firearm under § 922(n) is, in many states, subject to no grand jury review at all, and can be established only upon a state prosecutor's signature.

Upon arrest or appearance on a summons, an individual facing charges is subject to an individualized determination of whether he is a risk of flight or a danger to the community, after an adversarial hearing with significant procedural safeguards. *See generally* 18 U.S.C. § 3142; *see also United States v. Salerno*, 481 U.S. 739, 742-43 (1987) (describing procedural safeguards available for bail hearings). In this context, contrary to § 922(n), Congress has *not* made disarmament of the defendant a mandatory condition. *See* 18 U.S.C. § 3142(c)(1)(B)(viii) (allowing release subject to conditions "which *may* include the condition that the person -- . . . refrain from possessing a firearm, destructive device, or other dangerous weapon;")(emphasis added). Furthermore, the most recently available statistics from the Bureau of Justice Statistics shows that only 1.8% of federal defendants released under pre-trial supervision violate their

conditions by committing a new felony. *See* Bureau of Justice Statistics, *Federal Justice Statistics 2014 – Statistical Tables* at 15 (March 2017) (available at https://www.bjs.gov/content/pub/pdf/fjs14st.pdf).

Therefore no legal imagination is necessary to establish that a narrowly-tailored procedure is available to the government to advance its interest in public safety, and which allows deprivation of a fundamental Second Amendment right only when the need for it is established. Congress has enacted such a procedure with the Bail Reform Act, and placed that decision in the discretion of a court after an individualized determination. Section 922(n)'s blanket ban on the receipt of firearms by those against whom felony charges have been filed is not narrowly tailored to serve any interest in public safety.

## IV.    Counts One and Two Should Be Dismissed.

In Counts One and Two, Mr. Horma is charged with possession of a firearm while "an alien illegally or unlawfully present in the United States . . ." in violation of 18 U.S.C. § 922(g)(5)(A). ECF No. 9 at 1-2. Count One concerns a Smith & Wesson 9mm handgun and ammunition on September 21, 2016; and Count Two concerns a Ruger 9mm handgun and ammunition on November 12, 2016. *Id*.

Mr. Horma was admitted to the United States after inspection by immigration officers on December 29, 2013. His visa was set to expire on Jun 28, 2014. However, he filed an asylum application, Form I-589, before his visa expired. That application has been referred by United States Citizenship and Immigration Services to an Immigration Judge and is still pending.

The Fourth Circuit's decision in *United States v. Al Sabahi*, 719 F.3d 305 (4th Cir. 2013) is not to the contrary. In that case, the alien was applying for an adjustment of his immigration

status; Mr. Horma was under the status of an asylum applicant. Additionally, Mr. Horma's application for asylum was submitted while he was lawfully in the United States under a valid visa, unlike Al Sabahi, who had violated and overstayed his visa prior to filing his I-485 application.

Presence in the United States in such asylum applicant status, after application for such status was made when lawfully in the United States, should not be construed as "illegal" or "unlawful" within the meaning of 18 U.S.C. § 922(g)(5)(A).

## A. The Asylum Application Process

The current procedures for asylum were enacted as part of the Refugee Act of 1980, Pub. L. 96-212. Title 8 U.S. Code § 1158 provides in part:

**(a)  Authority to apply for asylum**

**(1)  In general**

Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

Thus, the right to apply for asylum does not depend on prior legal status, and cannot be asserted from abroad – only by an alien who is "physically present" within the border of the U.S.

The statute also establishes a time limit: an alien must file the application "within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). Subject to certain bars, asylum is available to an alien who establishes he is a "refugee," which is defined to include those who cannot or is unwilling to return to their country of last resident "because of persecution or a well-founded fear of persecution on account of race, religion, nationality,

membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1158(b)(1)(A); 8 U.S.C. § 1101(a)(42)(A) (defining "refugee").

A host of regulations govern the asylum application and adjudication process. *See generally* 8 C.F.R. Part 208. The regulations require affirmative claims of asylum to be filed on a Form I-589. *See* 8 C.F.R. §§ 208.3, 208.4. One of those regulations provides, in part:

> (a) An applicant who leaves the United States without first obtaining advance parole under § 212.5(f) of this chapter shall be presumed to have abandoned his or her application under this section.

8 C.F.R. § 208.8. Therefore, once an asylum applicant has filed a claim, he is effectively barred from leaving the country without forfeiting his application. Because asylum applications can take so long to process, and the alien cannot generally leave the country, the regulations provide that an asylum applicant can apply for work authorization after 150 days has passed. *See* 8 C.F.R. § 208.7.

