UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA         }
                                 }
v.                               }         Criminal Case No.:
                                 }         18 MJ 19
MOHAMED ABDELLAHI MOHAMED HORMA  }

                                           February 5, 2018


**COMPLETE TRANSCRIPT OF PROBABLE CAUSE AND DETENTION**
**BEFORE THE HONORABLE RODERICK C. YOUNG**
**UNITED STATES MAGISTRATE COURT JUDGE**


APPEARANCES:

Angela Mastandrea-Miller, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
919 East Main Street
Suite 1900
Richmond, Virginia  23219

     Counsel on behalf of the United States


Joseph S. Camden, Esquire
OFFICE OF THE FEDERAL PUBLIC DEFENDER
701 East Broad Street
Suite 3600
Richmond, Virginia  23219

     Counsel on behalf of the Defendant




                KRISTA L. HARDING, RMR
                OFFICIAL COURT REPORTER
              UNITED STATES DISTRICT COURT

## E X A M I N A T I O N S

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Agent DePietto | 4 | 9 | 18 | -- |

1    THE CLERK:  In the matter of Criminal Case 18 MJ

2 19.  *United States of America v. Mohamed Abdellahi Mohamed*

3 *Horma.*

4    The United States is represented by Ms. Angela

5 Mastandrea-Miller.

6    The defendant is represented by Mr. Joseph

7 Camden.

8    Mr. Ihab Samra interpreting.

9    Are counsel ready to proceed?

10    MS. MASTANDREA-MILLER:  The United States is

11 ready.

12    MR. CAMDEN:  The defense is ready, Your Honor.

13    THE COURT:  All right.

14    Government.

15    MS. MASTANDREA-MILLER:  Good afternoon.

16    THE COURT:  Good afternoon.

17    MS. MASTANDREA-MILLER:  We are here for both the

18 probable cause and a detention hearing for Mr. Mohamed

19 Abdellahi Mohamed Horma who's been charged in a criminal

20 complaint with possession of a firearm by an illegal alien

21 in violation of Title --

22    THE COURT:  Get you to slow down just a little

23 bit –

24    MS. MASTANDREA-MILLER:  Okay.

25    THE COURT:  – for the interpreter.

1        MS. MASTANDREA-MILLER:  Oh, sorry.  Yes, sir.

2        In violation of Title 18, United States Code,

3   Section 922(g)(5).

4        The United States would call Special Agent

5   Bridgette DePietto to the stand.

6        THE COURT:  All right.  Please proceed.

7        THE CLERK:  Do you affirm under penalty of

8   perjury that the testimony you're about to give, in this

9   case, before this Court, shall be the truth, the whole

10  truth, and nothing but the truth?

11       AGENT DePIETTO:  Yes, I do.

12       Whereupon, **Agent Bridgette DePietto**, having been

13  duly sworn in, testifies as follows:

14                    **DIRECT EXAMINATION**

15  BY MS. MASTANDREA-MILLER:

16  Q    Good afternoon.

17  A    Good afternoon.

18  Q    Could you please state your name, and spell your last

19  name for the record.

20  A    My name is Bridgette DePietto.  D-E-P-I-E-T-T-O.

21  Q    And are you an agent?

22  A    Yes.  With the FBI.

23  Q    Okay.  And Agent DePietto, --

24       THE COURT:  You've got to slow down just a

25  little bit for the interpreter.

1              MS. MASTANDREA-MILLER:  All right.  Thank you.

2    BY MS. MASTANDREA-MILLER:

3    Q    As part of your duties and responsibilities with the

4    FBI, did you become involved in an investigation involving

5    the defendant in this case, Mohamed Horma?

6    A    Yes.

7    Q    And can you tell the Court what was he originally

8    initially charged with in terms of a felony charge in

9    Maryland?

10   A    In July of 2016, he was charged with a felony for

11   unstamped cigarettes.

12   Q    And is that similar to a cigarette trafficking –

13   A    Yes.

14   Q    – offense?

15   A    Yes.

16   Q    And is that a felony?

17   A    Yes.

18   Q    And are you aware of what the disposition was in that

19   case?

20   A    Yes.  He was found guilty.

21   Q    And was that in July of 2016?

22   A    Yes.

23   Q    And are you aware of additional charges that he had

24   that had been adjudicated as well?

