IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                    )
UNITED STATES OF AMERICA            )
                                    )
v.                                  )    Criminal No.
                                    )    3:18CR18
MOHAMED ABDELLAHI MOHAMED HORMA )
_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ )    July 9, 2018


COMPLETE TRANSCRIPT OF MOTION TO DISMISS
BEFORE THE HONORABLE M. HANNAH LAUCK
UNITED STATES DISTRICT JUDGE


APPEARANCES:

Angela M. Miller, Assistant United States Attorney
Office of the U.S. Attorney
SunTrust Building
919 East Main Street, Suite 1900
Richmond, Virginia  23219

        Counsel for the United States

Robert J. Wagner, Assistant Federal Public Defender
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600

Richmond, Virginia  23219

        Counsel for the Defendant

                DIANE J. DAFFRON, RPR
              OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT

I N D E X


E X H I B I T S

Page

GOVERNMENT'S EXHIBITS

Nos. 1A, 1B, 1C, 1D, 1E                          23

No. 2, 3, 4, 5, and 6                            23


DEFENDANT'S EXHIBITS

No. 1                                            24

No. 2                                            24

1          (The proceedings in this matter commenced at

2     2:09 p.m.)

3

4          THE CLERK:  Case No. 3:18CR18, the United

5     States of America versus Mohamed Abdellahi Mohamed

6     Horma.

7          Ms. Angela Mastandrea Miller represents the

8     United States.

9          Mr. Robert J. Wagner represent the defendant.

10         Are counsel ready to proceed?

11         MS. MILLER:  The United States is ready, Your

12    Honor.

13         MR. WAGNER:  Mr. Horma is ready.

14         THE COURT:  First, I wish Mr. Camden well on

15    the addition to his family.

16         MR. WAGNER:  Thank you, Your Honor.

17         THE COURT:  Now, I understand we need to

18    re-arraign on the superseding indictment.  Is that

19    correct?

20         MS. MILLER:  That is correct, Your Honor.

21         MR. WAGNER:  Yes, ma'am.

22         THE COURT:  Why don't we go ahead and do that

23    first.

24         MS. MILLER:  If I may have just a moment,

25    Your Honor?

1        THE COURT:  Of course.

2        MS. MILLER:  Thank you.

3        THE COURT:  Uh-huh.

4        MS. MILLER:  Good afternoon.

5        THE COURT:  Good afternoon.

6        MS. MILLER:  Mr. Mohamed Abdellahi Mohamed

7   Horma has been charged in a superseding indictment.

8   The superseding indictment has the same exact charges

9   as the original indictment, just some corrections that

10   we made to it.

11        Count One charges that on or about

12   September 21, 2016, Mr. Horma, being illegally and

13   unlawfully in the United States, did knowingly and

14   unlawfully possess a firearm, to wit:  A Smith &

15   Wesson 9mm handgun, in violation of Title 18, United

16   States Code, Section 922(g)(5)(A).

17        In Count Two, he's charged on or about

18   November 12, 2016, in the Eastern District of

19   Virginia, being an illegal alien, he did possess a

20   Ruger 9mm handgun in violation of Title 18, United

21   States Code, Section 922(g)(5)(A).

22        If convicted of either of those charges, he

23   faces a penalty of up to 10 years incarceration, a

24   $250,000 fine, and three years of supervised release.

25        In Counts Three and Four, he's charged on or

about September 21, 2016, and on November 12 of 2016,
after having been indicted for a crime punishable by a
term of imprisonment exceeding one year, that is
felony transport unstamped cigarettes, that he did
willfully receive a firearm in Count Three, the Smith
& Wesson just referred to, and in Count Four, the
Ruger semiautomatic handgun just referred to, in
violation of Title 18, United States Code, Section
922(n) and 924(a)(1)(D). If convicted, he faces up to
five years incarceration, a $250,000 fine, and three
years of supervised release.

In Count Three -- I'm sorry -- in Count Five,
he's charged that on or about November 12 of 2016, he
did aid and abet in the making of a false statement in
the acquisition of a firearm, that is a firearm that
was purchased at the War Store, and that is in
violation of Title 18, United States Code, Section
922(a)(6) and (2). If convicted, he faces up to 10
years incarceration, a $250,000 fine, and three years
of supervised release.

There's also a forfeiture allegation that if
he's convicted of the offenses alleged in Counts Two,
Four, and Five of this indictment, that he would
forfeit to the United States a Ruger 9mm firearm and
all accompanying ammunition.

1    THE COURT: Are there also potential

2  immigration consequences?

3    MS. MILLER: There are, Your Honor. That is

4  part of two of the counts, that he's here illegally in

5  the United States. So he would be subject to

6  deportation as a result of the convictions, any of

7  these convictions.

8    THE COURT: And it would affect his ability

9  to reenter the United States on a legal basis?

10    MS. MILLER: It would affect his ability to

11  pursue his asylum application that's pending, and it

12  would also potentially affect his ability to reenter

13  the United States.

14    THE COURT: That's part of the maximum

15  possible penalties is what I'm asking.

16    MS. MILLER: Yes.

17    THE COURT: It's different for somebody who

18  is a citizen and someone who is not.

19    MS. MILLER: That's correct.

20    THE COURT: All right.

21    MS. MILLER: Thank you.

22    THE COURT: All right. Mr. Wagner, is your

23  client prepared to be arraigned?

24    MR. WAGNER: He is, Your Honor.

25    THE COURT: All right. If you-all could

stand just where you are.  I think the translation is
more readily conducted there.  We can arraign the
defendant.

THE CLERK:  Does the defendant waive formal
reading of the indictment?

MR. WAGNER:  He does.

THE CLERK:  Mohamed Abdellahi Mohamed Horma,
do you understand the charges against you in the
pending superseding indictment?

THE DEFENDANT:  (Through an interpreter)
Yes.

THE CLERK:  I ask you now, what is your plea
to Counts One through Five; guilty or not guilty?

THE DEFENDANT:  (Through an interpreter)  Not
guilty.

THE CLERK:  Do you request a trial by jury or
a trial by the Court?

MR. WAGNER:  Jury, please.

THE COURT:  All right.  You-all may have a
seat.

So we're here on the defendant's motion to
dismiss.  And I'm going to ask you all if you have
talked about how you want to proceed, including
whether either side is planning on presenting any
evidence.

1    MS. MILLER:  Your Honor, we have discussed

2  that, if I may approach.  We were prepared to have an

3  immigration officer testify, Officer Chin, today, but

4  we have also spoken about an agreement of

5  stipulations.  So I'll orally put them on the record,

6  and then if the Court would like me to file with the

7  Court formal stipulations in the case so that the

8  Court has it on the record, that would be fine as

9  well.

10    But the parties are agreeing to stipulate

11  that the defendant is a citizen of Mauritania.  He

12  came to the United States as an adult on a B1/B2 visa.

13    THE COURT:  You're going to have to say

14  capital or small whatever.

15    MS. MILLER:  Capital B1 slash capital B2

16  visa.  He arrived in the United States on December 29,

17  2013, and his visa expired on June 28, 2014.

18    In or about March of 2014, the defendant

19  filed a petition for asylum.  The petition, after

20  going through the first round of analysis, was deemed

21  not credible.

22    The defendant then filed, through his

23  attorney, additional information asking for

24  reconsideration.  The petition was again reviewed and

25  deemed not to be credible.

1          In 2016, the defendant was placed in removal

2    proceedings with his case referred to an immigration

3    judge.  That matter was set for 2023.

4          THE COURT:  2023, not 2021?

5          MS. MILLER:  I may have made a typo in there.

6    I'll go back and check.  I have his immigration

7    paperwork.  I thought it was 2023, but now that you

8    say that, I think it might be 2021.

9          THE COURT:  The brief said 2021.

10         MS. MILLER:  Is it 2021?

11         THE COURT:  I don't know.  That's what your

12   brief said.  I don't have the documentation.

13         MS. MILLER:  I do.  I filed it with the

14   Court, but I have another copy of these materials for

15   the Court as a government exhibit.  It's also been

16   provided to the defense, so --

17         THE COURT:  I'm sorry.  When was that filed?

18         MS. MILLER:  Maybe a month or two ago.

19         THE COURT:  Okay.

20         MS. MILLER:  I'm going to have to look

21   through the A file, which I have with me, Your Honor.

22   It's not in the documents that I'm filing with the

23   Court that has the date of it.  And then I'll clarify

24   for our argument.  But it was sometime, you know,

25   several years from now that he was supposed to be in

1   front of the immigration court.  And after he was

2   brought here to federal court on the current charges,

3   that date was moved to August of 2018.

4         The defendant was charged on July 13, 2016,

5   in Howard County, Maryland, via an indictment with

6   transporting cigarettes on which the tobacco tax had

7   not been paid in violation of the Maryland Tax-General

8   of the Annotated Code of Maryland, T-G 13-1015.

9         The indictment reads that this was contrary

10   to the Act of the Assembly and made and provided, and

11   against the peace, government, and dignity of the

12   state.

13         MR. WAGNER:  Judge, I think for purposes of

14   stipulation, the indictment itself would speak to

15   this.  I don't know that we want to necessarily

16   stipulate to what the indictment says.  We didn't

17   discuss this specifically, but I would just ask that

18   the indictment be produced rather than having a

19   stipulation as to what it says.

20         MS. MILLER:  We'd be happy to do that, Your

21   Honor.

22         MR. WAGNER:  Thank you.

23         MS. MILLER:  We'll provide it to the Court.

24   I will just tell the Court that Count Two in the

25   indictment is a misdemeanor, and we're not alleging

1   that in the indictment here.

2           THE COURT:  Just to be clear for the record,

3   Count Two of the Maryland indictment is a misdemeanor.

4           MS. MILLER:  We're talking about Count Two of

5   the Maryland indictment.  So, he's charged in a

6   two-count indictment --

7           THE COURT:  Right.  I know.  I'm just making

8   clear for the record --

9           MS. MILLER:  Yes, thank you.

10          THE COURT:  -- because we have an indictment

11  in front of us.

12          MS. MILLER:  Yes.

13          The defendant was arraigned on the charges in

14  early September 2016, and it was after that date that

15  he's alleged to have received the firearms.

16          THE COURT:  Can I ask you a question.  Why

17  are you guys not just putting the dates on the record?

18          MS. MILLER:  What dates?

19          THE COURT:  You're saying "early 2016,

20  sometime in March."

21          MS. MILLER:  Because I have -- I don't have

22  the actual paperwork in front of me, but I have it in

23  my file here.  So I can do that.  I didn't think I was

24  going to have to put it on the record today.  I

25  thought I was going to have an agent testifying to the

1   complete file.

2           But I can tell the Court that he was stopped

3   in Howard County, Maryland, on July 16th of 2016.  He

4   was indicted in the indictment that I just made

5   reference to on July 27th of 2016.  He appeared in

6   court in Maryland in early September.  I have the date

7   in my file.  I don't have the date in front of me.  I

8   believe it's September 2nd or 4th, but I want to

9   clarify that for the Court.

10          THE COURT:  I'm going to want written

11  stipulations.  This is a little mushy for me.  One of

12  the firearms is alleged to have been possessed in

13  September of 2016.  You're making it clear it was

14  before the 21st.  I understand what you're doing.

15          MS. MILLER:  That's all, yes.  That's all I'm

16  saying.

17          THE COURT:  It's just --

18          MS. MILLER:  Prior to that date, yeah.  We'll

19  put the dates, the exact dates in the written

20  stipulation to the Court, but we just want the Court

21  to be aware at this point that it was, as the Court

22  just said, prior to -- after indictment but prior

23  to -- it's actually just after indictment and after he

24  was aware that he was indicted.  After his appearance

25  in state court on that indictment he acquired the two

firearms.

I'll tell the Court that I believe that the only other thing that we would stipulate and agree to is that on November 15th, he pled guilty to the felony charge in Maryland.

THE COURT: November 15 --

MS. MILLER: 2016.

THE COURT: And he was sentenced to 11 months imprisonment?

MS. MILLER: He was sentenced to 11 months with all the time suspended. He received a fine. And I can tell the Court the amount of the fine, but it was --

THE COURT: This is a little awkward; right? I may have questions about some of this stuff.

MS. MILLER: I think we can agree to the answers to the Court's questions about it, though.

THE COURT: Yeah, but I'm not working from the stipulation that you've agreed to, and it's awkward to have stipulations only oral.

MS. MILLER: I understand.

THE COURT: I mean, obviously, this has been set for awhile; right?

