**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

UNITED STATES OF AMERICA

v.

**Criminal No. 3:18cr18**

MOHAMED ABDELLAHI MOHAMED HORMA,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Mohamed Abdellahi Mohamed Horma's Motion to Dismiss Counts One through Four of the Indictment (the "Motion to Dismiss"). (ECF No. 14.) The United States responded,[1] (ECF No. 21), and Horma replied, (ECF No. 24). The United States filed a Sur-Reply,[2] which the Court will not consider. (ECF No. 25.) Pursuant to the Court's order, the parties submitted additional briefing on several discrete issues. (ECF Nos. 37, 38.) On July 9, 2018, the Court heard arguments on the Motion to Dismiss, during which the parties referred to stipulations and presented exhibits, which they

---

[1] The United States also filed an "Amended Response" the day after filing its Response, and one day after its deadline to respond to Horma's Motion to Dismiss. (ECF No. 22.) No motion accompanied the "Amended Response." The Court will not consider the Amended Response.

[2] Local Rule of Criminal Procedure 47 governs motions in criminal cases. Local Criminal Rule 47(F)(1) prescribes the timeline by which parties must file response and reply briefs to criminal motions. *See* E.D. Va. Loc. Crim. R. 47(F)(1). It also states: "No further briefs or written communications may be filed without first obtaining leave of Court." *Id.*

The United States did not seek leave of Court to file its Sur-Reply, instead declaring that some of Horma's arguments in his Reply "warrant[] only a brief response." (U.S. Reply 1, ECF No. 25.) E.D. Va. Local Criminal Rule 47 provides that the Court (and not a party) determines the need for additional briefing. *See* E.D. Va. Loc. Crim. R. 47(F)(1). The Court will disregard the Sur-Reply.

later filed.[3]  (ECF Nos. 41, 42.)  The Motion to Dismiss is ripe for disposition.  For the reasons discussed below, the Court must deny without prejudice the Motion to Dismiss as to all Counts.

## I. Factual and Procedural Background

Horma, born in Morocco and a citizen of Mauritania, came to the United States on December 29, 2013, at the age of nineteen.  He entered on a valid six-month B-1/B-2 tourist visa, which expired on June 28, 2014.  On February 4, 2014, more than four months before his tourist visa expired, Horma filed an Application for Asylum (the "Asylum Application") with the United States Citizenship and Immigration Services (the "USCIS").  USCIS received the Asylum Application on February 13, 2014.  Pursuant to 8 U.S.C. § 1158(d)(2),[4] Horma could not have been granted employment authorization "prior to 180 days after the date of filing" of the Asylum Application.  8 U.S.C. § 1158(d)(2).  Given this timing, Horma became eligible for work authorization after his six-month visa expired.  On September 21, 2015, USCIS notified Horma

---

[3] At the hearing, the parties presented the record unconventionally.  They did not have a list of proposed stipulations or a complete version of exhibits.  An oral recitation of stipulated facts proved unfruitful:  the United States could not identify important dates, and gave conflicting dates for some events.  The United States also offered, contrary to local rules, only unredacted versions of exhibits that included sensitive identifying information about Horma.

So as not to further delay the hearing, the Court directed the parties to jointly file redacted exhibits and written stipulations.  At the end of the hearing, the parties requested until close of business July 12, 2017, to make this joint filing, which the Court ordered.  On July 12, 2017, Horma filed an Unopposed Motion for Leave, seeking additional time to file the Stipulations.  (ECF No. 40.)  Soon thereafter, Horma filed the Stipulations.  (ECF No. 42.)  The Court will grant the Motion for Leave.  (ECF No. 40.)

[4] Section 1158(d)(2) provides that

> [a]n applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney General.  An applicant who is not otherwise eligible for employment authorization shall not be granted such authorization prior to 180 days after the date of filing of the application for asylum.

8 U.S.C. § 1158(d)(2).

that he was eligible to apply for work authorization, (Referral Not. 2, ECF No. 41-3), but nothing in the record establishes whether Horma actually received it. The record indicates that he worked as an Uber driver. (Nov. 15, 2016 Tr. 17, ECF No. 41-9.)

On April 16, 2014, the Asylum Office Director sent Horma a "Notice of Intent to Deny" (the "NOID"), expressing an intent to deny Horma's Asylum Application and articulating why. On May 13, 2014, Horma submitted a rebuttal through counsel responding to the reasons articulated in the NOID for the intended denial and including additional information. On September 17, 2015, Horma received a Notice to Appear to demonstrate why he should not be removed from the United States. The Notice to Appear included notification to Horma that he was "removable" as a non-citizen who overstayed his tourist (nonimmigrant) visa and remained in the United States "without authorization." (Not. Appear 1, ECF No. 41-4.) The Notice to Appear also ordered Horma to "appear before an immigration judge" to show cause why he should not be removed from the United States, but it did not set a date for Horma's hearing, noting it only as "TBD," or To Be Determined. (*Id.*)

On September 21, 2015, USCIS issued a Referral Notice stating that, "after careful consideration," Horma's Asylum Application was not deemed credible. (Stip. 8; Referral Not. 1.) The Referral Notice also advised Horma that his Asylum Application was referred to an immigration judge who would independently consider it. The Referral Notice stated in bold: **"This is not a denial of your asylum application."** (Referral Not. 1.) On May 5, 2016, USCIS sent Horma a Notice of Hearing in Removal Proceedings in Immigration Court informing Horma

3

that an immigration judge would hear his matter on March 2, 2021.[5] Nothing in the record

suggests that Horma has ever appeared before an immigration judge.[6]

On July 13, 2016, while Horma's Asylum Application was pending, he was arrested in

Howard County, Maryland, and charged with: (1) shipping, importing, selling into or within, or

transporting into Maryland cigarettes or other tobacco products on which the tobacco tax had not

been paid, in violation of Maryland Tax Code § 13-1015(a)[7] (the "Maryland Tax Statute"); and,

(2) unlawful and willing possession, sale, or attempt to sell unstamped or improperly stamped

cigarettes, in violation of Maryland Tax Code 13-1014.[8] (Stip. 10; Md. Compl., ECF No. 41-6.)

On July 27, 2016, a grand jury in Howard County indicted Horma on both of those charges. On

September 2, 2016, Horma was arraigned in the Circuit Court for Howard County, Maryland

---

[5] The United States asserts in briefing that this date was later advanced to August 3, 2018. (Resp. Mot. Dismiss 3.) The United States submitted no stipulation or exhibit supporting this assertion. No evidence before the Court indicates that Horma's hearing before an immigration judge might occur on a date other than March 2, 2021. To date, neither party has reported that a hearing has occurred.

[6] Horma asserts in briefing that he has "submitted to biometrics administered by immigration officials[, and] attended all scheduled interviews[,]" to facilitate a full adjudication of his Asylum Application. (Mot. Dismiss 2.) This claim has no bearing on the Court's holding.

[7] The Maryland Tax Statute provides that

[a] person who willfully ships, imports, sells into or within, or transports within, [Maryland] cigarettes or other tobacco products on which the tobacco tax has not been paid in violation of [various regulations governing the sale and transportation of cigarettes] is guilty of a felony and, on conviction, subject to the penalties set forth in subsections (b) and (c) of this section.

Md. Code, Tax-Gen. § 13-1015(a).

[8] Section 13-1014 of the Maryland Tax Code provides that "[a] person who willfully possesses, sells, or attempts to sell unstamped or improperly stamped cigarettes in [Maryland] in violation of [various regulations governing the sale and transportation of cigarettes] is guilty of a misdemeanor." Md. Code, Tax-Gen. § 13-1014(a)(1).

("the Howard County Court"), on both charges.[9] At the arraignment, the Howard County Court informed Horma of the charges against him and their maximum possible penalties, and Horma stated on the record that he had received a copy of the indictment.

Just over two months later, on November 15, 2016, Horma, with the assistance of an interpreter, pled guilty to felony transportation of untaxed cigarettes, in violation of the Maryland Tax Statute. Horma was sentenced to eleven months' imprisonment, all suspended; a fine of $107,550, with all but $2,000 suspended; and two years of unsupervised probation.

The next day, on November 16, 2016, law enforcement obtained and executed a search warrant for Horma's residence. During the execution of that warrant, law enforcement allegedly recovered a Ruger firearm and ammunition.[10]

On February 20, 2018, a federal grand jury in the Eastern District of Virginia returned a five-count Indictment, (ECF No. 9), and on May 15, 2018, returned a five-count Superseding Indictment,[11] (ECF No. 28). The Superseding Indictment charges Horma as follows:[12]

---

[9] Horma's arraignment occurred without the benefit of an interpreter. Given Horma's presentation in this Court, and having reviewed the record, nothing that occurred in the Howard County Court gives the Court pause.