**B.      An Alien Asylum Applicant Under a Period of Authorized Stay, Where the Application Was Filed Before the Expiration of a Valid Visa, is Not Unlawfully or Illegally Present in the United States.**

As described above, Mr. Horma followed the asylum application procedures. He submitted his asylum application on the proper forms, not only within 1 year of entry, but before his visa expired. He submitted to biometrics and attended scheduled interviews. In *Al Sabahi*, the alien, like Mr. Horma, entered on a 6-month nonimmigrant visa. 719 F.3d at 307. However, unlike Mr. Horma, he stayed "after his visa expired without obtaining authorization to do so." *Id*. After almost five years of illegal presence, Al Sabahi registered with the government. *Id*. When he was placed in removal proceedings, he married a U.S. citizen and filed an application to adjust his status to lawful permanent resident. *Id*. While he was out on bond from

immigration, over three years later, he was charged with possession of a firearm while illegally or unlawfully present. *Id*. at 307-308.

Al Sabahi argued that he was not present in the United States illegally because he had a pending adjustment application. However, the Fourth Circuit noted that "an alien who has acquired unlawful or illegal status (either by overstaying a visa or illegally crossing the border without admission or parole) cannot relinquish that illegal status until his application for adjustment of status is approved." *Id*. at 309 (quoting *United States v. Elrawy*, 448 F.3d 309, 314 (5th Cir. 2006)). After surveying cases from other courts, the Fourth Circuit held that he could not avoid the status of being unlawfully present by virtue of his pending application. *Id*. at 310.

However, there are two key differences between *Al Sabahi* and Mr. Horma's case. Unlike Mr. Al Sabahi, Mr. Horma never acquired illegal status because he filed his asylum application and voluntarily submitted to immigration authorities before his valid visa expired. That is, there was no point when he "acquired unlawful or illegal status . . . ." *Id*. at 309. Instead of overstaying his visa and waiting to be arrested, Mr. Horma filed his application while he was present legally. There was no gap, as there was in *Al Sabahi*, where he was present in the United States and not submitting to immigration authorities.

Second, Mr. Horma applied for asylum, and not adjustment of status. As discussed above, the right to apply for asylum cannot be asserted from abroad – only by an alien who is "physically present" within the borders of the U.S. *See* 8 U.S.C. § 1158(a)(1). And immigration regulations forbid an applicant from leaving the country without abandoning his application:

> (a) An applicant who leaves the United States without first obtaining advance parole under § 212.5(f) of this chapter shall be presumed to have abandoned his or her application under this section.

8 C.F.R. § 208.8.  Therefore, once an asylum applicant has filed a claim, he is effectively barred from leaving the country without forfeiting his application.

As the Fifth Circuit has noted, "Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *United States v. Elrawy*, 448 F.3d 309, 313 (5th Cir. 2006) (quotations omitted).  It further noted that "Illegal aliens are likely to be in that category because they are likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood." *Id*. (quotations omitted).  The Fourth Circuit has not expressly addressed this point, but did quote approvingly from *Elrawy* in *Al Sabahi*, 719 F.3d at 309.  Mr. Horma, however, does not fall within that class.  He entered after inspection on a valid visa.  He filed an affirmative asylum application, was represented by an immigration attorney, submitted to biometrics, and attended all of his interviews and appointments with immigration officers.  He was following established legal procedures to pursue his bona fide asylum claim.  Therefore he was not illegally or unlawfully present in the United States.

The Fourth Circuit in *Al Sabahi* cited to a 1993 case from the Eighth Circuit, *United States v. Bazargan*, 992 F.2d 844 (8th Cir. 1993) (among other cases) on the issue of determining when an alien is "permitted to remain in the United States," and instructed that the court should "look to the date of the status violation." *Al Sabahi*, 719 F.3d at 309. Although not controlling on this court, it should be noted that the Eighth Circuit in *Bazargan* failed to draw the distinction made here between an asylum application and an application for adjustment of status, finding that a person who had applied for asylum was in this country unlawfully under 18 U.S.C. §

922(g)(5). *See Bazargan*, 992 F.2d at 848. *Bazargan*, however, involved a person whose student visa was invalid at the time of his asylum application, which distinguishes *Bazargan* from this case. *See Bazargan*, 992 F.2d at 845. Additionally, the issue was limited to the defendant's argument that INS's grant of employment authorization was the rationale for the defendant being in the country lawfully.

Because Mr. Horma applied for asylum while legally in the United States and because his application for asylum can be distinguished from other immigration adjustment filings, Mr. Horma was not "illegally or unlawfully present in the United States" at the time of his alleged firearm possession under Counts One and Two. Therefore, those counts must be dismissed.

Respectfully Submitted,
Mohamed Abdellahi Horma.

By:       /s/
Counsel

Joseph S. Camden
Va. Bar No. 92143
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0830
Fax (804) 648-5033
joseph_camden@fd.org

Robert J. Wagner
Va. Bar No. 27493
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0808
Fax (804) 648-5033
Robert_wagner@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

Angela Mastandrea-Miller
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219

_____/s/_____
Joseph S. Camden
Va. Bar No. 92143
Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad St., Ste. 3600
Richmond, VA 23219
(804) 565-0830
Fax (804) 648-5033
joseph_camden@fd.org