25   A    Yes, I am.

1  Q    Now, before we get into the charges in Albemarle

2  County, I want to ask you are you aware that the defendant

3  is here in the United States illegally?

4  A    Yes, I am.

5  Q    And can you just briefly describe for the Court what

6  it is that you're aware of?

7  A    That Mr. Horma arrived in the United States around

8  December of 2013 on a V1 and V2 VISA.  He was permitted to

9  stay in the United States for a period of six months until

10 approximately June 2014, and he overstayed his permissible

11 time to stay in the United States.

12 Q    So he is here illegally in the United States at this

13 point in time?

14 A    Yes.

15 Q    And are you also aware that a firearm was purchased

16 on November 12th of 2016?

17 A    I am.

18 Q    Okay.  And can you describe for the Court the

19 circumstances surrounding that firearm purchase?

20 A    Yes.  On November 16th, Mr. Horma was arrested by

21 Albemarle County.  A search was done of his vehicle, it

22 was -- for a firearm was found in his vehicle.

23      A search warrant was issued of his residence.  During

24 that search, the firearm was found in the nightstand of

25 his bedroom in that apartment.  The firearm was purchased

1  on November 12, 2016.

2  Q    And the information set forth in the affidavit in

3  support of the criminal complaint, you prepared that,

4  correct?

5  A    Yes.

6  Q    And is all the information that's set forth in there

7  true and correct?

8  A    Yes.

9  Q    And that includes that it was a Ruger firearm that

10  was purchased?

11  A    Yes, it was a Ruger 9 millimeter.

12  Q    And in addition, that firearm was manufactured

13  outside of the Commonwealth of Virginia?

14  A    Yes.

15  Q    Okay.  And in addition to video available showing the

16  defendant and another individual going into the store to

17  purchase the firearm, are you aware of statements that

18  were made by other people, as well as the defendant, with

19  regard to that purchase?

20  A    Yes.  I'm aware of two individuals who had made

21  separate statements stating that the weapon was purchased

22  by someone else for Mr. Horma.

23  Q    And are you also aware that Mr. Horma is on videotape

24  post-*Miranda* making a statement with regard to the

25  purchase of that firearm?

1  A    Yes, I am.

2  Q    And during that interview, does he talk about the

3  fact that it was purchased because he didn't have a

4  quote/unquote, green card?

5  A    Correct.

6  Q    And also that it was -- he had the firearm because

7  the person who was the actual straw purchaser was too

8  stupid to keep that firearm, basically?

9  A    Correct.  That is what he said.

10  Q    And that his girlfriend was not mentally healthy

11  enough to keep the firearm?

12  A    Correct.

13  Q    Okay.  Now, just very briefly, and this would go

14  really toward the risk of flight.  Are you aware that

15  there is an ICE detainer on the defendant as well as our

16  own detainer?

17  A    Yes, I am.

18  Q    And could you also describe for the Court while the

19  defendant was on -- under charges in, I believe, Henrico

20  or Albemarle County, he was on home electronic monitoring,

21  correct?

22  A    Yes.  After he was arrested in November 2016, he was

23  bonded out under the terms that he wore an ankle monitor.

24  He was then arrested again in April 2017 while wearing

25  that GPS monitor for, again, possession of untaxed

1    cigarettes.

2    Q    And was he ultimately convicted of three separate

3    felonies involving that?

4    A    Yes.  He was convicted in Albemarle of a felony,

5    Chesterfield of a felony, Henrico of a felony.  And then

6    he served time in Henrico for those three felony charges.

7    Q    And just to be clear, at the time that he bought the

8    firearm was he also under indictment in Maryland for

9    cigarette trafficking charges?

10   A    Yes, for the July 2016 charges in Maryland.

11   Q    And that was a felon -- that's a felony, correct?

12   A    That was a felony charge, yes.

13           MS. MASTANDREA-MILLER:  Okay.  Thank you.

14           I have no further questions.

15           THE COURT:  All right.

16           Mr. Camden, any cross-examination?

17           MR. CAMDEN:  Yes, if I could quickly, Your

18   Honor.

19                    **CROSS-EXAMINATION**

20   BY MR. CAMDEN:

21   Q    Agent DePietto, so you said he was indicted in

22   Maryland in July of 2016, correct?

23   A    Yes.

24   Q    But he did not plead guilty immediately to that

25   charge, right?