MS. MILLER: Well, we're going to hand up to the Court today, while Mr. Wagner is arguing, we will

1  provide the Court with documentation for everything

2  that I just said, because we have all of that today in

3  the files here.  So, we can certainly provide that to

4  the Court, and we'll mark it as an exhibit.  We'll put

5  it all together.  You'll have a copy of the

6  indictment, a copy of the plea, a copy of the -- I

7  could give you a copy of the transcripts of the plea

8  hearing, and a copy of the transcript of his

9  arraignment, and that would have all of these dates

10 noted in that, and then it would be filed by --

11        THE COURT:  So these exhibits that you have

12 that you filed, are those exhibits that are before me

13 for purposes of the motion to dismiss?

14        MS. MILLER:  Yes, they are.  We're entering

15 them into evidence at this point as well.  That's

16 exhibits 1A, 1B --

17        THE COURT:  All right.  So, my clerk is

18 telling me that the United States did not file

19 anything in the CM/ECF, but that the defendant filed

20 his A file.  So whatever you're saying was filed about

21 a month ago, I didn't remember seeing, but that

22 doesn't mean -- I'm often wrong, but my clerk is

23 almost never wrong, and she says --

24        MS. MILLER:  I hand-delivered it to the

25 Court.  I didn't file it in the ECF filing system.  I

1  filed it to the extent that I brought it to the Court

2  so that the Court would have it in advance of the

3  hearing, and I brought it -- and I provided it on the

4  same day to the defendant.

5         THE COURT:  So it's a courtesy copy, but it's

6  not in the record.

7         MS. MILLER:  That's right.

8         THE COURT:  It's a courtesy copy of something

9  that's not in the record.

10        MS. MILLER:  And we have them marked and are

11 asking to put them into the record, without objection

12 by the defendant, the exact same documents which were

13 marked for the Court when we hand-delivered them as

14 1A, B, C, and D, and it's just documents taken from

15 the A file.

16        THE COURT:  Did you deliver them to our

17 chambers?  We actually seem not to have gotten them.

18        MS. MILLER:  Yes, we did deliver them to your

19 chambers.

20        THE COURT:  Well --

21        MS. MILLER:  They are all documents that are

22 also in the A file, Your Honor, that was filed by the

23 defendant.

24        THE COURT:  Apparently, all that was filed

25 was the asylum application, not the A file.

1    MS. MILLER:  Okay.  I'm going to --

2         THE COURT:  So we're going to take a recess.

3    I'd like you to be a little more specific about what

4    exactly is in front of me or not.  And you all can

5    have agreed to it.  And, obviously, there were papers

6    delivered to us that we didn't get, which happens, but

7    I want to make sure that I have them available to me

8    and that I know the record we're dealing with before

9    we go forward.

10        So we'll just take a few minutes.  It sounds

11   like it changed pretty soon to when I was about to

12   take the bench.  So we'll just give you the

13   opportunity to be a little more direct, and so that I

14   can be sure I have what I want also.

15        MS. MILLER:  Sure.

16        THE COURT:  All right.  So we'll take a

17   recess.

18        MS. MILLER:  All right.  Thank you.

19        (Recess taken.)

20        THE COURT:  All right.  So where do things

21   stand?

22        MS. MILLER:  So, we have a set of documents

23   for the Court that defense and obviously I have, that

24   we'll hand up, that go through all the dates that the

25   Court was asking about and the documents that we were

1    referring to.  So I think that would make things

2    easier, hopefully.  I will hand those up to Your

3    Honor.

4              THE COURT:  So, I'm just going to state, Ms.

5    Miller, I understand that what happened is there were

6    documents that were emailed to my clerk outside of the

7    normal process of submitting documents, and that's why

8    we weren't really aware of them.  And I'm going to ask

9    that that process stop altogether.

10             MS. MILLER:  Yes, that was just a courtesy

11   copy in advance of the hearing.  We were planning to

12   introduce them at the hearing.

13             THE COURT:  I think that what I said was if

14   you're going to introduce proposed exhibits, there is

15   a way to submit on CM/ECF what might be proposed

16   exhibits.  It wasn't a secret.  I'm sure that the

17   federal public defender was also notified.

18             But, for instance, you are handing me up

19   exhibits now that have A numbers on them, which

20   there's a process for redacting information from A

21   files.  And so I'm hoping that you all have considered

22   how these are getting entered into the record.

23             MS. MILLER:  Well, for the purpose of this

24   hearing, we're going to provide them to the Court as

25   exhibits as marked, and then we'll provide a second

set for the record, for the public record that will be
redacted, but I think for the purpose of what we were
going to do today, which was to put them in through an
agent, we wanted to have the set unredacted so that
the A file numbers and the dates of birth and all that
would be available to the agent in case there was an
issue about whether this was his A file or something
like that.

So we will provide a set through the filing
system, along with the stipulation, but they'll be
redacted to have no personal identifiers included.
And there will, obviously, not be any references to
his reasons for filing for asylum, because I think
that was a concern as well.  So we'll take that out.
But we'll work together to do that at the end of the
hearing or tomorrow and file that with the Court.
Then either later today or tomorrow, whenever we sit
down, and make sure that we both agree to the
redactions.

THE COURT:  All right.  Just give me a
second, please, to look at these.

MS. MILLER:  Sure.

THE COURT:  So, in your briefing, you all
referred to a specific date of application for asylum.
Your stipulation that you said to me at the beginning

1  of this hearing did not specify -- well, I actually

2  think they might have been inconsistent.  And so I

3  want to be sure that we address what that date is.

4        I certainly don't have a document that

5  reflects that.

6        MS. MILLER:  I think that we said -- I said

7  aloud that it was March of 2014, but we are

8  stipulating that in between the date of his arrival

9  and the expiration of his B1/B2 visa that he applied

10 for asylum.

11       I don't have his actual -- the actual date of

12 when he stamped it and sent it in the mail.  I would

13 know when it was received but not when it was sent.

14       So I think in the defendant's position, he

15 said sometime before the expiration.

16       THE COURT:  Right.  Somebody represented that

17 it was February 13th, and I think that was in your

18 briefing.

19       MS. MILLER:  Okay.  Then I took that from the

20 file.  But for purposes of the stipulation, we're just

21 agreeing that it was before the B1/B2 visa expired

22 that he filed his asylum.

23       THE COURT:  What if I thought the date were

24 important?

25       MS. MILLER:  Well, if the Court thinks that,

1  we'll pull the file right now, and we'll tell you the

2  exact date.

3        The issue that they brought up in their

4  motion is that prior to the expiration.  He doesn't

5  say when.

6        I'm trying to fill in the blanks for the

7  Court as best I can.

8        THE COURT:  Both briefs refer to, or at least

9  the government's brief, I can't remember now, about an

10  application for work authorization that was approved.

11  Do you have a date for that?

12        MS. MILLER:  It was not in my brief, Your

13  Honor.  I can look it up.

14        MR. WAGNER:  Judge, I believe our opening

15  brief speaks to his authorization.

16        THE COURT:  Right.

17        MR. WAGNER:  On page two.

18        THE COURT:  On page two.  It doesn't have a

19  date.

20        MR. WAGNER:  I'll try to get that for the

21  Court.

22        MS. MILLER:  So, I don't have the date that

23  he applied for work authorization.  Mr. Wagner said

24  he'll get that for the Court.  But he signed the

25  application for asylum on February 4th of 2014, and it

1  was noted as having been received February 13th with

2  an interview date -- February 13th of 2014 with an

3  interview date of March 26th of 2014.

4          THE COURT:  Well, the February date was one

5  that was in the briefing.  So I would prefer to have

6  that document in the record.

7          MS. MILLER:  Okay.  His application for

8  asylum was already filed with the Court under seal; is

9  that right?

10         THE COURT:  Apparently, the defense did that

11 as part of their motion.  But the issue is -- yes, but

12 there's no date on it.  We don't know what date it is.

13         MS. MILLER:  Okay.  So we'll get a copy made

14 for the Court while we're going forward on the hearing

15 so we don't have to take another break, so we can just

16 move forward, but we're agreeing to that, and we'll

17 provide the Court with those specific documents that

18 will show that, those dates I just told the Court.

19         THE COURT:  And we talked before we took a

20 break about the date of the scheduled hearing.  And is

21 that in the documents you gave me, the 2021 versus

22 2023 date?

23         MS. MILLER:  Yes.  So it was March 2nd, 2021.

24         THE COURT:  And which document is that in?

25         MS. MILLER:  Hang on.  Let me pull it up.  I

1  think it was actually told to me by the defense.  It

2  was told to me by the defense, and we would agree that

3  that was the date that he had that hearing originally

4  scheduled for.

5          THE COURT:  So, I want some basis for that.

6  So, the March 2nd, 2021, and the moving up date to

7  August 8th.

8          MS. MILLER:  August 3rd.

9          THE COURT:  August 3rd.

10          MS. MILLER:  I think there is a document in

11  his A file that will show that, Your Honor, and we'll

12  pull that from the file for the Court.

13          THE COURT:  I'm sure there is also.

14          The date of the rebuttal submitted, that's

15  not in here, right, for the denial?

16          MS. MILLER:  Correct.  That is something that

17  the defense wants to introduce.

18          THE COURT:  Okay.

19          MS. MILLER:  Without objection, obviously.  I

20  asked if he wanted me to put it up, and he said that

21  he would prefer to do it.

22          THE COURT:  All right.

23          MS. MILLER:  So may I go through for the

24  record what's in the exhibits or does the Court not

25  want me to do that?  Just for the new items.

1          THE COURT:  I presume you're going to submit

2   a stipulation that covers it.

3          MS. MILLER:  Okay.

4          THE COURT:  This has taken an hour.

5          MS. MILLER:  I know.  I understand.  Okay.  I

6   will defer to Mr. Wagner since it's his motion.

7          THE COURT:  So, I guess I'm noting for the

8   record that the government has submitted Exhibits 1A,

9   1B, 1C, 1D, 1E, Government's Exhibit 2, 3, 4, 5, 6,

10  all of which are submitted and made part of the record

11  without objection.  Is that correct, Mr. Wagner?

12         MR. WAGNER:  Yes, Your Honor.

13         MS. MILLER:  That's correct, Your Honor.

14         MR. WAGNER:  Subject to redaction.

15         THE COURT:  Yes.

16         (Government's Exhibits No. 1A, 1B, 1C, 1D,

17  1E, 2, 3, 4, 5, and 6 were admitted into evidence.)

18         MR. WAGNER:  We have a single exhibit, a

19  rebuttal letter dated May 13, 2014, part of the A file

20  produced to the defense in discovery by the

21  government, if I can submit that as Defense Exhibit 1.

22         THE COURT:  Is it an exhibit to the

23  application that you submitted with your paper?

24         MR. WAGNER:  I'm sorry?

25         THE COURT:  The application for asylum?

1    MR. WAGNER:  Yes, I believe that's been
2  received by the Court.
3    THE COURT:  Is that Exhibit 2 for purposes of
4  today?
5    MR. WAGNER:  For purposes of today, let's
6  call it Exhibit 2.  Thank you, Judge.
7    THE COURT:  Well, yes.  Okay.
8    (Defendant's Exhibits No. 1 and 2 are
9  admitted into evidence.)
10    MR. WAGNER:  Are you ready to hear the
11  argument?
12    THE COURT:  I am.
13    MR. WAGNER:  Okay.  Thank you for your
14  patience, Your Honor.
15    THE COURT:  Uh-huh.
16    MR. WAGNER:  Judge, the issues before the
17  Court have been fairly thoroughly briefed.  So I will
18  not be rehashing arguments that have previously been
19  presented to the Court, but I do intend to discuss
20  matters that provide some additional context and to
21  touch on some points that I believe require some
22  additional explanation.  And also I wanted to be able
23  to address any questions that the Court may have.
24    There are four issues, essentially, before
25  the Court.  The first issue is the question of Mr.

1  Horma's alleged illegal or lawful presence in the

2  United States.

3       Second is whether the Second Amendment

4  affords protection to Mr. Horma as to Counts Three and

5  Four.  That is conditioned upon the Court's finding

6  regarding the first issue of whether he is here

7  illegally or unlawfully.  And then the second part of

8  that second issue is whether 18 U.S.C. 922(n) is

9  unconstitutional under the Second Amendment.

10      The third issue is whether the Maryland

11  cigarette charge at issue qualifies as an exception

12  under 921(a)(20)(A), the statute that exempts certain

13  matters from prosecution under 18 U.S.C. 922(g) and

14  (n).

15      And fourth is whether the residual clause of

16  921(a)(20)(A) is unconstitutionally vague in

17  consideration of the holdings of *Johnson* and *Dimaya*.