[10] The United States asserted in its briefing that: (1) on November 16, 2016, Horma was arrested in Albemarle County on charges of Possession of Cigarettes with the Intent to Distribute; (2) law enforcement executed a search warrant on Horma's vehicle, during which they uncovered a receipt for a firearm purchased for cash on November 12, 2016, from the War Store; (3) the Ruger recovered during the search of Horma's residence was found in Horma's bedroom dresser; and, (4) Horma admitted that he "had taken the gun from the purchaser" and kept it in his room. (Resp. Mot. Dismiss 4–5.) The United States put none of these facts before the Court in the form of either exhibit or stipulation. The Court, therefore, will not consider them in ruling on the Motion to Dismiss.

[11] The Superseding Indictment contains only typographical changes, and charges Horma with the same five crimes arising from the same alleged conduct as the original Indictment. Although the United States filed the Superseding Indictment after much of the briefing on the Motion to Dismiss concluded, the parties' arguments regarding the original Indictment apply

| **Count One:** | Possession of a Firearm by an Illegal Alien, in violation of 18 U.S.C. § 922(g)(5)(A), on September 21, 2016. |
| **Count Two:** | Possession of a Firearm and Ammunition by an Illegal Alien, in violation of 18 U.S.C. § 922(g)(5)(A), on November 12, 2016. |
| **Count Three:** | Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), on September 21, 2016. |
| **Count Four:** | Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), on November 12, 2016. |
| **Count Five:** | False Statements in the Acquisition of a Firearm, and Aiding and Abetting that Crime, in violation of 18 U.S.C. §§ 922(a)(6) and (2), on November 12, 2016. |

Horma moves to dismiss Counts One through Four of the Superseding Indictment.[13] As

to Counts One and Two, Horma contends that the charges must be dismissed because he does not

qualify as "an alien . . . illegally or unlawfully in the United States," as set forth in 18 U.S.C.

§ 922(g)(5)(A) because he "has only ever been present in the United States on a valid visa, or

later under a period of authorized stay due to a pending bona fide asylum application." (Mot.

---

with equal force to the Superseding Indictment. The Court did not order new briefing after the United States filed the Superseding Indictment, nor did Horma seek any. For clarity, the Court refers to the Superseding Indictment, throughout this Memorandum Opinion.

[12] In briefing, the United States expanded on the facts underlying the charges in the Superseding Indictment. Specifically, the United States asserted that, underlying the charges in Counts One and Three, on September 21, 2016, Horma went to a Richmond shooting range and rented a gun and ammunition, which he paid for using his credit card. As to the charges in Counts Two, Four, and Five, the United States contended that, on November 12, 2016, Horma and an unidentified individual went to a federally licensed firearms dealer, where the unidentified individual purchased a handgun and ammunition. Horma and the individual returned to Horma's residence, and Horma put the handgun in his bedroom dresser. The United States introduced no stipulation or exhibit supporting these facts, however. The Court therefore will not consider these facts in ruling on the Motion to Dismiss.

[13] Horma does not challenge Count Five in the Motion to Dismiss.

Dismiss 1–2.) As to Counts Three and Four, Horma argues that the Maryland Indictment cannot support a charge under 18 U.S.C. § 922(n) because the crime for which he was under indictment does not constitute "a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(n), as that phrase is defined in 18 U.S.C. § 921(a)(20). (Mot. Dismiss 1.) Horma argues in the alternative that § 922(n) is void for vagueness, and that it amounts to an unconstitutional infringement of the Second Amendment to the United States Constitution.

Based on the record presented to the Court, Horma's challenge to Counts One and Two must fail because the parties did not brief the proper legal issues or provide determinative factual evidence. Title 18, Section 922(g)(5)(A) prohibits someone who "is illegally or unlawfully in the United States" from possessing a firearm. 18 U.S.C. § 922(g)(5)(A). On the record presented, the Court cannot determine the legality of Horma's presence in the United States after his visa expired.

First, USCIS policies and provisions distinguish between a person's immigration status and the lawfulness of his or her presence in the United States. *See infra* Part II B. A person may be in illegal *immigration status* and be *unlawfully present*. Under certain circumstances, a person may be in *illegal immigration status*, but retain *lawful presence* in the United States. Horma may have illegal immigration status but retain legal presence.

Second, because parties failed to identify this critical distinction, they also failed to develop the factual record necessary to make this fact-specific determination. Despite the Court's specific request to identify the date of Horma's work authorization, the parties failed to include that information in the record they placed before the Court. The determination of Horma's lawful or unlawful presence turns on that date. The Court will deny without prejudice the Motion to Dismiss Counts One and Two.

7

As to the challenges to § 922(n) with regard to Counts Three and Four, Horma's argument that the Maryland Tax Statute does not constitute "a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(n), as defined in 18 U.S.C. § 921(a)(20) fails. His vagueness challenge to § 922(n) also fails. Those aspects of Horma's challenge will be denied with prejudice. But, given the parties' briefing and relevant United States Court of Appeals for the Fourth Circuit precedent, the Court declines to reach Horma's Second Amendment challenge on this record. The Court will deny without prejudice that aspect of Horma's Motion to Dismiss Counts Three and Four.

## II. Counts One and Two: Possession of a Firearm by an Illegal Alien

Title 18, Section 922(g)(5)(A) prohibits someone who is "illegally or unlawfully in the United States" from possessing a firearm. 18 U.S.C. § 922(g)(5)(A). The United States contends that, because Horma's tourist visa expired before the adjudication of his asylum application, he was illegally or unlawfully in the United States at the time he allegedly possessed the firearm. Horma counters that he applied for asylum before his tourist visa expired, meaning that he never became illegally or unlawfully present for purposes of 18 U.S.C. § 922(g)(5)(A).

USCIS guidance and policies make clear that a material difference exists between a person's immigration status and the lawfulness of his or her presence in the United States. A person's immigration status may be illegal, but he or she may still be lawfully present in the United States. Because neither party identified the distinction between a person's immigration status and the lawfulness of his or her presence, the parties did not brief whether "illegally or unlawfully in the United States" in 18 U.S.C. § 922(g)(5)(A) refers to a person's immigration status, the lawfulness of his or her presence, or both. Conflicting findings about status and presence could create an ambiguity when § 922(g)(5)(A) is applied.

Critical to the finding here, though, is whether and when Horma received a work authorization. Horma's immigration status became illegal when he overstayed his original visa. However, whether Horma accrued unlawful presence from that day forward depends upon whether he worked without first receiving a work authorization. Here, Horma may present a hybrid situation: he has illegal immigration status, but, if he did not work without authorization, he has not yet begun to accrue unlawful presence.

The United States failed to present, and the Court has been unable to find, any authority that suggests that Section 922(g)(5)(A) contemplates only a person's illegal immigration status. Horma may, then, distinguish himself from the defendants in the cases cited by the United States in support of their position. For the reasons outlined below, the Court finds that, absent a more complete record, it must deny without prejudice the Motion to Dismiss Counts One and Two.

### A. Legal Standard: In This Criminal Motion to Dismiss, The Court May Consider the Stipulated Evidence Before It

Federal Rule of Criminal Procedure 12(b)(1) states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A court may not decide a criminal case on a motion for summary judgment, *United States v. Weaver*, 659 F.3d 353, 355 n. * (4th Cir. 2011), so in deciding a pretrial motion to dismiss the indictment, "a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial," *United States v. Engle,* 676 F.3d 405, 415 (4th Cir. 2012). However, "a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *Weaver*, 659 F.3d at 355 n. * (citing *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005)). In *Engle*, the Fourth Circuit

9

affirmed the District Court's denial of Engle's motion to dismiss and distinguished *Weaver* by stating: "*Weaver* is inapplicable . . . because the government did not proffer or stipulate to the pertinent facts . . . and . . . some of the relevant . . . facts were developed only at trial." *Engle*, 676 F.3d at 416 n. 7.

## B. Legal Standard: A Distinction Exists Between Immigration Status and Unlawful Presence

USCIS guidance makes clear that an alien's immigration status and the lawfulness of his or her presence constitute related, but separate inquiries. UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, ADJUDICATOR'S FIELD MANUAL ch. 40.9(a)(2) ("Adjudicator's Field Manual"), available at https://www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-17138/0-0-0-18383.html#0-0-0-617 (last accessed Aug. 26, 2018).[14]

### 1. USCIS Determines an Alien's Immigration Status by Examining Compliance with His or Her Visa Requirements

An alien maintains legal immigration status as long as he or she complies with the requirements of his or her visa. *See, e.g.,* Adjudicators Field Manual ch. 40.9(a)(2)–(3); Memorandum for Thomas E. Cook, Acting Assistant Comm'r, Office of Adjudications, Immigration and Naturalization Serv. from Janice Podolny, Chief, Inspections Law Div., Office of Gen. Counsel (Mar. 27, 2003) ("Cook Memo"), available at https://www.uscis.gov/sites/default/files/files/pressrelease/PofStay4023Pub.pdf (last accessed

---

[14] Agency "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant" the level of deference given under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). The USCIS's interpretation "is nonetheless 'entitled to respect . . . to the extent that [its] interpretations have the power to persuade.'" *FDIC v. Cashion*, 720 F.3d 169, 179 (4th Cir. 2013) (quoting *Christensen*, 529 U.S. at 587). The Court finds the USCIS's interpretation of the interaction between lawful status, period of authorized stay, and unlawful presence to be reasonable and persuasive.