1  A    I don't know exactly the amount of time from the time

2  of the charge to the plea in terms of what immediately

3  would mean for you.

4  Q    Would November 15, 2016, sound like about the date he

5  pled guilty in that case?

6  A    I believe that was his sentencing date.

7  Q    Okay.  So would November -- oh.  Have you checked the

8  status of that case or the docket of that case in Maryland

9  -- from the Maryland court website?

10  A    Have I checked the status?

11  Q    Yes.  Have you looked up the docket in that case?

12  A    Yes, I have.

13  Q    Okay.  If I could show you -- what's the -- so you

14  stated that he arrived on a non-immigrant VISA, right?

15  A    Yes.  A V-1 and V-2.

16  Q    Right.

17  A    In December 2013.

18  Q    Right.  And that he overstayed that VISA?

19  A    Yes.

20  Q    Okay.  Where -- what's your source for that

21  information?

22  A    The -- his Alien File, and information that was

23  reviewed by Special Agent Tom Duffey who's with Homeland

24  Security.

25  Q    Okay.  So you have seen his A-File?

1    A    I have seen his detainer and I have seen parts of his

2    A-File, yes.

3    Q    Okay.  And just for the record to be complete, an

4    A-File is a file that is created, and kept, regarding a

5    person who is not a U.S. citizen, correct?

6    A    An alien, yes.  That's my understanding.

7    Q    And it has -- in that file are contained all of the

8    documents regarding admissions to the United States or

9    encounters with immigration officers, correct?

10   A    I'm not exactly sure exactly what is in his A-File

11   and what every A-File includes.

12   Q    Okay.  You are aware though that he filed a claim for

13   asylum, correct?

14   A    I am aware that he did.

15   Q    Okay.  And you know that that was filed sometime in

16   May of 2014, correct?

17   A    I understand it was in 2014, yes.

18   Q    Okay.  And you understand it was before his

19   non-immigrant VISA expired, correct?

20   A    I believe it was, yes.

21   Q    And you know that for a person who is here who has a

22   pending asylum application, immigration officers, or ICE,

23   can allow them employment authorization, correct?

24   A    If they've filed for a claim for asylum after a

25   period of time, yes, you can apply for employment.

1  Q     And they can issue a social security number, correct?

2  A     Yes, they do.

3  Q     And those documents were in fact issued to Mr. Horma,

4  weren't they?

5  A     I believe so.

6  Q     Okay.  You're also aware that per the federal

7  regulations states that if a person leaves the country

8  without obtaining advanced parole, while an asylum

9  application is pending, that that application is deemed

10 abandoned, correct?

11 A     If he travels to the country for which he is seeking

12 asylum for, yes.

13        MR. CAMDEN:  For the witness for now, Your

14 Honor, just to sort of refresh her recollection first.  If

15 we need to introduce it, I'll mark it and introduce it.

16        MS. MASTANDREA-MILLER:  Your Honor, I'm going to

17 object.  There's no -- no question before her that her

18 recollection needs to be refreshed on.

19        THE COURT:  Right.  That was my question is what

20 are you refreshing?  I don't remember her saying anything

21 that --

22        MR. CAMDEN:  She stated that the -- an applicant

23 who goes back to the country from which they claim fear

24 would be deemed abandoned.  The regulation -- I mean, it

25 says --

1          THE COURT:  Well, you need to ask her another

2  question then.

3          MR. CAMDEN:  If I could then, Your Honor.

4  BY MR. CAMDEN:

5  Q    So you would agree that actually anybody who leaves

6  the United States regardless of which country they go to,

7  while they have a pending asylum application, if they

8  don't get advanced parole, that application is deemed

9  abandoned, right?

10  A    My understanding is that there are situations where

11  you can apply for a travel permit to travel to certain

12  countries, not the country that you're seeking asylum

13  from.

14  Q    Right.  But you have to apply -- and that's called

15  advanced parole, correct?

16  A    I don't recall what it's called.

17  Q    But if you do not obtain that permission, and leave

18  the country while an asylum application's pending, then

19  it's deemed abandoned, right?

20  A    Yes.

21  Q    Okay.

22  A    That is my understanding.

23  Q    You stated that, on direct examination, that two

24  individuals had asserted in interviews with police that

25  the firearm was purchased for Mr. Horma, right?