18      So, turning to the first issue, Judge,

19  unlawful, illegal presence in the United States.  This

20  comes up as the basis for the 922(g)(5)(A) charges,

21  Counts One and Two.  And as a determining factor in

22  assessing Mr. Horma's basis to challenge the 922(n)

23  statute under the Second Amendment, 922(g)(5)(A)

24  provides that it shall be unlawful for any person,

25  who, being an alien, is illegally or unlawfully in the

1  United States to possess a firearm.

2          The Fourth Circuit in *Al Sabahi* addressed a

3  situation in which a visa to remain in the United

4  States expired, but it did not address situations

5  under which a person is applying for asylum, which is

6  the case here.

7          *Bazargan*, an Eighth Circuit case --

8          THE COURT:  None of those cases address an

9  instance where somebody was in the country lawfully.

10  All their reasons for being in the country lawfully

11  had expired at the time that any action by them took

12  place.  I know that.

13          MR. WAGNER:  That's exactly the distinction

14  that we're trying to draw here.  But what we're

15  further saying is that Mr. Horma -- and I think this

16  is uncontested -- that Mr. Horma has never been in the

17  United States under a period of an unauthorized stay.

18  His authorized period of stay never expired.

19          The government's admitted that in their

20  pleadings.  Document 22 at page 17, "A pending

21  application for asylum does confer an authorized

22  period of stay."  Bottom of the page --

23          THE COURT:  I know they admitted it.

24          MR. WAGNER:  Okay.  So the import of all

25  this, Judge, can be found in 27 C.F.R. 471.11.  It's

1  on page seven of the defendant's supplemental

2  pleading.

3           This regulation states that "Aliens illegally

4  or unlawfully in the United States include any alien

5  who is a nonimmigrant and whose authorized period of

6  stay has expired."

7           So it is uncontested that Mr. Horma's

8  authorized period of stay never expired.  So under

9  this regulation, Judge, which has been cited by the

10 Fourth Circuit in *Al Sabahi*, Mr. Horma has been in the

11 United States legally and lawfully for all of the time

12 that he has been here.

13          So, consequently, Counts One and Two should

14 be dismissed as a matter of law.

15          THE COURT:  Well, the United States cited the

16 policy manual that indicates that in chapter three,

17 part B, volume seven, that simply filing for an

18 application for immigration benefit or having a

19 pending benefit application generally does not put a

20 foreign national into a lawful immigration status.

21          So tell me what deference I owe that and what

22 I should do with their argument.

23          MR. WAGNER:  Judge, we would suggest that no

24 deference should be given to this particular

25 regulation.  Congress has not endorsed it under the

1  definition of being illegally or unlawfully in the

2  United States.

3          THE COURT:   There's no *Chevron* deference?

4  There's no deference?

5          MR. WAGNER:   Perhaps some deference but

6  certainly not to the extent that the government would

7  submit to the Court.   Any deference should certainly

8  be overridden by the very statute that the Fourth

9  Circuit has relied on in the *Al Sabahi* case, a case

10  cited by the government.

11          THE COURT:   But doesn't that same policy

12  manual say that those in a period of authorized stay

13  are protected from accruing unlawful presence?   Do you

14  want me to disregard that also?

15          MR. WAGNER:   Judge, unfortunately, I'm not

16  aware of that particular provision from that

17  regulation, but --

18          THE COURT:   It's in the same policy manual

19  that they cited.

20          MR. WAGNER:   I understand, Judge.   I was

21  unaware of that particular provision in the manual.   I

22  don't believe it's been cited in the briefs, but I

23  would certainly hope that the Court would look to that

24  favorably on the defendant, and if the rule of lenity

25  is to apply, then certainly that would weigh in favor

 1  of the defendant in construing any competing

 2  regulations that the Court has reviewed.

 3          So, Judge, I think what the most important

 4  regulation that we have here is that cited by the

 5  Fourth Circuit in the *Al Sabahi* case which talks about

 6  an authorized period of stay in the United States.

 7  And Mr. Horma was always in an authorized period of

 8  stay.

 9          THE COURT:  Well, that's the whole point;

10  right?

11          MR. WAGNER:  Yes, it is.

12          THE COURT:  The whole point is, is an

13  authorized stay lawful, unlawful or something else.

14          MR. WAGNER:  And we would submit to the Court

15  that it is lawful and legal, that if he was under a

16  period of authorized stay, that he could not be

17  punished under 922(g)(5)(A).

18          THE COURT:  All right.

19          MR. WAGNER:  So that leads to the second

20  issue, Judge, and the second issue, frankly, the Court

21  needs to determine initially whether or not Mr. Horma

22  was in the United States illegally or unlawfully in

23  order to find that he has the protection of the Second

24  Amendment.  The *Carpio-Leon* case clearly states this.

25          So we submit, though, even if the Court finds

1   that Mr. Horma was here illegally, a facial challenge

2   to 922(n) is permitted by the Court.

3        THE COURT:  Well, isn't it the case that the

4   Fourth Circuit, and specifically a district court case

5   here, and other Fourth Circuit cases, suggest that you

6   shouldn't jump to the facial challenge before you

7   decide the as-applied challenge, because if the

8   as-applied challenge decides that the statute is

9   unconstitutional, then when you're deciding facially

10   whether no set of circumstances exist where the

11   statute would be valid, you're done with the facial

12   challenge.  That's a decision by Judge Ellis in

13   *Masciandaro*.  Neither of you addressed which order to

14   do it in, but the Fourth Circuit, and actually a

15   challenge to an automatic rifle ban, says do the

16   as-applied challenge first.  Why wouldn't I do that?

17        MR. WAGNER:  The as-applied challenge

18   requires this Court to make certain factual

19   determinations and those factual determinations --

20        THE COURT:  Maybe that's why I'm asking about

21   facts.

22        MR. WAGNER:  Yes, Your Honor.  But those

23   factual determinations are what exactly I addressed in

24   the first issue before the Court, whether Mr. Horma

25   was here illegally or unlawfully.  And, certainly,

1   once the Court makes that as-applied determination,

2   the issue either goes forward under the Second

3   Amendment if he was here legally or lawfully or

4   doesn't go forward, but it seems to me, Judge, that if

5   the Court is to hear the facial challenge, then it

6   could not partake of the legal determination that the

7   Court would make under the as-applied challenge.

8           But I understand what the Court is saying.

9   If the law is that the as-applied challenge needs to

10  be made before the facial challenge is to be made,

11  then, clearly, the procedure would be to determine

12  whether or not he was here illegally or unlawfully.

13          THE COURT:  So it's the *Masciandaro* case, and

14  that was the right to carry a loaded firearm in a

15  national park.  That's a district court case

16  published.  There's a Fourth Circuit published case

17  assessing the automatic rifle and large capacity

18  ammunition ban in Maryland.  And both of those cases

19  suggest if it's the Fourth Circuit, does more than

20  suggest you do as-applied first.  So I am certainly

21  inclined to follow that.

22          MR. WAGNER:  Okay.  In that case, Your Honor,

23  we would suggest that the finding of whether Mr. Horma

24  was here illegally or unlawfully should be in favor of

25  the defendant, and that we've demonstrated that he was

1    here legally and lawfully, and that will lead you to

2    the resolution of the second issue in the case; the

3    Second Amendment argument.

4         And I would ask the Court to turn to the

5    Fourth Circuit decision in *Kolbe v. Hogan*.  That

6    decision starts out by talking about the parade of

7    horribles and atrocities and mass shootings that

8    assault weapons and large capacity magazines are

9    responsible for, and this makes an empirical showing

10   to the Court of the dangers of these types of weapons

11   and how the Second Amendment does not protect the

12   possession of these weapons.  This was not a matter,

13   the possession of or the ruling regarding assault

14   weapons and large capacity magazines, it's not a

15   matter of the Second Amendment's core protections.

16        So in the Second Amendment context, according

17   to the Fourth Circuit in *Chester*, the government bears

18   the burden of justifying the constitutional validity

19   of the law that impacts Second Amendment rights.  The

20   government has failed to provide the Court with any

21   empirical evidence to the Court to support its

22   position under a heightened level of security to

23   justify the statute of --

24        THE COURT:  Why does a heightened level apply

25   here?

1          MR. WAGNER:  Well, we would suggest that a

2     strict scrutiny standard should apply in this case,

3     Judge.

4          THE COURT:  I thought that's what you meant

5     by heightened.  Sorry.

6          MR. WAGNER:  Well, either the intermediate

7     level or the strict level.  The application of either

8     of those standards the government still bears the

9     burden of proof in demonstrating the justification for

10    the challenged statute.

11         So the government has provided nothing to the

12    Court, no statistics, no data, no anecdotal

13    information, no empirical evidence suggesting that

14    such a prohibition and such an infringement of

15    constitutional rights is justified.

16         Now, the law allows persons who are under

17    indictment to possess firearms.

18         THE COURT:  Well, wait a minute.  Under

19    *United States v. Carter*, the Fourth Circuit held that

20    the United States may resort to a wide range of

21    sources, such as legislative texts and history,

22    empirical evidence, which is what you're pointing to.

23         MR. WAGNER:  Exactly.

24         THE COURT:  Case law and common sense;

25    correct?

1          MR. WAGNER:  Yes, that is correct, Judge.

2     But there is no empirical evidence before the Court.

3     And in the absence of the empirical evidence, I

4     believe that the Court needs to, well, look to common

5     sense, to look to cases, and to look to authority, and

6     there's very little authority, very little information

7     before the Court to suggest what danger is posed by

8     people who are under indictment receiving firearms.

9     They are permitted under the code to possess firearms.

10    Those who are released, those people under indictment,

11    and only those who are released by the court would be

12    subject to this prohibition, subject to the

13    prohibition of receiving firearms.

14          And so there's no information before the

15    Court that those people who have been released by the

16    court -- so there's allegedly been a determination of

17    whether they pose a danger to the community, whether

18    they are a risk of flight.  And so there's already

19    been some kind of narrowing of that class of people.

20          The government has failed to demonstrate why

21    those people by receiving firearms pose a danger or

22    why those people should be restricted under this

23    statute from receiving firearms.

24          THE COURT:  Just to be clear, it's receipt or

25    transfer; right?

1    MR. WAGNER:  Yes, it is.

2    THE COURT:  The briefing kept saying receipt.

3    It's receipt or transfer.

4    MR. WAGNER:  It is, Judge.  But what we're

5    dealing with here, certainly what Mr. Horma is charged

6    with, is receipt.

7    THE COURT:  Right, but it's a constitutional

8    challenge.

9    MR. WAGNER:  You're absolutely right.

10    THE COURT:  Right.

11    MR. WAGNER:  Under the *Heller* decision, under

12    *Chester*, under *Kolbe v. Hogan*, the prohibition under

13    922(n) goes to the core protections of the Second

14    Amendment.  There's a two-step process that the Court

15    needs to undergo.  But 922(n) prohibits the arming,

16    the receipt and transfer, of a person of any and all

17    firearms in the defense of his home.  Because this is

18    an absolute prohibition, strict scrutiny should apply.

19    But even with intermediate scrutiny, the government

20    has failed to articulate a reasonable fit between the

21    challenged regulation and the substantial government

22    interest.

23    If this Court is true to *Heller's* dictates

24    regarding the core protections of the Second

25    Amendment, then strict scrutiny would be the

1  appropriate standard, and the government would have to

2  demonstrate that the challenged regulation was

3  narrowly tailored to satisfy a compelling government

4  interest.

5        So, based on this, the Court should find that

6  922(n) is unconstitutional under the Second Amendment.

7        THE COURT:  So, what if I apply intermediate

8  scrutiny?  Why isn't it narrowly tailored because it's

9  a limited period of time, because they can possess

10 other guns, it's just an issue of somebody has found

11 probable cause against somebody else, they're in the

12 system, they're notified of a crime, and there's a

13 moderate protection that they're not going to receive

14 firearms during that time or transfer firearms, and

15 why isn't that a reasonable fit?

16        MR. WAGNER:  Judge, if some dangerous

17 situation presents itself to someone who is under

18 indictment, and they see the need to obtain a firearm

19 in order to defend themselves, they are precluded from

20 obtaining any firearm whatsoever.  And so that,

21 essentially, goes to the core protections of the

22 Second Amendment as articulated in *Heller*.

23        They can't obtain a firearm.  They can't

24 obtain a firearm to protect themselves in their own

25 home.  And so under that scenario, we believe that a

strict scrutiny standard should be applied.

THE COURT:  What if I applied intermediate?

MR. WAGNER:  Yes.

THE COURT:  I'm asking you that different question.  I know what you argued.

MR. WAGNER:  All right.  In that situation, there is no rational basis that the government -- excuse me.

THE COURT:  Reasonable fit.

MR. WAGNER:  Reasonable fit that the government can demonstrate for their governmental interest in the 922(n) statute.