Aug. 26, 2018). The USCIS Policy Manual states that "[f]oreign nationals in unlawful immigration status generally include: foreign nationals who entered the United States without inspection and admission or parole; and [f]oreign nationals whose lawful immigration status expired or was rescinded, revoked, or otherwise terminated." UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, POLICY MANUAL vol. 7, pt. B, ch. 3 (2017) ("USCIS Policy Manual"), *available at* https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume7-PartB-Chapter3.html. The USCIS Policy Manual states that an alien's immigration status changes to illegal "[o]n the day after the foreign national's authorized status has . . . expired . . . while he or she is physically present in the United States." *Id.*

As described in other USCIS guidance, whether a foreign national has a pending asylum application or other pending change of status application does not affect whether the person's immigration status changes to illegal. "[A] pending application or petition does not automatically afford protection against removal if the foreign national's status expires after submission of the application." *Id.* The Cook Memo explains that a pending application for extension of status or change of status does not create a "'bridge' of continuing status." Cook Memo. 3. The pending application, if filed while the alien maintains legal status, will result in "a continuation of the period of stay authorized by the Attorney General," even though it does not result in "a continuation of 'status.'" *Id.* at 4. In this circumstance, the alien would have illegal immigration status, but would not begin to accrue unlawful presence.[15]

_____

[15] An alien may regain legal status after his or her status has changed to illegal status. For example, if an alien has timely filed an application for extension of status or change in status that USCIS then grants, his or her immigration status reverts back to legal status as of "the date the adjustment application [was] filed." USCIS Policy Manual ch. (E)(1).

## 2. USCIS Policies and the Immigration and Nationality Act ("INA") Allow an Alien's Presence to Remain Lawful, Even After His or Her Status Becomes Illegal

The lawfulness of an alien's presence in the United States depends upon his or her immigration status, but requires a different inquiry. Title 8 of the United States Code defines an alien as unlawfully present "if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). The Adjudicator's Field Manual describes the process of accruing unlawful presence as "[n]onimmigrants admitted until a specific date will . . . begin to accrue unlawful presence on the day following the date the authorized period of admission expires." Adjudicator's Field Manual ch. 40.9(E)(i).

Certain exceptions exist to these general rules. Relevant here, the Immigration and Nationality Act ("INA") creates a statutory exception for those aliens who file an asylum application. 8 U.S.C. § 1182(a)(9)(B)(iii)(II).[16] In that circumstance, "[t]he period of authorized stay begins on the date the alien files a bona fide application for asylum," Adjudicator's Field Manual ch. 40.9 (F)(ii), and continues until that application has been adjudicated, Cook Memo 5. However, this tolling provision applies only if the alien complies with all requirements,

---

[16] Title 8, Section 1182(a)(9)(B)(iii)(II) states:

> No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

8 U.S.C. § 1182(a)(9)(B)(iii)(II).

including refraining from working without authorization during the pendency of his or her asylum application.[17] 8 U.S.C. § 1182(a)(9)(B)(iii)(II).

In sum, with regard to an alien who files for asylum, whether he or she presents as unlawfully present, or has accrued time qualifying as unlawful, depends upon when he or she filed his or her asylum application. If he or she filed the application while in legal immigration status, then he or she accrues no unlawfully present days, even if his or her visa expires during the pendency of his or her asylum application. *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(II); Adjudicator's Field Manual ch. 40.9(F)(ii); Cook Memo. In that circumstance, the alien's immigration status would be illegal, but his or her presence in the United States would not be unlawful.[18]

---

[17] An alien may also be in illegal immigration status, have already accrued some unlawful presence time, but not currently accruing additional unlawful presence time. This situation occurs when an alien does not timely file for a change of status or extension of status, but files once his or her immigration status has become illegal. The Adjudicator's Field Manual states that "[a] grant of asylum does not eliminate any prior periods of unlawful presence." Adjudicator's Field Manual ch. 40.9 (F)(ii). If an alien files for asylum after his or her immigration status has become unlawful, then he or she will not accumulate any additional unlawful presence from the date he or she files his or her application, but he or she will be subject to the days already accumulated at the time he or she filed for asylum. *Id.* While the record plainly demonstrates that Horma filed for asylum, it remains silent as to whether he ever filed for an extension of status.

[18] While not relevant here, if an alien filed the application while in illegal immigration status, then he or she would accrue unlawfully present days beginning the day after his or her visa expires until the day he or she files his or her asylum application. *See* Adjudicator's Field Manual ch. 40.9(F)(ii). And any subsequently-filed asylum application would not retroactively convert unlawfully present days into lawful presence, but it does prevent the applicant from accruing additional unlawful presence. *Id.*

**C.   Analysis:  On the Record Before it, the Court Cannot Determine Whether Horma was "Illegally or Unlawfully Present in the United States," for the Purposes of 18 U.S.C. § 922(g)(5)(A)**

The Court may consider this motion pursuant to Federal Rule of Criminal Procedure

12(b)(1) because the United States and Horma have submitted stipulated facts, (ECF No. 42),

and joint exhibits, (ECF No. 41), and the United States has not contended that the Court lacks the

ability to decide this motion. *Weaver,* 659 F.3d at 355 n. *. However, the Court lacks the

necessary factual record to resolve the legal issue before it.[19] Neither the exhibits nor the

stipulated facts establish the essential fact of whether Horma received work authorization before

working as an Uber driver. Although the United States did not allege that Horma violated the

mandate to refrain from working without authorization, Horma did not expressly claim, either at

the hearing or in his briefing, that he worked only in compliance with the work authorization

requirements. Counsel for Horma declined to do so even when given the opportunity at the

hearing, and both parties failed to answer the Court's inquiry when they subsequently filed

stipulations and exhibits. The Court must make this threshold determination before it can decide

whether 18 U.S.C. § 922(g)(5)(A) applies to Horma. The Court must deny Horma's Motion to

Dismiss without prejudice as to Counts One and Two because to do otherwise on the incomplete

record before it would require the Court to improperly resolve a factual uncertainty.[20] *Engle,*

676 F.3d at 415.

---

[19] The Court cannot resolve factual uncertainties on a pre-trial motion and the factual record must drive the legal analysis. *See Weaver,* 659 F.3d at 355 n * (concluding that a district court may rule on a pretrial motion to dismiss "where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts").

[20] Per *Weaver*, the Court may rule on motions in criminal cases by relying on stipulated facts to make legal determinations. 659 F.3d at 355 n. *. In the alternative, all factual uncertainties must be submitted to the fact finder at trial.

### 1. Horma's Immigration Status Has Become Illegal

To maintain his or her legal immigration status, an alien must comply with the requirements of his or her visa, including the date by which he or she must leave the country. *See* Adjudicator's Field Manual ch. 40.9 (a)(2); Cook Memo 4. If the alien does not comply with those requirements, such as overstaying the validity of his or her visa, then his or her immigration status changes from legal to illegal. *Id.* The filing of an extension of status or change of status application does not create a "bridge" of continuing legal status, but USCIS's subsequent approval of that application retroactively converts the alien's status from illegal to legal as of the date he or she filed his or her application. Cook Memo 3–4.

On December 29, 2013, Horma entered the United States on a valid tourist visa. On February 4, 2014, while that visa was still in effect and Horma still had lawful immigration status, he applied for asylum with USCIS. Horma's tourist visa expired on June 28, 2014—more than two months after he applied for asylum. Horma's timely filing for asylum may have tolled his accrual of unlawful presence. However, as recognized in the Cook Memo, "[t]here is simply no analogous rule or guidance providing for a continuation of the alien's 'status.'" Cook Memo 4. On June 29, 2014, the day after his visa expired, Horma's *status* became illegal.[21]

### 2. Horma's Presence May Be Lawful or Unlawful

That said, the Court cannot determine the legality of Horma's *presence* on the record before it. Under current USCIS policies, an alien may be in illegal or unlawful immigration status, but not accruing unlawful presence. *See* Adjudicator's Field Manual ch. 40.9; Cook Memo. Generally, if an alien's status expires on a specific day, the alien's status becomes illegal

---

[21] If USCIS grants Horma's asylum application, then that approval may convert Horma's immigration status to legal status. *See* USCIS Policy Manual vol. 7, pt. B, ch. 3 (E)(1).

and he or she begins to accrue unlawful presence on the following day. Adjudicator's Field Manual ch. 40.9(E)(i). An exception exists for asylum applicants: "[n]o period of time in which an alien has a bona fide application for asylum pending under [§] 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States . . . " 8 U.S.C. § 1182(a)(9)(B)(iii)(II); *see* Adjudicator's Field Manual ch. 40.9(F)(ii). This exception tolls the accrual of unlawful presence time. It does not apply if the alien worked without authorization.[22] 8 U.S.C. § 1182(a)(9)(B)(iii)(II).