1   A    Correct.

2   Q    Who are those two people?

3   A    Teresa Abrams and Malik Sidya.

4   Q    Malik Sidya.  Okay.  Now, Malik Sidya was also

5   charged with cigarette smuggling, correct?

6   A    I believe he has been, yes.

7   Q    Okay.  And Malik Sidya, on the video that you

8   obtained from the War Store, was the person who actually

9   purchased the firearm, correct?

10  A    Correct.

11  Q    Okay.  Teresa Abrams, have you had occasion to

12  investigate her mental health?

13  A    I have not.

14  Q    Have you heard anything regarding her mental health?

15  A    Well, I mean, I have --

16  Q    Adverse information about her reliability as a

17  witness.

18  A    I have not heard anything about the reliability as a

19  witness.

20  Q    Have you heard that she was charged -- she had -- she

21  was in possession of marijuana at the time the search

22  warrant was executed?

23  A    Yes.

24  Q    Okay.  And that she admitted that the marijuana was

25  hers?

1   A    Yes.

2   Q    All right.  And you know that it's illegal for a

3   person to both possess marijuana and a firearm?

4           MS. MASTANDREA-MILLER:  Your Honor, I'm going to

5   object.

6           AGENT DePIETTO:  Yes.

7           THE COURT:  Hold on.  Hold on.

8           What's your objection?

9           MS. MASTANDREA-MILLER:  I'm going to object.

10  I'm not really sure what the relevance of whether or not

11  she was in possession of marijuana, a misdemeanor, or

12  whether she was -- if she has a conviction and he wants to

13  put it up for the Court's consideration, I don't think

14  this witness can answer as to whether or not she -- the

15  possession of marijuana relates to a lack of credibility.

16          MR. CAMDEN:  So, Your Honor, the witness wasn't

17  testifying from direct knowledge regarding the location of

18  where the firearm was found and who owned it.  She was

19  recounting information she had learned from those two

20  people, Mr. Sidya and Teresa Abrams.  So Teresa Abrams'

21  credibility directly influences whether the information

22  we're getting now in court today is reliable, so anything

23  that would go towards her credibility I think is relevant.

24          THE COURT:  Right.  So -- so your question about

25  whether or not she knew there was marijuana possession at

1    the time of her arrest, I thought at the time that this

2    was discovered is okay.

3           Asking the legal question, I don't see any

4    relevance to that, so that question is struck.

5           MR. CAMDEN:  Understood, Your Honor.  I think

6    it's judicial notice that that's illegal, so the argument

7    would be --

8           THE COURT:  Yes, I know that.

9           Go on to the next question.

10          MR. CAMDEN:  Understood, Your Honor.

11   A    Also just to clarify --

12          THE COURT:  Just a minute.  Let him ask a

13   question.

14   BY MR. CAMDEN:

15   Q    Were you present during the execution of the search

16   warrant on November 17th?

17   A    No.

18   Q    Okay.  But you did interview Teresa Abrams?

19   A    I did.

20          MR. CAMDEN:  One second.  Sorry, Your Honor.

21   Just one second to organize.

22   BY MR. CAMDEN:

23   Q    Are you aware that Mr. Horma has immigration counsel

24   representing him in the immigration proceedings?

25   A    I don't know if he currently has counsel.  I'm aware

1  that there was counsel during his asylum application

2  process.  I don't know if that's still the same counsel

3  that he has now.

4  Q    And you're aware that his next court date for a

5  hearing before an immigration judge was set -- scheduled

6  for the year 2021?

7            MS. MASTANDREA-MILLER:  Object, Your Honor.  I

8  don't see the relevance of when his next court date is as

9  far as the probable cause about whether or not he

10  possessed this firearm.

11           MR. CAMDEN:  The government wants --

12           MS. MASTANDREA-MILLER:  I don't see the

13  relevance of this.

14           THE COURT:  Just -- all right.

15           What's your response?

16           MR. CAMDEN:  Yes, Your Honor.

17           The government highlighted for the purposes of

18  risk of flight the existence of an immigration detainer.

19  The fact is he was in compliance with all the immigration

20  conditions, and he was out on bond in that case.