THE COURT:  So my question was, why isn't it -- if you have a congressional intent that says you've been convicted of a felony, and so everyone convicted of a felony can't have a gun, that's a governmental interest that derives in case law from public safety.  And there's Fourth Circuit cases that say that.

MR. WAGNER:  Of course.

THE COURT:  So, if you then have a statute that says if you're under indictment for a felony while that's going on, while you are facing the possibility that you could lose your ability to possess any kind of firearm if you're convicted,

1    because that's the result of being convicted, why

2    isn't it a reasonable fit to say all we're going to

3    say is you're not convicted yet.  You're only under

4    indictment, but you can't get new weapons, and you

5    can't transfer weapons.  Why isn't that a lesser

6    restriction that is tailored to a group of folks who

7    are facing serious charges and know, as the government

8    argued in its brief, and know that they could lose

9    their right to hold weapons?  Why isn't that a

10    reasonable fit?  And why doesn't the fact that there

11    are two levels reflect congressional intent to that?

12            MR. WAGNER:  Our position here, Judge, is

13    that if that person, that same person, has the right

14    to possess the weapon, has the right to exercise that

15    Second Amendment core protection to possess the

16    weapon, to protect himself in his home, why is it that

17    that person who never had a firearm to begin with

18    should be precluded from obtaining a firearm, to

19    exercise that same core Second Amendment right?  It's

20    simply -- there's no -- I don't believe there's a

21    rational basis for it.  I don't believe that the

22    government can provide the rationale, the explanation,

23    required to demonstrate why that distinction is

24    necessary here.

25            There can be ways of tailoring that

application for a receipt of a weapon to the
circumstances of the case to determine the
dangerousness of the person, to determine whether or
not a possession of a firearm for that person based on
the circumstances.

Take the *Laurent* case, Your Honor, from the
New York District Court.  That was a person who was
charged with a robbery, charged with a violent crime.
Very different than the situation we have here, a
situation which involves an indictment for unstamped
cigarettes in Maryland, a non-violent crime.

So at least there needs to be some provision
in the law for some kind of evaluation of the danger
that that person who may obtain that firearm, the
danger that that person poses, Judge, and this would
address the rationale that the government is required
to provide under the Second Amendment.

THE COURT:  All right.

MR. WAGNER:  So this takes us then to the
third issue before the Court, the willful
transportation of unstamped cigarettes as a business
practice violation under 921(a)(20)(A).

And this provision, 921(a)(20)(A), is an
exception to 922(g).  It's a situation which allows
for someone who is in possession of a firearm, if they

had been convicted of certain offenses, to have an

exemption to prosecution. And it also applies to

someone who's under indictment.

So, 921(a)(20)(A) states that the term "crime

punishable by imprisonment for a term exceeding one

year" does not include antitrust violations, unfair

trade practices, restraints of trade, or other similar

offenses relating to the regulation of business

practices.

Maryland's cigarette violations should be

considered as a similar offense to antitrust

violations, unfair trade practices, and restraints of

trade. Untaxed cigarettes provide a competitive

advantage, taking unfair advantage over retail sellers

of cigarettes, a competitor. And it should be

construed broadly, Judge. It should be construed as

an economic regulation.

The language of the statute itself refers to

"business regulation articles," which on its face

suggest that it's related to the regulation of

business practices as required by the statute.

But the analysis doesn't end there, Judge.

The Court must also consider the Constitutionality of

the residual clause under *Johnson* and *Dimaya*. *Johnson*

and *Dimaya* -- that turns to the fourth issue, Judge.

1    *Johnson* and *Dimaya* mark a new era in analyzing

2    residual clauses.  18 U.S.C. 924(e), the *Johnson* case,

3    and 18 U.S.C. 16(b), the *Dimaya* case, had been relied

4    on for years, but the U.S. Supreme Court through the

5    *Johnson* and *Dimaya* cases have changed that.  Courts

6    must now consider the vagueness of residual clauses,

7    especially in criminal cases, with greater scrutiny

8    through the lens of *Johnson* and *Dimaya*.

9         All of the cases cited by the government in

10   assessing the constitutionality of that residual

11   clause came before *Johnson*.

12        THE COURT:  What is the subsequent history?

13        MR. WAGNER:  I'm sorry?

14        THE COURT:  What's their subsequent history?

15   Does it indicate that *Johnson* abrogated them?

16        MR. WAGNER:  I haven't seen any cases that

17   have addressed that Judge, whether *Johnson* has

18   abrogated those previous cases.

19        THE COURT:  Well, are they reported as

20   abrogated?

21        MR. WAGNER:  I have not seen that, Judge, no.

22        THE COURT:  They're not.

23        MR. WAGNER:  So I understand the Court's

24   concern there, but still, we do have the dissent from

25   the *Stanko* case.  Circuit Judge Bright actually made

1   the comparison in his dissent in that *Stanko* case

2   between the residual clause in 921(a)(20)(A) and the

3   residual clause in the Armed Career Offender Act,

4   924(e), which was the subject of *Johnson*.

5         At page 420, he states, "But here the

6   vagueness of statute goes beyond, for example, the

7   uncertainty inherent in defining a 'violent felony'

8   for purposes of 18 U.S.C. 924(e)(2)(B), codifying in

9   part the Armed Career Criminal Act."

10        Circuit Judge Bright goes on to say that

11  "924(a)(20)(A)'s exemption of similar offenses clause

12  lacks the same specificity."  And this was brought

13  before the *Johnson* and *Dimaya* cases were ruled upon by

14  the United States Supreme Court.

15        So, in light of *Johnson* and *Dimaya*, this

16  gives more meaning to Circuit Judge Bright's dissent

17  in *Stanko*, and we ask the Court to rely on that in

18  finding that this provision, this residual clause in

19  921(a)(20)(A), is unconstitutional.

20        THE COURT:  Would you concede, at least, that

21  the Armed Career Criminal Act, the residual clause,

22  addressed crimes that were different and far less

23  dissimilar than those that are addressed in this

24  clause that you challenge here?  Unfair trade

25  practices and the three examples that are listed here

1  are fairly similar in nature; correct?

2          MR. WAGNER:  I would say that the list of

3  crimes under ACCA is far broader than what we have

4  here, but that doesn't necessarily mean a narrow

5  interpretation of the residual clause is required

6  here.  I think certainly in light of *Johnson* and

7  *Dimaya*, a much broader interpretation of that residual

8  --

9          THE COURT:  Is it your contention that the

10  taxing of cigarettes, directly or indirectly, has an

11  economic effect?

12          MR. WAGNER:  The taxing of cigarettes --

13          THE COURT:  Isn't it the case that the

14  similar offenses that are addressed here govern

15  behavior that affect consumers and competitors?

16  Correct?

17          MR. WAGNER:  Yes, Your Honor, they do.

18          THE COURT:  And to the extent that the clause

19  that you challenge, it is not a direct effect on

20  consumers and competitors.  It's a tax law.

21          MR. WAGNER:  Some of the cases that have been

22  cited talk about an elements test and within the

23  elements there must be some effect on competition,

24  some effect on consumers, and I would concede that the

25  elements of the Maryland statute do not have any

1  inquiry into competitiveness or consumers, but,

2  nonetheless, I think that a tax of cigarettes, an

3  unstamped cigarette law, necessarily impacts

4  competition and --

5       THE COURT:  Indirectly.

6       MR. WAGNER:  Indirectly, yes.  I think that's

7  fair to say.

8       THE COURT:  All right.  Now, I'm going to ask

9  you, Mr. Wagner, you rely heavily on *Heller* and its

10  finding with respect to the Second Amendment right to

11  possess weapons.  What class of individuals does

12  *Heller* apply to?

13       MR. WAGNER:  A very broad class, Judge.

14  Everyone who was impacted by the statute in Chicago.

15       THE COURT:  The language talks about

16  citizens.

17       MR. WAGNER:  Okay.

18       THE COURT:  Can you cite any part of *Heller*

19  that says it applies to anything but citizens?

20       MR. WAGNER:  I can't, Your Honor, but

21  certainly when you look to the Fourth Circuit's

22  treatment of the issue, they haven't simply narrowed

23  that class to citizens.

24       I think even in *Carpio-Leon*, Judge Niemeyer

25  talks about those who are here illegally not having

1   Second Amendment rights, but those who are noncitizens

2   aren't necessarily precluded from having Second

3   Amendment rights.  As long as they are here lawfully,

4   they don't have to be citizens to enjoy the

5   protections of the Second Amendment.  And that's a

6   fairly conservative application of the Second

7   Amendment by the Fourth Circuit.

8           So I don't think it's just restricted to

9   citizens, Your Honor, the application of the Second

10  Amendment.

11          THE COURT:  Right.  I asked about *Heller*.

12          MR. WAGNER:  Right.  But I'm just talking

13  about *Heller* in the eyes of the Fourth Circuit and how

14  they've construed *Heller* and how they've construed the

15  Second Amendment after the decision in *Heller*.

16          THE COURT:  Yes.  All right.  I think those

17  are all the questions I have.

18          MR. WAGNER:  Thank you.

19          THE COURT:  Wait.  Actually, I do have one

20  more question.

21          MR. WAGNER:  Sure.

22          THE COURT:  I'm sorry.  In your briefing, you

23  turn a couple of times to arguments that suggest

24  analogies to First Amendment assessments of the

25  constitutionality of a statute.  And I don't

1   understand why you would do that when the Fourth

2   Circuit has told me how to evaluate it.  Can you tell

3   me why I would turn to that?  There's a test in the

4   Fourth Circuit.

5            MR. WAGNER:  Right.  I think that the reason

6   we've relied on the First Amendment in our briefing, I

7   would suggest, is because we want to show that strict

8   scrutiny is the proper standard to apply.

9            In analyzing the Second Amendment issues to

10  the First Amendment issues, we're trying to

11  demonstrate that these core protections that are

12  protected by both the Second Amendment and the First

13  Amendment should be subjected to strict scrutiny

14  analysis.  So that's the principal reason for reciting

15  the First Amendment cases.

16           THE COURT:  All right.

17           MR. WAGNER:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MS. MILLER:  Your Honor, if I may begin with

20  the issue of whether or not the defendant is in the

21  United States lawfully, I think the seminal case that

22  we look at here is *United States v. Al Sabahi*.  And

23  the court in *Al Sabahi*, the Fourth Circuit, recognized

24  or noted that the federal regulations recognize that

25  aliens illegally or unlawfully in the United States

1    include "nonimmigrants whose authorized period of stay

2    has expired," and they cited to 27 C.F.R. 478.11 with

3    approval.

4          What I wanted to also point out to the Court

5    is the defendant in *Al Sabahi* argued that he was not

6    illegally or unlawfully in the United States at the

7    time he possessed the firearms, and it was after his

8    visa expired.  But in deciding *Al Sabahi*, the Fourth

9    Circuit specifically referred to the *Bazargan* case in

10   which that defendant had filed a petition for asylum.

11         THE COURT:  After -- when he was already in

12   the unlawful status.

13         MS. MILLER:  No.  No, that's not when it

14   happened.  The court referred back to the immigration

15   judge's multipage finding.  At first the court said

16   we're not sure about that.  But I have *Bazargan* here,

17   Your Honor, and I did a little timeline on it because

18   I think that it is important.

19         So what happened in *Bazargan*, if I can just

20   take a moment and pull it out, is on October 7th of

21   1988, the defendant was admitted on a nonimmigrant

22   student visa.  He attends the University of

23   Mississippi from October of '88 to December of '88.

24   He then transfers to Jackson State University, and he

25   did admit that he failed to follow the mandatory

1  transfer procedures, which would make the Court think

2  that he had already violated, and, therefore,

3  afterward applied for asylum, because in May of '89 is

4  when he applies for asylum, and that's when he also

5  receives his employment authorization.

6        But then in November of '89, he enrolls in

7  Morehead State University, and he failed to follow the

8  mandatory INS procedures for transfer.  And then he's

9  interviewed in January of '91.  The guns are acquired

10 in April of '91.  I think maybe also in November.  And

11 then his asylum application is denied in May of '91.

12 And the judge found that the defendant's status as a

13 nonimmigrant alien ended in early 1990.

14        THE COURT:  Which judge?

15        MS. MILLER:  I'll tell you where that is.  It

16 says -- this is *Bazargan* at 848, Your Honor.  I'll

17 just read from the --

18        THE COURT:  Just give me a second.  I have

19 it.

20        MS. MILLER:  Sure.

21        THE COURT:  All right.  I see it.

22        MS. MILLER:  So, in fact, the court found, We

23 agree with the District Court that Bazargan's status

24 as a nonimmigrant alien F1 student visa lawfully

25 ended -- I'm sorry -- lawfully in the United States

1   terminated in early 1990.