On December 29, 2013, Horma entered the United States on a valid tourist visa. On February 4, 2014, he applied for asylum while that visa was still in effect and Horma still had lawful immigration status. Horma's tourist visa expired on June 28, 2014—more than two months after he applied for asylum. Horma was therefore legally and lawfully present in the United States and in legal immigration status when he entered "[a] period of authorized stay." (Resp. Mot. Dismiss 16.) Although Horma states in his Motion to Dismiss that "after a certain amount of time had passed, he was given authorization to work in the United States," (Mot. Dismiss 2), Horma presents nothing, despite two opportunities to do so, establishing that he began employment only after receiving that authorization. Indeed, neither party provided the date on which Horma received this authorization. The parties submitted joint exhibits and stipulated facts that merely establish that Horma was eligible to receive work authorization as of at least September 21, 2015, and that—at some point in time—he worked as an Uber driver. (Referral Not. 2, ECF No. 41-3; Nov. 15, 2016 Tr. 17, ECF No. 41-9). Given this factual

---

[22] An asylum applicant can only become eligible for work authorization 180 days after filing his or her asylum application. 8 U.S.C. § 1158(d)(2).

uncertainty, the Court cannot ascertain the lawfulness of Horma's continued presence in the United States.

This information is critical because whether Horma received work authorization before he began work affects the lawfulness of his presence in the United States. If Horma began working before receiving his work authorization, then he has started to accrue unlawful presence. *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(II). Combined with his illegal immigration status, Horma would have no claim that 18 U.S.C. § 922(g)(5)(A) fails to reach him.

But if he did not begin working until after he received his work authorization, Horma would be in illegal immigration status, but would be lawfully present. 8 U.S.C. § 1182(A)(9)(B)(iii)(II). Only in this second factual scenario would it be necessary, or appropriate, for the Court to determine how or if 18 U.S.C. § 922(g)(5)(A) applies to Horma. Because the record does not establish the necessary facts, as the discussion below demonstrates, the Court cannot determine the applicability of the challenged statute to Horma.

### 3.    Section 922(g)(5)(A) May Be Ambiguous As to Horma

Section 922(g)(5)(A) makes it unlawful for "any person . . . who, being an alien . . . is illegally or unlawfully in the United States" to possess a firearm. 18 U.S.C. § 922(g)(5)(A). The statute does not make clear whether it applies only to a person's immigration status or the lawfulness of his or her presence. The case law cited by the parties and expanded upon by the Court does not provide determinative precedent for this case. Section 922(g)(5)(A) may be ambiguous when applied to Horma.[23]

---

[23] If, in fact, Horma's immigration status has become illegal, but his presence has not become unlawful, the statute may not apply to Horma. A question would exist whether Horma was "in" the United States "unlawfully or illegally" to a degree that would establish that element of the offense. The Court cannot decide that knotty issue here.

Neither party identifies any case law addressing whether an alien who applies for a change in status while, as Horma was, in *legal* immigration status acquires unlawful presence by virtue of his or her continued presence in the United States awaiting final determination of a pending status adjustment application. Nor does the Court see such a case. Rather, several federal circuit courts have addressed the applicability of Section 922(g) when an alien applied for a change of status *after* his or her immigration status became illegal, which lead to him or her being unlawfully present in the United States and in an illegal immigration status. *See, e.g.*, *United States v. Rehaif,* 888 F.3d 1138, 1140–41, 1147–48 (11th Cir. 2018) (affirming the jury instruction that "[a]n alien illegally or unlawfully in the United States is an alien whose presence within the United States is forbidden or not authorized by law," and affirming the defendant's 18 U.S.C. § 922(g)(5)(A) conviction when the defendant rented a gun nine months after USCIS terminated his visa); *United States v. Al Sabahi*, 719 F.3d 305, 309–10 (4th Cir. 2013) (finding that 18 U.S.C. § 922(g)(5)(A) applied when the defendant applied for a change of status four years after his status became illegal); *United States v. Latu*, 479 F.3d 1153, 1157–59 (9th Cir. 2007) (finding that 18 U.S.C. § 922(g)(5)(A) applied when the defendant applied for a change of status three months after his status became illegal); *United States v. Elrawy*, 448 F.3d 309, 312– 14 (5th Cir. 2006) (finding that 18 U.S.C. § 922(g)(5)(A) applied when the defendant filed for a change of status one month after his status became illegal); *United States v. Bazargan*, 992 F.2d 844, 847–49 (8th Cir. 1993) (finding that 18 U.S.C. § 922(g)(5) applied when the defendant filed an asylum application four months after violating his visa requirements).

If, in fact, Horma did not work without authorization, then his situation may be distinguishable from the defendants in *Al Sabahi*, *Latu*, *Elrawy*, and *Bazargan*. Specifically, each of those defendants presented as in illegal immigration status and either accruing or having

accrued some amount of unlawful presence. In those cases, Title 18 U.S.C. § 922(g)(5)(A) clearly applies. If Horma began to drive for Uber before he received his work authorization, then his situation cannot be distinguished from that faced by the defendants in *Al Sabahi*, *Latu*, *Elrawy*, and *Bazargan*. In that case, Horma's immigration status would be illegal, as discussed *supra,* and he would have accrued unlawful presence time because the tolling provision in 8 U.S.C. § 1182(a)(9)(B)(iii)(II) would not apply.

The parties put into play Horma's work status without tying together necessary loose ends. A claim that Horma received work authorization stands alongside evidence that Horma worked. But the joint exhibits and stipulated facts show only that Horma became eligible to receive work authorization and that he worked. They do not identify receipt of work authorization, or whether Horma received work authorization before commencing employment. The timing of these events are critical to a finding of lawful or unlawful presence. Given these circumstances, the Court must deny without prejudice Horma's Motion to Dismiss Counts One and Two.

### III. Counts Three and Four: Possession of a Firearm While Under Indictment

Horma brings several challenges to the charges in Counts Three and Four. First, he contends that a plain reading of the Maryland statute under which he was convicted does not qualify as a predicate conviction for purposes of a § 922(n) charge for receipt of a firearm by a person under indictment. For the reasons below, this challenge fails. Next, Horma contends that Section 922(n) is void for vagueness under *Johnson v. United States*, 135 S. Ct. 2551 (2015). This challenge also fails given the statutory construct of the Maryland law, and given *Johnson's* narrow holding.

As to Horma's Second Amendment challenge, however, the Court is constrained to deny his challenge without prejudice. It must do so because both parties failed to identify or apply the governing standard of review within the Fourth Circuit for evaluating Second Amendment challenges. This failure presented the Court with an inadequate record on which to evaluate the constitutionality of the statute. More understandably, the parties also did not brief these constitutional challenges based on what is now the law of the case: that Horma's immigration status has changed to illegal status, but that his presence may be either lawful or unlawful. These deficiencies oblige this Court to deny the Motion to Dismiss Counts Three and Four, but to do so without prejudice.

### A. Horma's Challenge That the Maryland Indictment Cannot Support a Charge Under 18 U.S.C. § 922(n) Fails

#### 1. Statutory Framework

Two statutes are relevant to the charges in Counts Three and Four. First, 18 U.S.C. § 922(n) (the "Non-Receipt Statute") provides that "[i]t shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n). Congress also exempted certain crimes from the definition of "a crime punishable by imprisonment for a term exceeding one year." Relevant here, 18 U.S.C. § 921(a)(20)(A) (the "Business Practices Clause") states: "[t]he term 'crime punishable by imprisonment for a term exceeding one year' does not include . . . any [f]ederal or [s]tate offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A).

The Business Practices Clause thus provides that someone under indictment for a federal or state offense "pertaining to antitrust violations, unfair trade practices, restraints of trade, or

other similar offenses relating to the regulation of business practices" does not violate the Non-Receipt Statute by receiving, possessing, or shipping a firearm. 18 U.S.C. §§ 921(a)(20)(A); 922(n). Horma contends that the Maryland Indictment constitutes just such an indictment, meaning that he cannot have violated § 922(n), the Non-Receipt Statute.