21           THE COURT:  Okay.

22           MR. CAMDEN:  And he had a pending court date, so

23  that's what I was trying to establish.

24           THE COURT:  Sure.  I'll allow it.  Go ahead.

25  BY MR. CAMDEN:

1  Q    So, you understand that his next court date had been

2  scheduled for the year 2021?

3  A    I recall seeing a piece of paper that said that it

4  was in 2021.

5  Q    Okay.  And so immigration officers were aware that he

6  was present in the United States?

7  A    Can you repeat the question?

8  Q    Immigration officers were aware that he was present

9  in the United States, correct?

10  A    I wouldn't assume.  But I also don't know what the

11  immigrations officers know.

12  Q    Well, a notice to appear which alleged that he was

13  deportable was issued in September 2015, right?

14  A    I believe so.

15  Q    And then there was a hearing where the next court

16  date was set, correct, in 2021?

17  A    That would be a hearing in front of the immigration

18  judge, yes.

19         MR. CAMDEN:  Okay.  No further questions, Your

20  Honor.

21         THE COURT:  All right.

22         Any redirect, Ms. Miller?

23         MS. MASTANDREA-MILLER:  Just very briefly, Your

24  Honor.

25                    **REDIRECT EXAMINATION**

1    BY MS. MASTANDREA-MILLER:

2    Q    After he applied for asylum, was he -- was it granted

3    or was it denied?

4    A    No, it was denied.

5    Q    And that doesn't change the fact that he is here on

6    an expired VISA, in other words, here illegally?

7    A    Correct.  It does not change that.

8            MS. MASTANDREA-MILLER:  No further questions.

9            THE COURT:  All right.

10           MR. CAMDEN:  I know it's out of order, Your

11   Honor, but that new information that it had been denied I

12   think needs to be addressed by (inaudible).

13           THE COURT:  No.  Thank you.  All right.

14           All right, Agent, you may step down.  Thank you.

15                    **WITNESS STOOD ASIDE**

16           THE COURT:  All right, Ms. Miller, call your

17   next witness.

18           MS. MASTANDREA-MILLER:  No further witnesses for

19   the United States, Your Honor.

20           THE COURT:  All right.

21           Mr. Camden, do you have any witnesses on the

22   issue of probable cause?

23           MR. CAMDEN:  No, Your Honor.

24           THE COURT:  All right.

25           Is there any argument on the issue of probable

cause?

MS. MASTANDREA-MILLER: Your Honor, I think we would submit unless the Court has any questions.

THE COURT: All right.

MS. MASTANDREA-MILLER: We would submit on probable cause.

MR. CAMDEN: Yes, Your Honor, if I could.

THE COURT: All right.

MR. CAMDEN: So 922(g)(5)(A) does require the government -- the element is that the person is unlawfully or illegally present in the United States. So the testimony so far has been that he was admitted pursuant to a VISA. He filed an affirmative asylum application while that VISA was still valid. And then that a person with a pending asylum application cannot leave the country unless in fact given permission to work and a social security number. And the evidence was so far that he's been compliant with the immigration requirements, so I don't believe that qualifies as illegally or unlawfully present in the United States.

I have to say I did a lot of research and the background for this. I was able to find some cases from other circuits saying that when a person had entered illegally and had a pending application to adjust status, that that still qualified as unlawfully or illegally

1  present.

2        The difference we've got here is that he had

3  legal authority at the time he crossed the border.  He

4  filed the application within -- before the expiration of

5  the VISA, and then he complied with the requirements that

6  state that the person is expected -- and this is -- sorry,

7  for the record, 8 CFR Section 208.8.

8        And it states, quote, "An applicant" -- and I'm

9  reading it for asylum.  This is part of the asylum

10 regulations.

11       "An applicant who leaves the United States

12 without first obtaining advance parole under

13 Section 212.5(f) of this chapter shall be presumed to have

14 abandoned his or her application under this section."

15       So there's no way when you -- once you start

16 that process you can't leave without permission, Your

17 Honor, without abandoning the application.

18       I won't get into, at this point I think -- well,

19 I can, but I'd want to seal the hearing, I think, if we

20 were to get into the reasons for the asylum application.

21       And that will go to risk of flight, so I'm

22 addressing just probable cause, Your Honor, right now.

23       THE COURT:  Right.  We're just doing probable

24 cause.