2           So, Bazargan, as I just noted for the Court,

3   submits his application for asylum in May of '89.  So

4   his application for asylum was pending.  And even

5   though he technically violated, the court used the

6   1990 violation, not the prior violation, in holding

7   that he was unlawfully in the United States.

8           But I would say to the Court even if he had

9   applied for asylum after the date that his visa had

10  expired, the court in *Al Sabahi* -- and no court, no

11  court, has made a distinction between an application

12  for asylum and an application for a change of status.

13  There is not a single court that has found that a

14  person applying for one versus the other is somehow

15  different.  And the Fourth Circuit in *Al Sabahi* cites

16  to *Bazargan*.  This is in *Al Sabahi* at -- it's at 309.

17  I'm sorry.  I might have missed that.  No, it's at

18  309.

19          The court says after talking about the

20  federal regulations and finding that 27 C.F.R. 478.11

21  is a regulation that recognizes that aliens illegally

22  or unlawfully in the United States includes --

23          THE COURT:  You're talking really fast and

24  somebody is taking this down.

25          MS. MILLER:  Yes.  I apologize.

1         So what I'm talking about is in *Al Sabahi*,

2    referring to *Bazargan* and other cases with approval,

3    first the federal regulations are cited to, that you

4    just asked about a moment ago, with approval.  And

5    then it cites a number of cases that say an

6    application for a change of status does not change a

7    person into a lawful -- lawfully here for purposes of

8    922(g)(1) or (5) or anything else.

9         It's also, I think, important that the Fourth

10   Circuit in *United States v. Cavillo-Rojas*, which is an

11   unpublished opinion but one that the court in *Al*

12   *Sabahi* talks about, also found that the mere filing of

13   an application for adjustment of status and receipt of

14   an employment authorization card does not legalize an

15   alien's presence in the United States and is still a

16   crime under 922(g)(5) for the individual to possess a

17   firearm.  I don't know how it gets better than that.

18        THE COURT:  So, why don't you speak to the

19   policy manual that you cite.

20        MS. MILLER:  Right.  So, you're talking about

21   27 C.F.R. 478.11?

22        THE COURT:  I'm talking about the United

23   States Custom and Immigration Policy Manual that you

24   cite, which cites the unlawful immigrant status at

25   time of filing at INA 245(c)(2).

1     MS. MILLER:  All right.  If I can have a

2  moment.  I thought the Court was referring to my

3  reference to 478.  Yes.  So, it says -- well, first of

4  all, the policy manual is not obviously binding on the

5  Court.  The Fourth Circuit's decision in *Al Sabahi* is.

6     THE COURT:  Then why did you raise it?  So

7  what deference do I give it?

8     MS. MILLER:  You know, some.  The Court can

9  look at it and consider it.

10     THE COURT:  Under the law.

11     MS. MILLER:  Under the law, there's no

12  requirement that the Court --

13     THE COURT:  There's no *Chevron* deference to

14  an agency that issues a policy manual.  I know the

15  law.

16     MS. MILLER:  So, the *Chevron* deference to --

17  there's *Chevron* deference, I believe, to a regulation

18  and a statutory provision when made in the exercise of

19  delegated authority.  I'm not sure how much deference

20  the Court should give to a memorandum in a policy

21  manual, but we included it to be complete.  But the

22  case of *United States v. Atandi* talks about *Chevron*

23  deference.  And in terms of the ATF regulation under

24  --

25     THE COURT:  Wait.  I'm not talking about

1    that.

2              MS. MILLER:  Okay.

3              THE COURT:  I know that --

4              MS. MILLER:  So it's not --

5              THE COURT:  Please don't talk over me.

6              MS. MILLER:  I apologize.

7              THE COURT:  I'm aware that the ATF regulation

8    is not given the same amount of deference.

9              MS. MILLER:  Right.

10             THE COURT:  But certainly the Supreme Court

11   has spoken to whether or not interpretations contained

12   in policy statements, agency manuals, and enforcement

13   guidelines do not warrant the level of *Chevron*

14   deference that is generally accorded, but the Fourth

15   Circuit may have addressed that issue about whether or

16   not an agency's statement can be entitled to respect

17   to the extent that the interpretations have the power

18   to persuade; is that right?

19             MS. MILLER:  I'm not sure.  I would assume

20   that that's correct.  Your Honor, I'm not really sure

21   that I have any kind of information in front of me

22   that could say what the level of consideration the

23   Court could give to that field manual.  But the only

24   point I was making was that although a pending

25   application for asylum does confer an authorized

1  period of stay, it does not extend an alien's lawful

2  immigration status or cure his unlawfully status.

3          THE COURT:  The reason -- obviously, I'm

4  going to ask you the same question I asked Mr. Wagner,

5  which is, in note 17 of the policy manual, it says

6  that simply filing for an application for immigration

7  benefit or having a pending application generally

8  doesn't put a foreign national into lawful immigration

9  status, which is what you're citing, but note 17 also

10 says, "However, those in a period of authorized stay

11 are protected from accruing unlawful presence."

12         MS. MILLER:  And I think there they're

13 talking about temporary protected status, TPS.

14 They're not talking about an asylum applicant or a

15 person who has applied for an adjustment of status.

16         THE COURT:  But he's an asylum applicant.

17         MS. MILLER:  Right, but that's not -- an

18 asylum applicant and someone who's been granted

19 temporary protected status is very different.  In

20 other words, the granting of a temporary protected

21 status would prevent somebody from being required to

22 leave.

23         THE COURT:  Are you denying that he was in a

24 period of authorized stay?

25         MS. MILLER:  I am saying that he was allowed

to remain, of course.  While his asylum petition was
pending, he was allowed to remain.  So, to that
extent, if the Court wants to say "authorized period
of stay," he is allowed to remain.  And as cases have
said, permitting someone or allowing them to remain is
quite different than conferring lawful status on an
individual.

THE COURT:  Well, the issue, though, is are
they unlawful; right?

MS. MILLER:  Right.  So our argument based on
*Al Sabahi* and the other 14 cases that have addressed
this all say he is unlawfully here for purposes of
922(g)(5)(A).  And that's the case in *Latu*, a Ninth
Circuit case, decided in 2006, footnote 3; *Bazargan*
that we talked about; *Igbatayo; Elrawy*, a Fifth
Circuit case from 2006; *Ochoa-Colchado*.

THE COURT:  So, let me ask you the question,
presuming your interpretation of *Bazargan* is correct,
why doesn't it make a difference?  Because if you're
interpretation is correct --

MS. MILLER:  Sure.

THE COURT:  -- that's the one case where
somebody was not an overstay or some other
identifiably unlawful status.  Why doesn't that make a
difference?

1    MS. MILLER: So, you're asking me if *Bazargan*

2  wasn't?

3    THE COURT: I'm asking you hypothetically.

4    MS. MILLER: Okay.

5    THE COURT: So, presuming you're saying there

6  are 14 cases that have found this. So, I think if

7  there are, really the major ones that have been

8  addressed, all of them are in overstay. And I'll

9  reread *Bazargan*. I see what you said. The issue, of

10  course, is he admitted twice violating the terms

11  before the time of the application being heard. But

12  independent of that, I'll reread the case.

13    Why wouldn't it matter if you have the

14  circumstance we have here? Which is Mr. Horma is here

15  on a valid visa. Within the time period of the visa,

16  actually months before it expires, he seeks asylum.

17  As part of the asylum process, there are regulations

18  that require that while it's under review, if you

19  leave, you're considered to have abandoned your asylum

20  application. You agree that's part of the process;

21  right?

22    MS. MILLER: No, not exactly. If he leaves

23  and goes back to his home country, he will have

24  abandoned his asylum application, but if he applies

25  for permission to travel, he can do that, and I don't

1   think there's anything that firmly says that he

2   forfeits it.  I think what he does is he loses his

3   place in line, because when he comes back, and if he

4   came back under --

5          THE COURT:  Pretend I think that's what the

6   regulation says.  Pretend I think that if you leave,

7   you're considered to have abandoned your asylum.

8          MS. MILLER:  Okay.  Then he would come back.

9   Are you saying come back?  No.

10          THE COURT:  No.  I'm saying he's here.  And

11  part of the reason he's here is because if he

12  leaves -- even if he just loses his place in line and

13  it's not abandonment, there is a reason to not want to

14  leave -- right? -- while you have a valid, meaning

15  timely, procedurally correct asylum application

16  pending.

17          Why is that not different than somebody who

18  applies for some kind of protection when they're

19  clearly, under the law, in illegal status, which I

20  think most of these cases faced?  Right?

21          MS. MILLER:  Right.

22          THE COURT:  Here we're arguing about whether

23  or not he's illegal.  That's different; right?  So why

24  isn't it legally important that the reason we're

25  arguing this is because he made a valid asylum

1  application well before he became in overstay status?

2  Why isn't that different?

3         MS. MILLER:  Are we talking about the

4  defendant here or the hypothetical?  The defendant is

5  in removal proceedings right now.  His asylum

6  application has been found to not have merit.  And

7  then he reapplied, and that reapplication was found to

8  not have merit, and so he was put into removal

9  proceedings and is in removal proceedings right now.

10  So, the first step to his asylum application is that

11  it's not credible.

12         Only an immigration judge can grant him the

13  lawful status.  But I think that we're trying to

14  thread the needle a little bit too closely here by

15  saying the timing of the application is what decides

16  whether you're here illegally or not.  I don't think

17  any court is saying that.

18         THE COURT:  I think most of the courts refer

19  a lot to the status of the individual.

20         MS. MILLER:  And once you overstay, once

21  June 25, 2014, rolled around, even though he had an

22  application for asylum pending, he become illegally in

23  the United States for purposes of purchasing of a

24  firearm.

25         THE COURT:  That's what you're arguing.

1      MS. MILLER:  That's right.  And that's what

2   the cases say.

3      THE COURT:  Why isn't it different?  Because

4   the courts that are making these decisions refer

5   repeatedly to the fact the person is clearly illegal

6   at the time the conduct occurred.  And we here --

7   either I agree with you or I don't.

8      MS. MILLER:  Right.

9      THE COURT:  You need to tell me why it's not

10  different that this gentleman made an appropriately

11  timed request for asylum well before his overstay

12  status.

13     MS. MILLER:  Because the timing of his filing

14  of asylum doesn't get us there.  Doesn't get the

15  defendant there.  If we think about it, if you think

16  about it from a policy perspective, let's say that we

17  agree with the defendant for sake of this

18  hypothetical, that the defendant's filing of asylum

19  allowed him to remain in the United States and

20  conferred status on him, some sort of legal status to

21  be able to buy a firearm, and he goes and he buys a

22  firearm at the War Store, and the firearms' dealer

23  sells him that firearm, and then his application for

24  asylum is denied.  And by that denial, he suddenly

25  becomes a person in possession of a firearm unlawfully

1  under 922(g)(5)(A).

2          So not only did he commit a crime without any

3  notice that he had done that, that could not have been

4  the intent, and the War Store dealer that sold him the

5  firearm would also have committed a crime.

6          So it's the moment that that B2 visa expired

7  that the defendant's status is illegally in the United

8  States but lawfully present.  He's allowed to remain.

9          And if we think about it in terms of, say,

10 somebody who's here from Africa and is afraid of going

11 back for fear of genital mutilation, we're not going

12 to send that person back until the immigration judge

13 has decided whether that application is valid or not,

14 but that doesn't confer legal status for purposes of

15 purchasing a firearm.

16         So, the person is, in many cases, tolerated

17 or allowed to remain while that decision is finalized.

18 So, if Mr. Horma's application is denied by the

19 immigration judge, then for purposes of this hearing,

20 he would be illegally here.  That's not the way it can

21 possibly work.

22         THE COURT:  Well, you're saying it was okay

23 in *Bazargan*.  You're saying he become legal because

24 the immigration judge said later he was -- isn't that

25 what you're arguing with me about this case?

1          MS. MILLER:  No, no.  In *Bazargan*, I'm saying

2    that *Bazargan* was in the same situation as the

3    defendant here in this case.

4          THE COURT:  Are you saying, though, his

5    status is retroactive?

6          MS. MILLER:  The status is not retroactive.

7    The status is the status.  I'm saying there is no

8    change in status.  That would have a bizarre result.

9          THE COURT:  Wait, wait, wait, wait.  With

10   *Bazargan*, you just said to me -- I said all of these

11   cases are folks who were illegal.  And you said, "No,

12   *Bazargan* is different because they said he became

13   lawful in 1990."  But before 1990 he would have been

14   deemed unlawful because he violated the rules twice

15   and admitted it.