### 2. Principles of Statutory Interpretation Guide the Court's Analysis

Under well-settled principles of statutory construction, the Court's analysis must "begin, as always, with the language of the statutory text," and "[i]n the absence of a definition from Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common meaning." *United States v. Midgett*, 198 F.3d 143, 145–46 (4th Cir. 1999) (internal citation and quotation marks omitted). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). When "the terms of [a] statute are unambiguous on their face, or in light of ordinary principles of statutory interpretation," judicial inquiry normally ends. *United States v. Morison*, 844 F.2d 1057, 1064 (4th Cir. 1988) (quoting *United States v. James*, 834 F.2d 92, 92 (4th Cir. 1987)); *see also United States v. Wells*, 519 U.S. 482, 495 (1997) ("[Courts] presume that Congress expects its statutes to be read in conformity with th[e] [Supreme] Court's precedents).

### a. "Relating to" Modifies Only "Other Similar Offenses"

"According to the rule of the last antecedent, 'a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows.'" *United Seniors Ass'n v. Soc. Sec. Admin.*, 423 F.3d 397, 402 (4th Cir. 2005) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003)). Applying this basic grammatical rule to the Business Practices Clause, the Qualifying Clause, "relating to the regulation of business practices" refers only to the

preceding antecedent "other similar offenses." *See, e.g., United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) (applying the rule of the last antecedent similarly and rejecting the defendant's suggestion that the Qualifying Clause serves as a "descript[or] of the commonalities between each of the enumerated offenses and as an indication of a congressional intent to exclude any business-related offense"). The question for the Court, then, is how to determine the scope of "other similar offenses related to the regulation of business practices." Principles of statutory interpretation guide that analysis as well.

      **b.    The Qualifying Clause Is Limited By the Enumerated List of "Antitrust Violations, Unfair Trade Practices, [and] Restraints of Trade"**

Congress's inclusion of the word "similar" to modify "offenses" in the Qualifying Clause "indicates an intent to limit the [B]usiness [P]ractices [C]lause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses." *Stanko*, 491 F.3d at 414 (quoting *Webster's Third New International Dictionary* 2120 (2002)). Construing the statute otherwise would render the word "similar" superfluous and without meaning. *See, e.g., Bowsher v. Merck & Co.*, 460 U.S. 824, 833 (1983) (identifying the "settled principle of statutory construction that [the court] must give effect, if possible, to every word of the statute"); *see also United States v. Ivester*, 75 F.3d 182, 185 (4th Cir. 1996) (stating that the Fourth Circuit is "reluctant to interpret statutory provisions so as to render superfluous other provisions within the same enactment").

Other established principles of statutory interpretation support this reading. Under the doctrines of *ejusdem generis* (of the same kind or class) and *noscitur a sociis* (it is known by its associates), "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *United States v. Bursey*, 416 F.3d 301, 306 (4th Cir. 2005) (quoting

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship of Danny Keffeler*, 537 U.S. 371, 384

(2003)). Here, the Qualifying Clause refers generally to "offenses relating to the regulation of

business practices," certainly less specific than the three enumerated types of offenses preceding

the Qualifying Clause—"antitrust violations, unfair trade practices, and restraints of trade."

18 U.S.C. § 921(a)(20)(A). These doctrines of statutory interpretation therefore instruct that the

Qualifying Clause should be "understood as a reference to subjects akin" to the specifically

enumerated offenses.[24] *United Seniors Ass'n*, 423 F.3d at 403 (defining the doctrine of *ejusdem*

*generis*).

In light of established principles of statutory construction, the Court interprets the

Qualifying Clause, "other similar offenses relating to the regulation of business practices," as

referring to offenses similar to the Enumerated Offenses, "antitrust violations, unfair trade

practices, [and] restraints of trade." 18 U.S.C. § 921(a)(20)(A).

> ### c. The Business Practices Clause Does Not Cover Horma's Maryland Indictment

The Maryland Tax Statute undergirding Horma's Maryland Indictment makes it a felony

to "willfully ship[], import[], sell[] into or within, or transport[] within, [Maryland] cigarettes or

other tobacco products on which the tobacco tax has not been paid." Md. Code, Tax-Gen. § 13-

1015(a). For the Business Practices Clause to apply to the Maryland Tax Statute, the Maryland

---

[24] Horma argues that, when interpreting statutes that include the phrase "relating to," courts have given "relating to" broad meaning, and therefore the Qualifying Phrase, "the phrase 'relating to the regulation of business practices' should likewise be given a broad meaning sufficient to cover transportation of unstamped cigarettes." (Mot. Dismiss 11.) The Supreme Court of the United States has instructed that the doctrine of *noscitur a sociis* (it is known by its associates), "while not an inescapable rule, is often wisely applied where a word [or phrase] is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). Given the relevant principles of statutory interpretation, and given that the specific language "antitrust violations, unfair trade practices, [and] restraints of trade" precedes "offenses relating to business practices," Horma's proposed broad reading of the Qualifying Clause cannot prevail.

Tax Statute would have to constitute an offense similar to "antitrust violations, unfair trade practices, [or] restraints of trade." 18 U.S.C. § 921(a)(20)(A). The Maryland Tax Statute is not similar to those offenses, and the Business Practices Clause does not therefore exempt it from the definition of a crime punishable by imprisonment for a term exceeding one year.

###     i.     The Enumerated Offenses All Directly Regulate Business Activity in Order to Prevent Unfair Competition

All of the enumerated offenses share commonalities: they each regulate business directly, broadly seek to prevent unfair competition, and govern behavior affecting consumers and competitors.

Antitrust law is "the body of laws designed to protect trade and commerce from restraints, monopolies, price-fixing, and price discrimination." *Antitrust Law*, *Black's Law Dictionary* (10th ed. 2014). The Supreme Court has expressed its "general view that the primary purpose of the antitrust laws is to protect interbrand competition." *State Oil Co. v. Kahn*, 552 U.S. 3, 15 (1997); *see also Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 315 (4th Cir. 2007) ("Antitrust laws . . . are the Magna Carta of free enterprise." (alteration in original) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 670 (1972))).

The phrase "unfair trade practices" could have a much broader definition than "antitrust violations." *See, e.g.*, *Stanko*, 491 F.3d at 416 (noting that "unfair trade can include generally any 'inequitable business practice'"). Indeed, unfair trade practices surely include unfair competition, which involves "[d]ishonest or fraudulent rivalry in trade and commerce; [especially] the practice of endeavoring to pass off one's own goods or products in the market for those of another by means of imitating or counterfeiting the name, brand, size, shape, or other distinctive characteristic of the article or its packaging." *Unfair Competition,* Black's Law Dictionary (10th ed. 2014).

24

Finally, "restraint of trade" broadly includes "[a] limitation on business dealings or professional or gainful operations," and in the antitrust context involves "[a]n agreement between two or more businesses or a combination of businesses intended to eliminate competition, create a monopoly, artificially raise prices, or otherwise adversely affect the free market." *Restraint of Trade*, Black's Law Dictionary (10th ed. 2014). The term "refers not to a particular list of agreements, but *to a particular economic consequence*, which may be produced by quite different sorts of agreements in varying times and circumstances." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 731 (1988) (emphasis added).

Despite the different scope of each of these phrases, the Court does not interpret each phrase in a vacuum. Rather, under the doctrine of *noscitur a sociis*, reading each phrase in light of the terms around it, the Court interprets the enumerated offenses so as to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). It therefore becomes apparent that,

> while the term 'unfair trade practices' *can* apply broadly to any inequitable business practice, the meaning it carries here must be determined by reference to the other two enumerated terms[—]antitrust violations and restraints of trade[—] both of which clearly involve negative economic effects on consumers or competition.

*Stanko*, 491 F.3d at 416.

Furthermore, each of the enumerated offenses speaks to competition and the effects on *consumers* and *competitors*. *See, e.g.*, *Stanko*, 491 F.3d at 416 (noting that the enumerated offenses include "criminal statutes addressing only economic harm to competition or consumers"). This focus on consumers and competitors—rather than other general societal

concerns—becomes apparent when looking at the purpose of the enumerated offenses. A United States District Court for the District of New Jersey persuasively discussed this purpose, stating:

> [T]he purpose of the antitrust and other laws specifically mentioned in [the Business Practices Clause] is to lay down a scheme of acceptable and unacceptable behavior by imposing direct restraints against certain business procedures, and requirements and regulations for the carrying out of a business enterprise. Such regulatory laws have the purpose of protecting the consumer while promoting appropriate competitive business and pricing practices.