25       MR. CAMDEN:  Right.  So it's just that one

element, I think.  The testimony here pretty much

establishes that he had permission to be here.  His

presence in the United States at the point where he was

arrested was not unlawful or illegal.

THE COURT:  All right.

Any response to that, Ms. Miller?

MS. MASTANDREA-MILLER:  Just very briefly, Your

Honor.

I think the law is fairly clear, Your Honor,

that a person who is -- has overstayed his VISA, even if

he's applied for asylum, and that when that asylum is

denied, or even if that asylum was pending, he has

overstayed his VISA.  And there's cases that say exactly

that, that he can be prosecuted under 922(g)(5)(A) for

being here illegally in the United States.

The testimony before the Court is that he is

here illegally in the United States, that he applied for

asylum, that it was denied and now there's another pending

asylum case.  That has nothing to do with whether or not

he's here illegally.  That is -- he is trying to say,

look, I know I'm here illegally but I'm asking for

permission to stay in the country for whatever reason is

that he wants.  That doesn't change the 922(g)(5)(A)

status of the defendant.  That's number one.

Number two, the testimony the Court has also

1  heard is that he was under indictment at the time that he

2  purchased this firearm, which is also a crime under

3  922(g) -- 922(n), which while he hasn't been charged with

4  that at this point in time, that will be an additional

5  charge that's forthcoming.

6          To say that the defendant has followed the rules

7  while here in the United States is just not supported by

8  the testimony that the Court has heard.  He was convicted

9  of three separate cigarette trafficking felony offenses

10 while he was here in the United States, while he was on

11 bond and on home electronic monitoring or on a GPS

12 monitor.

13         THE COURT:  That might go more to detention than

14 probable cause.

15         MS. MASTANDREA-MILLER:  Exactly.  No, I'm --

16 yeah, I'm just addressing that as well, Judge, because I

17 thought that he was talking about that.

18         THE COURT:  Well, just let me (inaudible).

19         MS. MASTANDREA-MILLER:   Okay.

20         THE COURT:  Let me make a finding on probable

21 cause first, and then we'll deal with detention.

22         MS. MASTANDREA-MILLER:  Okay.  Thank you.  All

23 right.

24         THE COURT:  All right, Mr. Horma, based on the

25 evidence elicited during the hearing today, coupled with

1 the information contained in the criminal complaint, I

2 find there's probable cause to believe that you've

3 violated Title 18, United States Code, Section 922(g)(5).

4        All right, so now we'll pivot to the issue of

5 detention.

6        Government, do you have any evidence on the

7 issue of detention?

8        MS. MASTANDREA-MILLER:  No evidence, Your Honor.

9 Just argument.

10        THE COURT:  All right.

11        Mr. Camden, do you have any evidence on the

12 issue of detention?

13        MR. CAMDEN:  If I could for one second, Your

14 Honor.

15        Just what's in the presentence -- sorry, the

16 pretrial services interview, Your Honor.  I've got some

17 documents from his immigration case, but I'm also

18 (inaudible).

19        THE COURT:  All right.

20        Government, let me hear your argument.

21        MS. MASTANDREA-MILLER:  Your Honor, just to kind

22 of continue what I was saying a few minutes ago.  First,

23 it's clear that Mr. Horma is here illegally in the United

24 States.  But beyond that, while he was on a pretrial

25 release on another felony matter, he continued to disobey

1  orders of the Court and was charged with cigarette

2  trafficking in which he was subsequently convicted.

3          If we look at his criminal record since he has

4  been here, he's been charged, and found guilty, of

5  reckless driving, speeding, driving without a license

6  multiple times, and then found guilty of transporting

7  unstamped cigarettes with a July 29th, 2016, guilty in

8  Howard County Circuit Court in Maryland, and then

9  sentenced on November 15th to 11 months of confinement.

10          Then in the midst of all of that, he is charged

11  with fraudulent purchase of cigarettes, another felony

12  offense.  His bond was revoked on that, and then he was

13  ultimately found guilty of felony possession with intent

14  to distribute 40,000 cigarettes in Henrico.

15          And then November 17th of 2016, charged in

16  Albemarle County with possession of cigarettes with intent

17  to distribute, and found guilty of that.  Again, a felony.