16          MS. MILLER:  Yes, he did.  The judge found

17   that he was illegal in 1990, but he admitted that he

18   was illegally here prior to that.  So if the defendant

19   admits that he's illegally here, does that make him

20   illegally here?

21          But I think the point I'm trying to make is

22   this:  I think that not a single one of the cases

23   distinguishes between whether an application for

24   asylum was filed before the expiration or after.

25          THE COURT:  Of course, they didn't.  That is

1  absolutely right.

2          MS. MILLER:  Right?

3          THE COURT:  That's correct.

4          MS. MILLER:  They don't distinguish that in

5  *Al Sabahi*.

6          THE COURT:  They didn't have to.  They didn't

7  face that issue that we have here.

8          MS. MILLER:  There is no case that says a

9  person who has filed an application becomes legally

10 here for purposes of (g)(5)(A) because they filed an

11 application, because if -- the explanation that I just

12 provided to the Court where he becomes -- he can go

13 legally buy a firearm because he filed an application

14 for asylum?  That hasn't been approved.  That would

15 mean that everybody could go --

16         THE COURT:  I understand your argument.

17         MS. MILLER:  Okay.  So we talked about the

18 Fourth Circuit in *Cavillo-Rojas* that the mere filing

19 of an application for adjustment of status and

20 receiving employment, the authorization card didn't

21 legalize the alien's presence.

22         THE COURT:  You're talking really fast again.

23 Please slow down for my court reporter.

24         MS. MILLER:  Okay.

25         And I would argue that the *Bazargan* court was

1  a pending application for asylum.  And he gives no

2  reason why and no legal authority to say why the

3  pending application for asylum would be treated

4  differently because there is no case out there because

5  it's not treated differently.  So I think that that

6  would be the rationale on that, Your Honor.

7        The other last thing I wanted to mention with

8  that is if Congress intended to exclude from

9  922(g)(5)(A) aliens who have merely filed for an

10 application for adjustment of status, it would have

11 said that.  It would have said that you are illegally

12 or unlawfully in the United States unless you have

13 filed an application for a status and that application

14 is pending.  That's not in the law.

15        And, again, tolerating an alien's presence is

16 quite different from legalizing an alien's presence.

17        I was going to talk about the transportation

18 of unchecked cigarettes, if I may.  It doesn't fall

19 under the business practice exception, 921(a)(20)(A).

20        THE COURT:  I've read that pretty carefully.

21        MS. MILLER:  Okay.  And I would just like to

22 distinguish the *McLemore* case, if I may, and point out

23 to the Court that the *McLemore* case that the defendant

24 is relying on heavily for the idea that rollback of an

25 odometer is somehow similar to smuggling cigarettes

1　into another state is that the court specifically

2　stated in *McLemore* that the only reason why it found

3　*McLemore* was subject to the exception under

4　922(a)(20)(A) is that the United States had charged

5　him, *McLemore*, under 15 U.S.C., and the court said

6　that 15 U.S.C. 1984 and 1990(c)(a) were meant to

7　punish unfair trade practices.  It falls under trade

8　and commerce of the code.  The court went on to say if

9　he had been charged under Title 18, fraud, there would

10　not have been the exception.

11　　　　We talked about -- and if the Court would

12　just like me to move on, I will -- that the cigarette

13　smuggling is a tax that's levied.

14　　　　THE COURT:  I don't think we need to discuss

15　that.

16　　　　MS. MILLER:  Okay.  The void for vagueness

17　argument under 921(a)(20)(A) and the *Dimaya* decision,

18　I would just summarize for the Court, unless you want

19　me to go into more detail, but Justice Kagan found

20　that, in *Dimaya*, that the problem with 16's residual

21　clause was that it had the same two features of ACCA

22　and that those two features were that a judge had to

23　imagine an ordinary case.  It had the ordinary case

24　requirement.  And then on top of that, an ill-defined

25　risk threshold.  And it was those two that coalesced

1   to say that residual clause was void for vagueness.

2          We don't have that here.  Here we have the

3   offenses pertaining to antitrust, unfair trade

4   practices, and restraints of trade, all business

5   offenses, clearly, or other similar offenses relating

6   to the regulation of business practices.  It's very

7   clear.

8          And in the *Stanko* opinion, in a footnote, the

9   court invokes the statutory interpretation canon

10  *ejusdem generis*, which is Latin for "of the same

11  kind," and it's used to interpret statutes when the

12  law lists classes of persons or things.  For example,

13  if it refers to automobiles, trucks, tractors,

14  motorcycles or other motor-powered vehicle, the court

15  might use *ejusdem generis* to hold that it wouldn't

16  include an airport.

17         And the *Stanko* court in response to the

18  dissent, which the defendant asked you to rely on a

19  dissent which is not joined by any other case, says

20  even if we were to find ambiguity in the language of

21  921(a)(20)(A), as suggested by the defendant in that

22  case, the application of the established maxim of

23  statutory construction *ejusdem generis* would support

24  our interpretation, the majority's interpretation.

25         So I would just conclude by saying that under

1  *Dimaya*, there is no uncertainty in the residual

2  language.

3         THE COURT:  You know, I'm aware of the

4  statutory argument about it's known by its associates,

5  about the law of the antecedent, and about the one you

6  just cited.

7         MS. MILLER:  Okay.

8         THE COURT:  *Stanko.*

9         MS. MILLER:  Did you want me to move to the

10 next subject?

11        THE COURT:  Yes, please.

12        MS. MILLER:  Okay.

13        So I think the next item, if I'm not

14 mistaken, is the Second Amendment argument.  And we

15 provided the Court with our brief, our subsequent

16 briefing, where we discussed *Heller* and the

17 application of *Heller* and the *Chester* analysis, and

18 then, of course, talking about *Carpio-Leon*.

19        THE COURT:  Are you talking about your

20 sur-reply?

21        MS. MILLER:  No, not in our sur-reply.  In

22 the -- the Court had ordered us to do some additional

23 briefing after we filed *Carpio-Leon*.  That's what I'm

24 talking about.

25        THE COURT:  Why don't you cite the ECF

1  number.

2          MS. MILLER:  Okay.

3          THE COURT:  You didn't seek permission to

4  file your sur-reply, and so I don't know why I should

5  consider it.

6          MS. MILLER:  Well, okay.  I know that the

7  Court had already said that.  I felt that if --

8          THE COURT:  If you follow the rules and ask

9  for it, then you can argue that.

10         MS. MILLER:  Right.

11         THE COURT:  But if you just file it, you

12 can't argue it.

13         MS. MILLER:  I'm not talking about the

14 sur-reply, Your Honor.

15         THE COURT:  Okay.

16         MS. MILLER:  I'm not even addressing the

17 sur-reply then.  I am talking about the filing of

18 docket entry 38, the government's supplemental

19 statement.

20         THE COURT:  All right.

21         MS. MILLER:  And that's where we talked about

22 the effect of the defendant's status on his challenge

23 to 922(n) as violative of the Second Amendment.  And

24 we talked about -- we started with the Supreme Court's

25 decision in *Heller*.  And one of the important aspects

1  that we tried to point out is that the Supreme Court

2  held in *Heller* that the Second Amendment does not

3  permit an absolute prohibition on handguns held and

4  used for self defense in the home.  And that was

5  *Heller* at 636.

6          The ban on handguns in *Heller* was found to be

7  --

8          THE COURT:  I know what *Heller* holds.  So why

9  don't you just relate it to what we're arguing here.

10         MS. MILLER:  Okay.  So, then does the Court

11 want me to skip *Chester* and *Carpio-Leon* and just talk

12 about the Second Amendment?

13         THE COURT:  I don't know why you're talking

14 in that level of detail about *Heller*.  Just tell me

15 why you think *Heller* does or does not apply here.

16         MS. MILLER:  Okay.  Thank you.

17         So, in *Heller*, the Supreme Court said that a

18 person who was lawfully permitted to purchase and keep

19 a handgun in the home, under the regulation in

20 Washington, D.C., he was not permitted to keep the --

21 to register to keep a firearm in his home and also had

22 to keep it unloaded with a trigger lock.  That is a

23 complete ban on firearms in the home.  Something that

24 the Second Amendment protects.

25         In this case, this is a very limited

1    application of receipt of a firearm.  And the key

2    here, I was reading through the defendant's brief, and

3    sometimes he talks about possession of a firearm in

4    terms of 922(n), and sometimes he talks about receipt

5    of a firearm, and it's not about possession of a

6    firearm.

7         And the distinction here for purposes of a

8    Second Amendment analysis is, is a person who is,

9    first, illegally in the United States even enjoying

10   the extension of the Second Amendment rights to them?

11   And the court in *Carpio-Leon* said no.

12        If we look then at what this statute does in

13   terms of the Second Amendment, it requires a few

14   things:

15        (1)  The person has to be under indictment.

16        (2)  The person has to know that they are

17   under indictment.  Fourth Circuit case law says they

18   must know.

19        (3) They had to have received that firearm

20   after they were under indictment.

21        But if they lawfully possessed firearms prior

22   to that, they are not required to turn those in under

23   922(n).  They are simply not permitted to receive.

24        THE COURT:  Or transfer.

25        MS. MILLER:  Or transfer.  In this case,

we're talking about receive.  But, yes, receive or

transfer a new firearm.

So what is the reason for that?  The reason

for that is pretty clear, I think.  It almost goes

without saying.

THE COURT:  Well, no, you have to say it.

MS. MILLER:  I will say it.  Okay.

The reason for that is that courts have held

that people who are under indictment who are then

acquiring firearms through either a receipt, a new

receipt, can be viewed as having done that for a very

suspicious or a nefarious purpose.

THE COURT:  What courts say that?

MS. MILLER:  I will tell you exactly what

court said that.  I believe that the court in -- if I

could have just a moment.

So, in *Salerno*, the Supreme Court in *Salerno*,

the court said no one doubts the goal of preventing

armed mayhem is an important governmental objective.

While this interest is heightened when the government

musters convincing proof that the arrestee already

indicted or held to answer for a serious crime

presents a demonstrable danger to the community.

And then the *Salerno* court went on to say

since the statute requires the defendant to know that

```
1   he has been indicted and thereafter knowingly receives
2   a gun, the government's interest is narrow and clear.
3   It would take a particularly brazen and dangerous
4   individual to engage in a gun transaction while
5   knowingly under a felony indictment.
6          The defendant talks about --
7          THE COURT:  What case is that from?
8          MS. MILLER:  *Salerno*, 481 U.S. at 750.  The
9   full citation is *U.S. v. Salerno* --
10         THE COURT:  Wait.  481 U.S. --
11         MS. MILLER:  839.  I'm sorry.  It's referring
12  to *Skoien*, 614 F.3d 638, and *Salerno* both.
13         THE COURT:  So this goes to -- what is your
14  definition of the public interest that's at issue
15  here?
16         MS. MILLER:  All right.  I'll talk about that
17  if I may have just a moment.
18         Thank you for indulging me while I located
19  some of the notes that I wanted to talk about with
20  regard to the government interest at stake.
21         So, as a general matter, the government's
22  interest is preventing crime by indictees, and that is
23  significant.  And the risk of an erroneous deprivation
24  is not there by putting additional procedures into
25  place.
```

1          Here the idea is that the crime prevention --

2    I mean, we can look at the history of the crime act,

3    the Gun Control Act, beginning in 1961 going into the

4    Gun Control Act in 1968 and then 1986.  And the

5    legislators when they were talking about that were

6    talking about an important governmental interest in

7    preventing crime.

8          And what we have here is a defendant who was

9    an indictee.  If we can use the defendant here just as

10   an example for the important governmental interest,

11   who is indicted for cigarette trafficking, and after

12   he is indicted for cigarette trafficking, receives a

13   gun, and then is charged with not only receiving a

14   gun, but then later straw purchasing the gun.  And we

15   all know that cigarette trafficking is a high cash --

16         THE COURT:  Right.  So you're going farther

17   into facts than you need to.  My issue here is, first

18   of all, where in your brief do you argue or state that

19   the public interest protected is preventing crime by

20   indictees?

21         MS. MILLER:  I'm arguing that to you now.

22         THE COURT:  Well, there's a test.

23         MS. MILLER:  Right.  It's the intermediate

24   scrutiny test.  And we said that in our brief, that

25   intermediate scrutiny is the proper level of scrutiny

1    if he even gets there.

2          THE COURT:  I know.  We're presuming he's

3    there.

4          MS. MILLER:  Presuming he gets there,

5    intermediate level of scrutiny he fails because of the

6    important government interest in keeping guns out of

7    the hands of indictees who have been charged with a

8    felony.  It's not someone who's charged with a

9    misdemeanor.  Someone who's been charged with a

10   felony, who, had they had a gun before that, would

11   have been able to keep it, but to all of a sudden get

12   a gun after indictment and before resolution of the

13   case is a suspicious activity.  And the important

14   government interest is to keep guns out of the hands

15   of people who may become involved in further criminal

16   activity.  So that is the important government

17   interest.