*United States v. Kruckel*, No. 92-611(JBS), 1993 WL 765648, at *16 (D.N.J. Aug. 13, 1993). The *Kruckel* court correctly concludes that the enumerated offenses focus on consumers and competitors. *Id.*

### ii. The Maryland Tax Statute Prevents Unfair Competition Only Indirectly

Even Horma admits that the Maryland Tax Statute only incidentally regulates business activities or unfair competition. (Mot. Dismiss 10 ("[T]he [Maryland Tax Statute] punishes commercial activity *which necessarily impacts* competition and consumers . . . ." (emphasis added)).) This indirect effect on competition and consumers cannot bring the Maryland Tax Statute within the ambit of the Qualifying Clause.

Each of the enumerated offenses is specifically designed to minimize unfair practices that affect business and consumers. The Maryland Tax Statute, in contrast, addresses transportation or sale of cigarettes or tobacco products on which a state tobacco tax has not been paid. *See* Md. Code, Tax-Gen. § 13-1015(a). Although, as Horma argues, it is certainly true that businesses who sell tobacco products lawfully—by paying the state tobacco tax—"face unfair competition when illicit cigarettes enter a market," because those tobacco products can be sold at a lower retail price, (Mot. Dismiss 10 (quoting *Protecting Our Cigarette Brands*, http://www.altria.com/our-companies/philipmorrisusa/protecting-our-cigarette-

26

brands/Pages/default.aspx), the Maryland Tax Statute does not regulate *business* practices in the

same way that "federal or state offenses pertaining to antitrust violations, unfair trade practices,

[or] restraints of trade" do, 18 U.S.C. § 921(a)(20)(A). The Maryland Tax Statute

*indirectly* affects competition and consumers, but does not do so in a way that makes it similar to

the enumerated offenses.

The Maryland Tax Statute, therefore, falls outside the Business Practices Clause, and

does not qualify as an exception to a "crime punishable by imprisonment for a term exceeding

one year," on which a prosecution under the Non-Receipt Statute could not be based. Given this

finding, the Court will next evaluate Horma's void for vagueness argument.

**B.      Horma's Contention That § 921(a)(20)(A) is Void for Vagueness Under the
Due Process Clause Does Not Succeed**

Horma contends that § 921(a)(20)(A) is void for vagueness under the Supreme Court's

2015 holding in *Johnson v. United States*, 135 S. Ct. 2551 (2015). The plain meaning of the

Business Practices Clause demonstrates congressional intent to limit the offenses within that

exclusion to those pertaining to antitrust violations, unfair trade practices, restraints of trade, or

offenses *similar* to them, countermanding Horma's proposed broad reading of the Qualifying

Clause. Given the clear meaning of the Business Practices Clause and *Johnson*'s narrow

holding, the statute survives a vagueness analysis.

**1.      Legal Standard**

The government violates Due Process when it deprives a person of "life, liberty, or

property under a criminal law so vague that it fails to give ordinary people fair notice of the

conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson*, 135 S. Ct.

at 2556 (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). The doctrine of vagueness

"is a corollary of the separation of powers—requiring that Congress, rather than the executive or

judicial branch, define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). The touchstone of the vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier,* 520 U.S. 259, 265 (1997).

A defendant asserting that a statute is void for vagueness must show a lack of fair warning of "what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). "The . . . principle is that no [person] shall be held criminally responsible for conduct which he [or she] could not reasonably understand to be proscribed." *Lanier*, 520 U.S. at 265 (first alteration in original) (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)). Courts have identified three means to evaluate whether a statute meets the fair warning requirement:

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second . . . the canon of strict construction of criminal statutes . . . ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third . . . due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

*Id.* at 266 (citations and quotation marks omitted). "[T]he failure of 'persistent efforts . . . to establish a standard' [for enforcing or applying a law] can provide evidence of vagueness." *Johnson*, 135 S. Ct. at 2558 (second alteration in original) (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921)).

## 2. *Johnson*'s Narrow Holding

Horma asserts that § 921(a)(20)(A) is void for vagueness under the Supreme Court holding in *Johnson*. *Johnson* decided a vagueness challenge to the so-called "Residual Clause"

of 18 U.S.C. § 924(e), the Armed Career Criminal Act ("ACCA").[25] ACCA provides enhanced

penalties for individuals convicted of firearm crimes under 18 U.S.C. § 922(g) who have three or

more previous convictions "for a violent felony or a serious drug offense, or both." 18 U.S.C.

§ 924(e)(1). ACCA defines a "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year . . . that—

>> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or[,]

>> (ii) is burglary, arson, extortion, involves [the] use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*

18 U.S.C. § 924(e)(2)(B) (emphasis added).

Although courts generally "do not doubt the constitutionality of laws that call for the

application of a qualitative standard . . . to real-world conduct," *Johnson*, 135 S. Ct. at 2561, the

Supreme Court held that two features of ACCA's Residual Clause "conspire[d] to make it

unconstitutionally vague," *id.* at 2557. First, it left "grave uncertainty about how to estimate the

risk posed by a crime" because "[i]t ties the judicial assessment of risk to a judicially imagined

'ordinary case'[26] of a crime, not to real-world facts or statutory elements." *Id.* Further,

---

[25] ACCA's Residual Clause defines a violent felony as including any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii).

[26] *Johnson*'s finding of vagueness also rested on the uncertainty created by using the "ordinary case" analysis coupled with a qualitative standard. This "ordinary case" analysis follows from the requirement that a court "[d]eciding whether the residual clause covers a crime . . . picture the kind of conduct that the crime involves in 'the ordinary case,' and . . . judge whether that abstraction presents a serious potential risk of physical injury." *Johnson*, 135 S. Ct. at 2557. This categorical approach requires courts in the sentencing context to apply the facts considering a so-called ordinary case of the offense, instead of contemplating the facts underlying the defendant's previous conviction. *See Mathis v. United States*, 136 S. Ct. 2243, 2251 (2016); *see also* 3 Charles Alan Wright & Sarah N. Welling, *Federal Practice and Procedure* § 549 (4th ed. 2018) (describing that the categorical approach governs when "the

ACCA's Residual Clause simultaneously left "uncertainty about how much risk it takes for a crime to qualify as a violent felony." *Id.* at 2558.

The Supreme Court reasoned that most laws "require gauging the riskiness of conduct in which an individual defendant engages *on a particular occasion.*" *Id.* at 2561. ACCA's Residual Clause, however,

> requires application of the "serious potential risk" standard to an idealized ordinary case of the crime. Because "the elements necessary to determine the imaginary ideal are uncertain *both in nature*[27] *and degree of effect,*" this abstract inquiry offers significantly less predictability than one "[t]hat deals with the actual, not with an imaginary condition other than the facts."

*Id.* (emphasis added) (quoting *Int'l Harvester Co. of Am. v. Kentucky*, 234 U.S. 216, 223 (1914)). The combined "indeterminacy about how to measure the risk posed by a crime [and]

---

government seeks to use a previous conviction to increase the sentence being imposed for the current conviction," and is used to analyze "whether the previous conviction qualifies to increase the sentence"); *Chapman v. United States*, No. 1:16cv512, 2018 WL 3470304, at * 11 (E.D. Va. July 19, 2018), *appeal filed by United States v. Chapman* (4th Cir. 2018) ("As the Supreme Court explained in *Johnson,* one of the predominant features of the ACCA residual clause that gave rise to its unconstitutional indeterminacy was that it did not limit the risk-of-force analysis to the conduct surrounding the elements of the crime but instead required courts to 'imagine' how a stylized version 'of the crime subsequently plays out.'" (quoting *Johnson*, 135 S. Ct. at 2557–58)).

[27] Regarding the uncertainty as to the *nature* of a crime that carries a "serious potential risk," the Supreme Court noted that other laws using

> terms like "substantial risk," "grave risk," and "unreasonable risk" . . . . [did not] link[] a phrase such as "substantial risk" to a confusing list of examples. "The phrase 'shades of red,' standing alone, does not generate confusion or unpredictability; but the phrase 'fire-engine red, light pink, maroon, *navy blue*, or colors that otherwise involve shades of red' assuredly does so."

*Johnson*, 135 S. Ct. at 2561 (quoting *James v. United States*, 550 U.S. 192, 230 n.7 (2007) (Scalia, J., dissenting)). ACCA's Residual Clause, however, "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes—burglary, arson, extortion, and crimes involving the use of explosives[, each of which is] . . . 'far from clear in respect to the degree of risk each poses.'" *Id.* at 2558 (quoting *Begay v. United States*, 553 U.S. 137, 143 (2007)). This lack of clarity contributed to the statute's unconstitutional vagueness.

indeterminacy about how much risk it takes for the crime to qualify as a violent felony" rendered ACCA's Residual Clause "more unpredictab[le] and arbitrar[y] than the Due Process Clause tolerates." *Id.* at 2558.