18          And then in March of 2017, he's found guilty of

19  violating the conditions of pretrial release.

20          And then in April of 2017, he's found guilty of

21  possession of cigarettes with intent to distribute on

22  August 8th of 2017.

23          So during the entire time that he has been here

24  between 2015 and 2017, he's done nothing but disobey

25  orders of the Court, failed to follow the supervised --

1 supervision terms and conditions, committed felony

2 offenses while on pretrial release while on bond, and

3 purchased a firearm while he is illegally here in the

4 United States through a straw purchaser, and admitted to

5 doing so. The testimony that the Court heard was not just

6 that the girlfriend that he had at the time said that he

7 had done that, in that the straw purchaser admitted that

8 he had done that, but that defendant himself also admitted

9 to having done it. That he possessed that firearm through

10 a third party because he knew he couldn't buy it because

11 he wasn't here legally in the United States.

12 So based on all the circumstances, the United

13 States would argue to the Court that he is both a risk of

14 flight and a danger to the community. Possession of a

15 firearm is a serious matter. Having a firearm for any

16 purpose, especially when you look at the fact that he is a

17 convicted cigarette trafficker, which involves significant

18 sums of cash on hand, it seems that possession of that

19 firearm had to be at least in part, if not all, for the

20 reason of him having to protect the proceeds of his

21 illegal activities.

22 So based on all of that information, Your Honor,

23 we'd ask the Court to find that there are no conditions,

24 or a combination of conditions, that would allow the

25 community to remain safe or ensure his return to court.

1          THE COURT:  All right.

2          Mr. Camden.

3          MR. CAMDEN:  A few things, Your Honor.  None of

4    the allegations anywhere in this case involve any credible

5    violence, threats of violence, or risk of violence.  This

6    is cigarette smuggling, which obviously is illegal, but

7    it's not in the same category as, say, drug trafficking

8    where people have to settle their debts or their disputes

9    through use of firearms, first.

10         Second, and regarding the risk of danger, I

11   would note all of -- the government says, for example,

12   that he was convicted of reckless driving.  These are

13   reckless driving simply by speed.  I think it was more

14   than 20 over 80 miles an hour.  Yeah, reckless driving,

15   speeding 20 miles or more over the speed limit, and then

16   reckless driving, again, it was just speeding.  So no

17   conduct that actually, in that particular case, put a

18   person at risk.  The law in Virginia is simply that

19   speeding more than 20 miles over a speed limit is, per se,

20   reckless driving, first.

21         Second, he does have a friend here in court, a

22   cousin or a distance family member here, to support him.

23   I will say we're not going to proffer him as a third-party

24   custodian at this point.  He has offered to allow

25   Mr. Horma to stay with him until he gets back on his feet

1 and is able to get a job since he does have employment

2 authorization; however, he also has certain charges. I

3 believe this investigation stems or spans a lot of

4 cigarette smuggling activities alleged, and it's possible

5 that there's some charges pending against him, so I don't

6 -- I'm not comfortable proffering him at this point.

7 However, he does have support from relatives that we've

8 been in touch with that live in Arlington and in Henrico.

9 I have been in touch with his immigration

10 attorney, the one who forwarded me a lot of his documents.

11 They are actively representing him on that case, Your

12 Honor. So the fact that there is an immigration detainer

13 I think should not preclude the Court from considering

14 conditions of release.

15 If he goes into immigration custody, he would

16 very likely, I hope at least, but he would at least have a

17 chance to argue that he should be allowed to bond out

18 pending those further proceedings.

19 His asylum claim was preliminary denied by

20 USCIS. The way these go is you apply to U.S. Citizenship

21 and Immigration Services first, they issue a decision

22 about whether to grant it or deny it, and then if they

23 deny it then you're sent to an immigration judge and

24 you're still allowed to claim it. This is not the end of

25 the road for him. He still has this pending application

1  that could be adjudicated.

2       I think the Court can see some of the basis for

3  the asylum claim in the pretrial services report.  I'd

4  like to avoid stating it publicly, but especially at

5  page -- I believe Page 3 in the very middle -- actually,

6  under the mental health section, and also regarding his

7  spouse listed on Page 1.