18          And I would just also mention to the Court

19   that intermediate scrutiny is appropriate also for a

20   922(n) as in the present case because, again, it's

21   unlike the total ban in *Heller* that we talked about.

22   922(n) is only applied to a very narrow class of

23   persons rather than the public at large.

24          So that would be another reason why I think

25   intermediate scrutiny is appropriate and that it would

1    more than pass intermediate scrutiny.

2            THE COURT:  So, why don't you take me through

3    the Fourth Circuit test about why it survives

4    intermediate scrutiny.

5            MS. MILLER:  Sure.  So, in the Fourth

6    Circuit, and relying on *United States v. Chester*, in

7    *Carpio-Leon* said that the Second Amendment does not

8    guarantee the right for every person to possess every

9    type of weapon at every place by every person.

10           It said -- it noted that under *Heller*, the

11   court noted that under *Heller*, the weight of the right

12   to keep and bear arms depends not only on the purpose

13   for which it's exercised but also on the relevant

14   characteristics of the person invoking the right.

15           And under the *Chester* framework, the Fourth

16   Circuit adopted the two-step approach, which many

17   other courts have also used, and in *Kolbe v. Hogan* as

18   well.  And the first step is to assess whether the

19   challenged law imposes a burden on conduct falling

20   within the scope of the Second Amendment's guarantee.

21           And so what the court did in *Chester* is it

22   examined the charge of a person who was in possession

23   of a firearm while under -- who had been previously

24   convicted of a crime of domestic violence.  And the

25   court, in *Chester*, said that the proper level of

1    scrutiny for that was intermediate scrutiny.

2             I think it's obvious that --

3             THE COURT:  Presuming intermediate scrutiny.

4             MS. MILLER:  Yes.  I'm presuming intermediate

5    scrutiny, Your Honor.  And that is what we argued in

6    our document 38 to the Court.

7             THE COURT:  So what is the second step of the

8    process, and why do you succeed?  Well, the first step

9    is whether or not the conduct falls within the scope

10   of the Second Amendment.

11            MS. MILLER:  Right.  And then whether or not

12   there's an important governmental interest, which I

13   think we talked about for intermediate scrutiny and

14   whether or not it survives that.

15            THE COURT:  Well, so, what does *Chester* --

16   Mr. Wagner argued that you didn't provide any basis.

17   The government bears the burden of proof; right?

18   *Chester* says what you might rely on.

19            MS. MILLER:  Uh-huh.

20            THE COURT:  Both *Chester* and *Carter* talk

21   about the opportunity to present evidence, statistics,

22   and other things.

23            MS. MILLER:  Right.

24            THE COURT:  Both at some point involve

25   remands because there was not that record in front of

1  the District Court.  So where have you provided this
2  Court the information to show that the means and the
3  ends, presuming intermediate scrutiny, and the nature
4  of the -- you've made it clear that it's a limited
5  burden on Second Amendment rights.
6              MS. MILLER:  Right.
7              THE COURT:  So given that it's a limited
8  burden, what do I have to make a finding that bears
9  your burden that there's a rational fit?
10             MS. MILLER:  So, there's a couple of things,
11 Your Honor, that I would point out.  And I think -- I
12 don't know that the Court wants me to go into all this
13 historical information regarding --
14             THE COURT:  Is it in your briefing?
15             MR. WAGNER:  It's in my oral argument today.
16             THE COURT:  So, no, it's not in your
17 briefing.
18             MS. MILLER:  I mean, I think what our
19 position was, and if I could have a moment, I'll look
20 at it and see.  I think we do talk about intermediate
21 scrutiny in our original brief here.
22             THE COURT:  Yeah, I'm presuming intermediate
23 scrutiny.  But the thing is, you bear the burden of
24 the irrational fit under intermediate scrutiny.  You
25 still have to show why the fit is rational.

1          So, Mr. Wagner just argued it's not rational.

2   It's basically random.  He's arguing something

3   different altogether, that it's an absolute and

4   complete ban on the group of folks who are indicted.

5   So, he's saying it's unconstitutional for that reason.

6          MS. MILLER:  Right.

7          THE COURT:  But even if we take your argument

8   that says that it's not -- that it is narrow.  It is

9   more narrow than an absolute ban.  What do I have that

10  says that there is a reason that the fit is rational,

11  that where they got as far as narrowing it is a

12  rational fit?

13         MS. MILLER:  Sure.  Okay.  So, if I could

14  have just a moment, Your Honor.

15         THE COURT:  I'm sorry.  Reasonable fit.  I

16  keep saying "rational fit."

17         MS. MILLER:  I understand.

18         THE COURT:  My clerk has to take care of me.

19  It's not rational basis.  It is a reasonable fit.

20         MS. MILLER:  Right.  And a reasonable not a

21  perfect fit.

22         In *Heller*, the court talked about

23  intermediate scrutiny as being perhaps the proper

24  approach to some Second Amendment claims, not a

25  complete ban on the Second Amendment, but some of the

```
1    lesser restrictions as in 922(n).  Obviously, they
2    didn't talk about 922(n).  And the court said that in
3    adopting -- if I could have just a moment.  Sorry.
4           So, I think we talked about -- I guess maybe
5    I'm not really understanding what you're asking me to
6    articulate to you about why it survives intermediate
7    scrutiny beyond the fact that I pointed out, you know,
8    the governmental interest in preventing crime, the
9    Crime Control Act of 1968, the idea that Congress
10   expanded and included --
11          THE COURT:  Those are all things you're
12   adding; right?  That's not in your briefing; am I
13   right?
14          MS. MILLER:  I don't know if I talked about
15   the Gun Control Act of 1968, but I did refer to the
16   *Laurent* court's decision, which goes on for I think 65
17   pages that talks about the history of the Gun Control
18   Act.
19          THE COURT:  So, here's the issue:  To make a
20   determination about whether or not a fit is
21   reasonable, it's a means and an ends.
22          MS. MILLER:  Yes.
23          THE COURT:  And so my question goes to not
24   just the test, but the basis about why the narrowing
25   is the appropriate narrowing.
```

1    So under *Carter* and under *Chester*, there were

2  discussions, evidence, or the Fourth Circuit's concern

3  about a lack of that.  *Carter* also said that the

4  United States may resort to a wide range of sources,

5  such as legislative texts and history, empirical

6  evidence, case law, and common sense.

7    And so I'm trying to have you meet the burden

8  that the Fourth Circuit requires that you meet under

9  the test they set forward.  What you have not given me

10  is empirical evidence, which is the first thing that

11  Mr. Wagner argued.  So I'm saying meet the test.

12    MS. MILLER:  Okay.  So, I think to meet that

13  test I would have to talk about the 1968 Gun Control

14  Act as described by the Supreme Court.  And the

15  Supreme Court talked about the 1968 act reflecting

16  concern with keeping firearms out of the hands of

17  categories of potentially irresponsible persons.

18    It broadly stated the principal purpose was

19  to make it possible to keep firearms out of the hands

20  of those not legally entitled to possess them.  And it

21  could be because of age or because of a criminal

22  background or, in circumstances like this, because a

23  person is under indictment.

24    And the act sought to combat violence and

25  promote public safety.  And I would point the Court to

1   a number of cases.

2        First, *Huddleston v. United States*.  That's

3   415 U.S. 814 at 824 to 825.  That the act sought to

4   combat violence and promote public safety is mentioned

5   in a Ninth Circuit case.

6        *United States v. Pruner*, P-r-u-n-e-r.  That's

7   606 F.2d 871 at 874.  It's a Ninth Circuit 1979 case.

8        And then I would point to the congressional

9   record quoting it's not the purpose of this title --

10   we're talking about the Gun Control Act -- to place

11   any undue or unnecessary federal restrictions or

12   burdens on law-abiding citizens.  Then it talks about

13   the different things that law-abiding citizens might

14   do; hunting, trapshooting, personal protection.

15        It goes on to say, "This title is not

16   intended to discourage or eliminate the private

17   ownership or use of firearms by law-abiding citizens

18   for lawful purposes."  And that is at S.Rep. No. 1501,

19   90th Congress --

20        THE COURT:  You're talking way too fast, and

21   you're looking down while you're reading it.

22        MS. MILLER:  I'm reading the cite.

23        THE COURT:  I can't hear you is the issue.

24        MS. MILLER:  Okay.  It's at S.Rep No. 1501,

25   90th Congress, 2d Session, 22 (1968).

1       And then I think I can also point out to the

2  Court as additional evidence for the Court's

3  consideration is the 1986 revision to the statute.

4  There was a statute that was 922(g)(1) and (h)(1).

5  And both of those restricted the possession of a

6  firearm.  It wasn't just the receipt.

7       And then in 1986, more than 30 years ago,

8  Congress revised the statute that dealt with indictees

9  into a single statute, 922(n).  And I can refer the

10 Court in a second to the cite for that, but Congress

11 found that the right of citizens to keep and bear arms

12 under the Second Amendment, an assurance of due

13 process of law, required additional legislation to

14 correct existing firearms' statutes and enforcement

15 policies.

16      And, again, Congress reaffirmed its intent in

17 the 1986 revisions not to discourage or eliminate

18 private ownership or use of firearms by law-abiding

19 citizens for lawful purposes.

20      And then subsequent amendments to 922(n) have

21 not changed the language of 922(n), which deals, as

22 this Court is well aware, with receipt and transfer

23 but not possession.

24      THE COURT:  I'm sorry, Ms. Miller.  What are

25 you referring to there?

1    MS. MILLER:  Oh, in the 1968 provisions?

2    THE COURT:  Yes.

3    MS. MILLER:  I'm sorry.  The 1986 provisions?

4  Yes.  So, when I talked about the 1986 revision to the

5  statute where they came together again, that would be

6  Firearms Owners' Protection Act.  And then here's the

7  cite.  It's Pub.L. 99-308, 100 Stat 449 (1986).

8    I'll go back and repeat that.  It's Firearms

9  Owners' Protection Act, Pub.L. 99-308, 100 Stat 449

10  (1986).

11    THE COURT:  Is that something you briefed in

12  front of me or you're just arguing that now?

13    MS. MILLER:  You asked me about some

14  additional -- one of the things we can consider is

15  common sense, which I haven't talked about that yet,

16  but also the congressional record is important.  And I

17  mentioned to the Court that this is laid out

18  significantly in a case that I did cite for the Court

19  in our original brief, which was --

20    THE COURT:  *Laurent*.

21    MS. MILLER:  Yes, *Laurent*.

22    THE COURT:  All right.  It's been a little

23  over an hour and a half, which is normally my breaking

24  point.  And so I'm going to give all of us a 15-minute

25  break.  And I'm going to ask you, Ms. Miller, if you

 1   have anything more to say, that you get it ready so

 2   that it's concise and to the point, and then I'll

 3   allow you to respond, Mr. Wagner, so we can keep

 4   moving because we are hitting close to five o'clock,

 5   which, given a 2:00 start time, I didn't imagine we

 6   were going to do.

 7          So we'll take a 15-minute break and be back

 8   at five o'clock.

 9          MS. MILLER:  Okay.  Thank you.

10          (Recess taken.)

11          THE COURT:  So here's my suggestion, Ms.

12   Miller.  If you want to take another five minutes or

13   so, you may do so.  And then we can allow Mr. Wagner

14   an opportunity to respond.

15          I'm going to ask you, and you can either do

16   it now or you can ask your folks at your counsel table

17   with you, we are struggling to find the case that you

18   quoted from.

19          MS. MILLER:  Okay.  Which one?

20          THE COURT:  The one that you first said was

21   *Salerno* and then said it was *Skoien*.

22          MS. MILLER:  Oh, sure.  I'll find that for

23   you.

24          MR. WAGNER:  I've got them right here, Judge.

25          THE COURT:  You have the cases?

1          MR. WAGNER:  I do.

2          THE COURT:  Is the language in it?  We can't

3    find the language in it.

4          MR. WAGNER:  I haven't gotten that deep into

5    the cases as to be able to determine whether the

6    language is in there, but I have the cases.

7          MS. MILLER:  Your Honor, I'll find that for

8    the Court.

9          THE COURT:  The computer is not finding that

10   language.

11         MS. MILLER:  Well, I have it cited, so I

12   think it's got to be in there or maybe it was a, you

13   know, reference to a different case above it, but I'll

14   find it, where it talks about that.