### 3. Section 921(a)(20)(A) Survives a Vagueness Analysis

Horma contends that "[b]y enumerating certain offenses, and then announcing a mismatched residual category, [18 U.S.C.] § 921(a)(20)(A) is remarkably similar to [ACCA's] Residual Clause." (Mot. Dismiss 13.) This contention, however, flows from Horma's proposed broad reading of the Qualifying Phrase, "relating to the regulation of business practice." 18 U.S.C. § 921(a)(20)(A). The phrase "other similar offenses" precedes the Qualifying Phrase, however, and the Court interprets the statute in a way that avoids rendering the word "similar" superfluous and without meaning. *See supra* Part III.A.; *see also Bowsher*, 460 U.S. at 833 (articulating the "settled principle of statutory construction that [the court] must give effect, if possible, to every word of the statute"). Moreover, the design of each of the enumerated offenses in the Business Practices Clause specifically minimizes unfair practices that affect business and consumers, meaning that § 921(a)(20)(A) does not suffer from the same lack of similarity among specified crimes that contributed to render ACCA's Residual Clause unconstitutionally vague.

Furthermore, the Fifth, Seventh, and Eighth Circuits have each held that the Business Practices Clause is not unconstitutionally vague.[28] In *Stanko*, the Eighth Circuit held that

---

[28] Horma describes the analysis in these cases as inapposite because each was decided before *Johnson*, and thus "do[] not address the contention . . . that the reasoning of *Johnson* applies to § 921(a)(20)." (Reply Mot. Dismiss 6, ECF No. 24.) Undergirding *Johnson*'s holding of unconstitutional vagueness, however, was the fact that

"Congress used the comparative term 'similar' to modify 'offenses[.]' . . . The term 'similar'
indicates an intent to limit the business practices clause's reach to offenses which are
'comparable' or 'nearly corresponding' to the enumerated offenses." *Stanko*, 491 F.3d at 414.
Similarly, the Seventh Circuit upheld the Business Practices Clause against a vagueness
challenge, stating that "the word 'similar' limits the term 'offenses,' so that it refers back to the
three enumerated offenses, and is further limited by 'relating to the regulation of business
practices.'" *United States v. Schultz*, 586 F.3d 526, 531 (7th Cir. 2009). "Accordingly, an
ordinary individual would have notice that the § 921(a)(20)(A) exception applies only if he or
she committed an enumerated or similar offense related to the regulation of business practices."
*Id.* Finally, the Fifth Circuit concluded that "the plain meaning of the statute indicates
Congress's intent to limit the offenses that fall within the § 921(a)(20)(A) exclusion to those
pertaining to antitrust violations, unfair trade practices, restraints of trade, or offenses *similar* to
them." *United States v. Coleman*, 609 F.3d 699, 707 (5th Cir. 2010) (emphasis added) (quoting
*Dreher v. United States*, 115 F.3d 330, 332 (5th Cir. 1997)).

The Business Practices Clause does not suffer from the infirmities underlying ACCA's
Residual Clause that led to the Supreme Court's holding in *Johnson*. Rather, the statute makes it
"reasonably clear at the relevant time that [Horma's] conduct was criminal." *Lanier,* 520 U.S. at

---

the enumerated crimes [in ACCA] were themselves too varied to provide . . .
assistance. Trying to reconcile them with each other, and then compare them to
whatever unlisted crime was at issue drove many a judge a little batty. And more
to the point, the endeavor failed to bring any certainty to [ACCA's Residual
Clause's] application.

*Dimaya*, 138 S. Ct. at 1221. The enumerated offenses in the Business Practices Clause,
however, lack such incongruity. Nothing in the subsequent history of these cases indicates that
their vagueness holdings were abrogated by *Johnson*, and counsel for Horma stated at oral
argument that he had not seen anything indicating such an abrogation. (July 9, 2018 Tr. 41, ECF
No. 43.) Horma's argument under *Johnson* fails to persuade.

265. Horma was on notice that his indictment for possession of unstamped cigarettes in violation of the Maryland Tax Statute did not amount to an offense exempted under § 921(a)(20)(A), meaning that, pursuant to § 922(n), he could not receive a gun. The Court cannot find that 18 U.S.C. § 921(a)(20)(A) is unconstitutionally vague. The Motion to Dismiss on that basis must be denied.

### IV. The Inadequate Record as to Horma's Second Amendment Challenge

Given that § 922(n) is not unconstitutionally vague, the Court must evaluate Horma's Second Amendment challenge. Here, the record prevents a finding. In their briefing, both parties failed to apply the governing Fourth Circuit standard for Second Amendment challenges. Reliance on the governing standard would have guided the parties to place necessary information before the Court to assess the purpose and fit of § 922(n). Furthermore, the applicable law of the case may change materially based on the Court's decision about Horma's illegal immigration status versus his lawful or unlawful presence.

### A. Neither Party Articulates or Applies the Fourth Circuit's Standard for Second Amendment Challenges

Supreme Court precedent and the governing standard within the Fourth Circuit for evaluating Second Amendment challenges direct that courts should first address an as-applied review, and only then proceed to the facial validity of a statute if the as-applied challenge falters. Despite this long established principle, both parties bypass Horma's as-applied challenge and proceed directly to arguing the facial validity of § 922(n).

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

When[n] a party brings both as-applied and facial constitutional challenges, it is appropriate to determine first whether the law is constitutional as applied to the

33

challenging party's conduct, and then only if the as-applied challenge fails, to determine whether it is necessary to consider the facial challenge. This is so "for reasons relating both to the proper functioning of courts and to their efficiency," as addressing facial challenges unnecessarily "would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws."

*United States v. Masciandaro* (*Masciandaro I*), 648 F. Supp. 2d 779, 786 (E.D. Va. 2009)

(quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989) and citing *Brockett v.*

*Spokane Arcades, Inc.*, 472 U.S. 491, 502–04 (1985)), *aff'd*, 638 F.3d 458 (2011). Furthermore,

because "a party ordinarily 'can only succeed in a facial challenge by "establish[ing] that *no set*

*of circumstances exists* under which the [law] would be valid," *i.e.*, that the law is

unconstitutional in *all* of its applications,'" if a defendant fails to establish that a challenged law

is unconstitutional as applied to *him*, that will often also, *a priori*, decide the facial challenge.

*Masciandaro I*, 648 F. Supp. 2d at 792; *see also United States v. Masciandaro* (*Masciandaro II*),

638 F.3d 458, 474 (4th Cir.), *cert. denied*, 565 U.S. 1058 (2011) ("[A] person, such as

Masciandaro, to whom a statute was constitutionally applied, 'will not be heard to challenge that

statute on the ground that it may conceivably be applied unconstitutionally to others, in other

situations not before the Court.'" (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973))).

Despite this caselaw and his statement that he challenged "both the facial validity of

§ 922(n) as well as its particular application to him," (Mot. Dismiss 16), Horma's Second

Amendment argument reads only as a facial challenge. Nowhere does Horma discuss the

particular facts of *his* case or the conduct in which *he* engaged that the statute proscribed. Horma

also never discussed whether the Court should address one challenge before the other, or how the

outcome of the Court's analysis of his as-applied challenge would impact the outcome of his

facial challenge. The United States also proceeds straight to an argument of facial invalidity

without addressing how or why it should do so. According to the United States, although Horma

"challenges the constitutionality of 18 U.S.C. § 922(n) as applied to him, . . . the facial validity

of the statute means that it provides little cover for [Horma]." (Resp. Mot. Dismiss 15.)

Moreover, neither party presents their arguments regarding the constitutionality of

§ 922(n) under the governing—and binding on this Court—Fourth Circuit standard. Clear

Fourth Circuit law dictates how the Court must undertake a Second Amendment analysis. This

Court must first ask "whether the challenged law imposes a burden on conduct falling within the

scope of the Second Amendment's guarantee." *United States v. Chester*, 628 F.3d 673, 680 (4th

Cir. 2010). Second, "[i]f the challenged regulation burdens conduct that was within the scope of

the Second Amendment as historically understood, then [the court] moves to the second step of

applying an appropriate form of means-end scrutiny." *Id.*

In order to determine the "appropriate form of means-end scrutiny," a court must

determine whether the challenged law encumbers "core" Second Amendment rights.[29] "[L]aws

burdening 'core' Second Amendment conduct receive strict scrutiny, while less severe burdens

receive only intermediate scrutiny." *United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016)

(citing *Masciandaro II*, 638 F.3d at 471). Finally, "unless the conduct at issue is not protected

by the Second Amendment at all, the Government bears the burden of justifying the

constitutional validity of the law." *Chester*, 628 F.3d at 680.