8       THE COURT:  I saw that.

9       MR. CAMDEN:  Yes, Your Honor.

10      So in the country from which he was fleeing was

11 Martinia, so this is not somebody who can simply, you

12 know, gather the funds and go back to wherever they came

13 from in order to flee the jurisdiction of the Court.  He's

14 got nowhere else to go.  He is established here, he has

15 family here, and he is -- certainly, there's no indication

16 that he fled the Court's jurisdiction in any of the other

17 pending cases.

18      I believe given these circumstance that GPS

19 monitoring -- since he doesn't have a third-party

20 custodian, I would ask for GPS monitoring, electronic

21 location monitoring.

22      I can come back to the Court if the Court wanted

23 to delay the order for a little bit as soon as we can find

24 somebody who's a suitable person with whom he could live.

25 In the meantime, the Court could set as a condition that

1  pretrial services arrange for a temporary halfway house or
2  housing.
3          I think the important thing for him is to get
4  back to -- in touch with his lawyer and pursue his asylum
5  claim, to get that done, and to be able to work to help
6  support himself since he's pretty much without any sort
7  of -- obviously, his parents and his siblings are
8  unavailable to help him with this.
9          So, those are the reasons, Your Honor, I would
10 ask the Court to set conditions of release.
11         THE COURT:  Thank you.
12         All right, Mr. Horma, would you stand up where
13 you are, please.
14         All right, after considering the evidence
15 elicited both during the preliminary hearing and the
16 detention hearing and the argument of counsel, and the
17 pretrial services report, the Court finds by clear and
18 convincing evidence that there are no conditions, or a
19 combination of conditions of release, that will reasonably
20 assure the safety of any person and the community.
21         And the Court also finds by a preponderance of
22 the evidence that there are no conditions, or combination
23 of conditions of release, that will reasonably assure your
24 appearance at further proceedings.
25         And I make these findings based on the

1  following:

2         One, the weight of the evidence against you is

3  strong.

4         Two, you're subject to a lengthy period of

5  incarceration if you're convicted.

6         Three, you have a prior criminal history that

7  includes three felony convictions for cigarette

8  trafficking or like offenses of cigarette trafficking.

9         Four, there's evidence that you participated in

10 criminal activity while on supervised probation.

11        Five, you have significant ties outside of the

12 United States.

13        Six, there's a lack of legal status in the

14 United States.

15        Seven, you're subject to removal or deportation

16 as there's a pending ICE detainer on you.

17        And eight, there's evidence in your criminal

18 history of prior violations while you were in pretrial

19 release status.

20        So when I look at all of those things, sir, I

21 don't believe that I can fashion any conditions, or a

22 combination of conditions, under which I can release you.

23        So I'm going to remand you to the continuing

24 custody of the United States Marshals pending

25 consideration of this matter by the grand jury.

1    Is there anything else from the government?

2    MS. MASTANDREA-MILLER:  Nothing else at this

3  time.  Thank you, Your Honor.

4    THE COURT:  Anything else from you, Mr. Camden?

5    MR. CAMDEN:  I would ask for clarification of a

6  backup probable cause issue.  The Court found that there

7  was probable cause, but I think we need a little more

8  detail about it.  Is the Court saying that -- well, the

9  factual findings, is the Court saying that he is illegally

10 or unlawfully present in the United States if he –

11    THE COURT:  Yes.

12    MR. CAMDEN:  If he has a pending asylum

13 application filed while he had regular status?

14    THE COURT:  Yes.

15    MR. CAMDEN:  And stays beyond that?

16    THE COURT:  Yes.

17    MR. CAMDEN:  Because I noted the government

18 proffered that there were cases, and didn't actually

19 provide any cases and I wasn't able to find any.

20    THE COURT:  Yes.  Thank you.

21    Anything else?

22    MS. MASTANDREA-MILLER:  Nothing else, Your

23 Honor.

24    THE COURT:  We'll stand in recess.

25

REPORTER'S CERTIFICATE

          I, Krista Liscio Harding, OCR, RMR,
Notary Public in and for the Commonwealth of
Virginia at large, and whose commission expires
March 31, 2020, Notary Registration Number 149462,
do hereby certify that the pages contained herein
accurately reflect the recording transcribed by me,
to the best of my ability, in the above-styled
action.
     Given under my hand this 2nd day of April, 2018.


                    _____
                    Krista Liscio Harding, RMR
                    Official Court Reporter