15         THE COURT:  I believe there is a case that

16   talks about that.  That's my issue.  I have no doubt

17   you're not quoting something that doesn't exist.  I'm

18   not sure it exists where you're suggesting it does.

19         MS. MILLER:  You're talking about in the

20   intermediate scrutiny analysis; correct?

21         THE COURT:  I was talking about your quote

22   that said "preventing armed mayhem is heightened when

23   an arrestee presents a demonstrable danger to the

24   community."

25         MS. MILLER:  Right.  I'll find that for the

1  Court.

2       THE COURT:  And the language was the actions

3  are particularly brazen when someone receives a gun

4  while knowing they are under indictment.

5       MS. MILLER:  I don't think that was in there.

6  I think preventing the armed mayhem is what I was talk

7  about, Your Honor.  I don't think I was quoting that

8  second part.  I don't have my argument in front of me

9  at the moment, but I'll look and see exactly where

10 that was from, and I'll cite to it before we leave

11 today.

12      Your Honor, I don't even think I need five

13 minutes if the Court doesn't have any questions about

14 the other issues that were raised, but I do want to

15 just briefly reiterate that the *Al Sabahi* court talked

16 about the federal regulations that recognize that

17 aliens illegally or lawfully in the United States

18 include nonimmigrants whose authorized period of stay

19 has expired.  And an alien who is only permitted to

20 remain in the United States for the duration of his or

21 her status becomes illegally or unlawfully in the

22 United States for purposes of 922(g)(5)(A) upon

23 commission of a status violation, which is the

24 expiration of the visa.

25      THE COURT:  I understand that part of your

1  argument very well.

2         MS. MILLER:  Okay.  Very good.  Thank you.

3         THE COURT:  My question was about how you met

4  the burden of intermediate scrutiny.  So, if you want

5  to add anything to that, you may do so.

6         MS. MILLER:  I don't think I need to add

7  anything to that unless the Court feels that I haven't

8  addressed it fully.

9         THE COURT:  You can address it however you

10  wish.  It's your burden.  So either you've said

11  everything you want to say or you haven't.  You have

12  the burden.

13         MS. MILLER:  I have said everything I want to

14  say.  I would only note for the Court that the United

15  States did talk about intermediate scrutiny.

16         THE COURT:  I know you cited intermediate

17  scrutiny.  I am presuming intermediate scrutiny.  I am

18  talking about what *Carter* says you may rely on to

19  establish the reasonable fit.

20         MS. MILLER:  Right.

21         THE COURT:  So, intermediate scrutiny is the

22  standard of review, and then you have to meet the

23  test.

24         MS. MILLER:  Right.  So, I would just add for

25  the Court then, all of the courts that have looked at

1  the Second Amendment issue in terms of 922(n) have

2  found that intermediate scrutiny is the appropriate

3  level of scrutiny.

4        The congressional record shows that the

5  reason for the existence of the statute is the safety

6  of the community and the inherent or enhanced danger

7  of somebody who is under felony indictment for a

8  crime, and the common sense approach would say that

9  the very limited period of time that somebody is not

10 permitted to acquire a new firearm is there because it

11 is not disarming somebody who has firearms legally in

12 their home prior to indictment.

13        So the common sense approach would be that

14 the person who is acquiring a firearm only after

15 indictment and only for a fairly short duration of

16 time, that is while the indictment is being reviewed

17 and finalized either by way of a plea, dismissal, or

18 guilty verdict in a trial, is a fairly short period of

19 time.  And so the common sense is we don't want people

20 who are indicted for felonies, serious felonies, to be

21 able to go out and get a firearm.

22        THE COURT:  So what about the transfer?  How

23 is that commonsensical?  You could transfer one away.

24 Why can't you do that?

25        MS. MILLER:  So the transferring of a firearm

1  is, for example, a person who is a felon under

2  indictment transferring it to another person who may

3  be a felon or --

4          THE COURT:  It may be a totally legal

5  recipient of the firearm and he needs money for

6  defense.

7          MS. MILLER:  Right.  So, for a person to

8  transfer their firearm, you know, is not even the

9  issue we have before the Court today.

10          THE COURT:  It's a constitutional challenge.

11          MS. MILLER:  It's a constitutional challenge

12  to 922(n) that no court has invalidated since hearing

13  any of the arguments under the Second Amendment

14  *Laurent* --

15          THE COURT:  Well, maybe they had a different

16  record.

17          MS. MILLER:  The record is that the person

18  received a firearm while under indictment.

19          I thank you for your consideration, Your

20  Honor.  And we would ask that the defendant's motion

21  be denied in its entirety.

22          THE COURT:  All right.  The mayhem language

23  is in the *Skoien* opinion.

24          MS. MILLER:  I think that's correct, Your

25  Honor.

1          THE COURT:  All right.

2          MR. WAGNER:  I will be brief, Your Honor.

3          Judge, on the issue of Mr. Horma being in

4   this country illegally or unlawfully, the principal

5   point we're trying to make here is that he was always

6   here under an authorized period of stay.  That's the

7   critical factor that we ask the Court to look to.

8          Every other case, the *Al Sabahi* case, the

9   *Bazargan* case, does not have those facts, Judge.  And

10  I don't really understand how it is that the

11  government characterizes *Bazargan* the way they did

12  before the Court, Judge.

13         In serval places in *Bazargan*, it's clear that

14  before Mr. Bazargan obtained the weapon, he was not

15  authorized to be in the United States.  He was told by

16  an INS official before he possessed the firearm,

17  before he received the firearm, that he was here on an

18  illegal status.

19         It was said by the judge in *Bazargan* that

20  when he failed to comply with the conditions of the

21  college of Mississippi State where he was going, he

22  fell out of lawful status.  He was no longer here as a

23  lawful person.

24         So, *Bazargan* stands for exactly the

25  proposition that we say it stands for, that

1  Mr. Bazargan fell out of lawful status, was not

2  authorized to stay in the United States at the time he

3  obtained the firearm.  Our facts here are very

4  different.  And 27 C.F.R. 478.11 would support that

5  position.

6        The government also talks about, as a policy

7  matter, that we should find that Mr. Horma was here

8  illegally and unlawfully.  Judge, in these

9  circumstances, we want to encourage people trying to

10  enter our country, trying to get visas to our country,

11  trying to get citizenship to our country, to go

12  through the proper, lawful procedures in a timely

13  manner.  And that's exactly the facts we have in this

14  case.

15        Mr. Horma came here on a visa.  He applied

16  for asylum while that visa was valid.  Those are the

17  procedures that we want people to follow to get lawful

18  residence, to become residents and citizens of the

19  United States.  As a policy matter, it seems that that

20  weighs in favor of finding that Mr. Horma was here

21  lawfully and legally.

22        Judge, I just want to turn to the *Heller*

23  argument, and I mistakenly said that was a Chicago

24  case and not a D.C. case earlier.  I was thinking

25  about *McDonald*.  I apologize for that misstatement.

1 But, again, we have a government's burden of proof,

2 and the government has to show under an intermediate

3 standard that there's a reasonable fit between the

4 challenged regulation and a substantial government

5 interest. The government has failed to present

6 information sufficient to meet that the burden.

7    Judge, indictees can possess firearms. It's

8 just they can't receive firearms under the statute.

9 If an indictee is indicted for a business offense, he

10 can receive or transfer a firearm. An indictee would

11 have to go through a certain process for release in

12 order to be in a position where he or she could

13 receive a firearm. So there would be a certain amount

14 of scrutiny that would be placed on that individual

15 before they could be in a position to receive a

16 firearm. That person has a presumption of innocence,

17 Judge, when they're indicted for a crime.

18    We talk about in the cases, the Fourth

19 Circuit cases, and *Heller*, that the people that should

20 be precluded from possessing firearms are those who

21 are not law-abiding, responsible citizens. I don't

22 understand how the government can show here that

23 someone who is under indictment and can possess a

24 firearm is a law-abiding, responsible citizen, but

25 someone who is in that same category can't receive a

1  firearm.  What is the danger?  What is the increased

2  danger in receiving or transferring a firearm when you

3  are in the same status as someone who is permitted to

4  possess a firearm?

5        The government just stated that, generally

6  speaking, someone is under indictment for a relatively

7  short period of time.  Well, that's not true

8  universally, Judge.  People are under indictment

9  awaiting trial, awaiting to be adjudicated for a year,

10 even two years in some state courts, even in some

11 federal courts.  So that's not necessarily the case

12 when applying this universally.

13       And many indictees for felonies in the class

14 of felonies where they are released on bond don't even

15 face felony convictions.  They're not even convicted

16 of a felony.  So the situation we have here, Judge,

17 does not present sufficient evidence for the

18 government to meet their standard, even under

19 intermediate review.  And we ask the Court to apply

20 the strict scrutiny standard of review.

21       Judge, the government, in their brief, has

22 relied on the *Call* case and the *Laurent* case.  And in

23 those cases, when the court, applying the intermediate

24 standard, when the court found that this provision was

25 constitutional, 922(n), the court turned on the

1  specific facts of those cases.

2          On the facts in *Laurent* that this person was

3  charged with robbery, and the facts in *Call* when this

4  person had a job that involved the transfer of

5  firearms.

6          Judge, in this case, the government has

7  produced no information that there's any specific

8  danger here by Mr. Horma possessing a firearm.  In

9  Counts One and Three, it involves a firearm that was

10 evidently received and possessed while he was at a

11 shooting range, a very short period of time where he

12 was alleged to have possessed or received a firearm.

13 The second involved a firearm that was found in a

14 dresser drawer, both Counts Two and Four, a dresser

15 drawer of a residence where he was living.

16          So, Judge, neither of those situations would

17 impute in this case the kind of dangerousness that

18 would allow the government to meet its government,

19 even understand the intermediate scrutiny standard.

20          Judge, this case is distinguishable.  This

21 case is unique.  And we ask on its unique facts, under

22 the law that's been presented to you, that Counts One

23 through Four should be dismissed.  Thank you.

24          THE COURT:  Mr. Wagner, let me ask you this

25 question.

1        MR. WAGNER:  Yes, ma'am.

2        THE COURT:  In both *Carter* -- I'm going to

3   give you the opportunity to answer this.  In both

4   *Carter* and *Chester*, cases were remanded because the

5   government had failed to demonstrate evidence of the

6   reasonable fit.  And so if a court -- if you're

7   arguing here that they have not submitted any

8   evidence -- not just submitted evidence.  I know

9   that's not the only thing you argued.  What should

10  this Court do if there's a bad record and there are

11  two Fourth Circuit cases that have remanded?

12       MR. WAGNER:  Judge, you have given the

13  government -- first of all, the government has the

14  obligation, they have the burden of proof in this

15  case, and they have not produced what I would consider

16  to be sufficient evidence at this point.

17       THE COURT:  I'm not saying they haven't,

18  though.

19       MR. WAGNER:  I understand that.  My argument

20  is that they have not.  The Court has admonished the

21  government that you need to produce whatever evidence

22  you can to satisfy your burden.

23       Upon listening to that, they didn't even take

24  the five minutes that you offered them just a moment

25  ago to produce any such evidence.

1          And so, Judge, I think that any review of

2  this case, the appellate court would be satisfied that

3  you gave the government every opportunity to

4  supplement the record, to provide what's required in

5  the record, to meet that standard, and they haven't

6  done that, Judge.

7          THE COURT: Okay. All right.

8          So, obviously, it's now after five o'clock.

9  I presume that you all will get the exhibits together

10  and the stipulations as quickly as possible.

11          That can be done by when? Obviously, I

12  presume that -- Mr. Wagner, when can you do it?

13          MR. WAGNER: By Thursday, Your Honor?

14          THE COURT: Okay.

15          MR. WAGNER: If the Court requires it more

16  quickly, we could try to do that.

17          THE COURT: I want it to be accurate, so I'm

18  happy to give you the time that you need. And I

19  presume, obviously, you need to make sure that Mr.

20  Horma knows what's being submitted.

21          MR. WAGNER: Absolutely.

22          THE COURT: And so that appears to allow time

23  to do that.

24          Okay. Let me just take one minute.

25          (The Court is conferring with her law clerk.)

1          THE COURT:  All right.  So we will anticipate

2    that the stipulations and the properly redacted

3    exhibits will be submitted by close of business, five

4    o'clock, on the record.  And I will take the matters

5    under advisement.  All right?

6          Thank you all very much.  I apologize to

7    those I kept late.

8          (The proceedings were adjourned at 5:25 p.m.)

9

10    I, Diane J. Daffron, certify that the foregoing is

11    a correct transcript from the record of proceedings

12    in the above-entitled matter.

13

                        /s/

14    _____    _____

                                DIANE J. DAFFRON, RPR, CCR     DATE

15

16

17

18

19

20

21

22

23

24

25