The United States, apparently relying on the reasoning of *United States v. Laurent*, 861 F.

Supp. 2d 71 (E.D.N.Y 2011), a case from a district court within the Second Circuit, contends that

"because the statute places some burden on the right, but does not substantially burden the right,

intermediate scrutiny is the appropriate form of means-end scrutiny." (Resp. Mot. Dismiss 14.)

---

[29] *Heller* identified the "core" Second Amendment right as "the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Chester*, 628 F.3d at 683 (emphasis omitted) (citing *Heller*, 554 U.S. at 634–35).

Horma, citing to a Fourth Circuit case but seemingly ignoring the progression of its analysis, asserts that "[t]he corollary of *Kolbe* [*v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc),] is that, when a statute does effectively disarm individuals, and leaves them unable to acquire any firearm for protections, strict scrutiny should be the proper standard." (Mot. Dismiss 22.) The Court cannot find that a ruling on a constitutional issue would serve the ends of justice when both parties failed to identify, articulate, and present their arguments in the context of the binding law this Court must apply.

### B. The Parties Premise Their Arguments on Opposite Findings as to Horma's Immigration Status

Throughout briefing, the parties premise their Second Amendment arguments on diametrically different assumptions about Horma's immigration status, neither of which this Court adopts. Horma did not even acknowledge the *potential* that his immigration status could affect this Court's constitutionality determination until the Court expressly ordered him to do so. (*See* June 4, 2018 O. 3–4, ECF No. 36.) At that point, Horma stated that his immigration status "is not relevant to the challenge to the *facial* validity of § 922(n), but would preclude an *as-applied* challenge to § 922(n)." (Def.'s Suppl. Br. 1, ECF No. 37 (emphasis added).) To the extent any status could be determined, Horma contended that he remained in the United States legally.

The United States argued consistently that Horma's status as a nonimmigrant alien, whether legally present or not, "defeats [Horma's] alleged expectation of a right to acquaint himself with a firearm for self-defense purposes because his possession of any firearm is manifestly illegal." (Resp. Mot. Dismiss 15.) According to the United States, a separate provision in § 922(g), 18 U.S.C. § 922(g)(5)(B), which prohibits even *lawfully* present nonimmigrant aliens from possessing firearms absent certain narrow exceptions "reflects

Congress's judg[]ment that non[]immigrant aliens are not entitled to the Second Amendment right to bear arms." (*Id.*) In its supplemental brief, the United States reiterated its position that "[i]f this [C]ourt concludes that Horma is an illegal alien, he would not enjoy the protection of the Second Amendment, and his invocation of it to mount a challenge to § 922(n)—or any statute under the sun—would necessarily fail." (U.S. Suppl. Br. 5, ECF No. 38 (footnote omitted).)

Because the parties premise their arguments on their opposing positions regarding Horma's immigration status, they brief past each other. The Court now has concluded that Horma may lie somewhere between these two positions: he may not be *unlawfully* present for the purposes of § 922(g)(5)(A), but neither has his immigration status remained legal. *See supra* Part II. In light of the distinction between immigration status and presence, and given that the Court lacks a record to determine the issue of presence or the constitutionality of the statue, much of the parties' briefing does not address the Second Amendment issue this Court must decide.

### C.    The Court Has an Inadequate Record Before It

Finally, it would not serve the ends of justice for the Court to rule on Horma's Second Amendment challenge on the present record. At least twice, the Fourth Circuit has remanded cases presenting Second Amendment challenges to statutes because of an inadequate record from which to determine whether the United States carried its burden under intermediate scrutiny.[30]

---

[30] The Court makes no determination at this point about what level of scrutiny would apply to Horma's Second Amendment claim, noting only that, on this record, intermediate scrutiny likely would apply to Horma's Second Amendment challenge.

The Fourth Circuit has held that "laws burdening 'core' Second Amendment conduct receive strict scrutiny, while less severe burdens receive only intermediate scrutiny." *Hosford*, 843 F.3d at 168 (citing *Masciandaro II*, 638 F.3d at 471). *Heller* identified the "core" Second

*See United States v. Carter*, 669 F.3d 411, 421 (4th Cir. 2012); *Chester*, 628 F.3d at 683. In

*Chester*, the Fourth Circuit noted that "[t]he government has offered numerous plausible *reasons*

why the disarmament of domestic violence misdemeanants is substantially related to an

important government goal; however, it has not attempted to offer sufficient *evidence* to establish

a substantial relationship between [the statute at issue there] and an important governmental

goal." 628 F.3d at 683. Similarly, in *Carter*, recognizing that "the burden of demonstrating the

fit rests on the government," and noting that "the government did not present sufficient evidence

to substantiate the fit," the Fourth Circuit also remanded "the case to allow [the government] to

do so and to allow Carter to respond." 669 F.3d at 421.

Here, the Court has a record perhaps even less hearty than those in *Chester* and *Carter*.

Although the parties offered evidence related to Horma's immigration status and his asylum

application, neither side presented evidence as to the relationship between § 922(n) and an

important governmental goal.[31] Moreover, the bulk of the United States' argument related to the

*fit* of the statute—not any relationship between the statute and the government interest.

The fit inquiry, however, merely constitutes the *start* of a court's intermediate scrutiny

analysis. The Fourth Circuit directs that courts "begin [the] reasonable fit inquiry by considering

the precise contours of" the challenged statute. *United States v. Staten*, 666 F.3d 154, 162 (4th

---

Amendment right as "the right of a law-abiding, responsible citizen to possess and carry a
weapon for self-defense." *Chester*, 628 F.3d at 683 (emphasis omitted) (citing *Heller*, 554 U.S.
at 634–35). Because both parties agree that Horma is not a citizen, Horma could not likely
invoke the core Second Amendment right. *See id.* (holding that Chester's Second Amendment
claim "is not within the core right identified in *Heller* . . . by virtue of Chester's criminal history
as a domestic violence misdemeanant"). The parties remain free to argue otherwise.

[31] "[I]intermediate scrutiny places the burden of establishing the required fit squarely
upon the government." *Chester*, 628 F.3d at 683.

Cir. 2011). At this initial stage, the court looks at the kind of conduct prohibited by the statute, and whether the statute contains any narrowing features. *See, e.g.*, *United States v. Chapman*, 666 F.3d 220, 228–29 (4th Cir. 2012) ("Of critical importance to our reasonable fit analysis is the fact that numerous features of [the challenged statute] keep its prohibitory sweep exceedingly narrow."). After the Court has established "the narrowness of [the challenged statute's] prohibitory sweep, . . . [it] turn[s] to evaluate *the evidence offered by the government in support of its reasonable fit burden*." *Staten*, 666 F.3d at 163 (emphasis added). At this second stage, under intermediate scrutiny, the United States would have the burden of establishing a reasonable fit between the *specific*, *identified* government interest and the *specific scope* of the challenged regulation.

The Fourth Circuit has identified that "the Constitution does not mandate a *specific* method by which the government must satisfy its burden under heightened judicial scrutiny." *Carter*, 669 F.3d at 418 (emphasis added). Under intermediate scrutiny, for instance, in order to carry its burden of establishing a reasonable fit between the governmental interest and the regulation, "the government may resort to a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense." *Id.* at 418. The Fourth Circuit also has suggested that when a statute includes an "important limiting principle," the United States need not establish an especially "fulsome" record. *See id.* Even when a statute contains such a limiting principle, however, "the government still bears the burden of showing that [the statute]'s limited imposition on Second Amendment rights *proportionately advances* the goal of preventing gun violence." *Id.* at 419 (emphasis added). Furthermore, "the nature and quantity of any showing required by the government 'to satisfy heightened judicial scrutiny of legislative

judgments will vary up or down with the novelty and plausibility of the justification raised.'" *Id.* (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000)).

Although, during oral argument, the United States relied heavily on the record laid out in *Laurent* in attempting to make its showing, this Court will not base such a finding on a factual record established seven years ago by a different court, with different litigants, with material not before this Court. *See Laurent*, 861 F.Supp.2d at 105 (citing to the Bureau of Justice Statistics *Compendium of Federal Justice Statistics, 2004* 54 (2006), which found that "only 1.8% of felony defendants violated the terms of their pre-trial release by committing any other crime.").

With these principles in mind, cognizant of the Fourth Circuit's apparent reluctance to decide Second Amendment challenges on inadequate evidentiary records, and in the interests of justice, the Court will deny this aspect of Horma's Motion to Dismiss as to Counts III and IV without prejudice.

For the reasons stated above, the Court will deny without prejudice aspects of the Motion to Dismiss as to all Counts; and grant the Motion for Leave. An appropriate Order shall follow.

/s/

M. Hannah Lauck
United States District Judge

Date: 9/4/18
Richmond, Virginia