IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.                                    )<br>)<br>MOHAMED ABDELLAHI MOHAMED HORMA, )<br>)<br>a.k.a. "Mohamed Abdellahi Moham Horma" )<br>a.k.a. "Mohamed Abdel Mohamed Horma" )<br>)<br>Defendant.             ) | Criminal No. 3:18cr18-MHL |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
DISMISS COUNTS 3 & 4 OF THE SUPERSEDING INDICTMENT**

The United States of America, by and through G. Zachary Terwilliger, United States

Attorney, and Angela Mastandrea-Miller, Assistant United States Attorney, files its response in

opposition to defendant Mohamed Abdellahi Mohamed Horma's, a.k.a. "Mohamed Abdellahi

Moham Horma," a.k.a. "Mohamed Abdel Mohamed Horma" Motion to Dismiss Counts 3-4 of

the pending superseding Indictment (Docket Entry 53). Contrary to the defendant's assertions, 18

U.S.C. § 922(n) is constitutional both as-applied to the defendant and facially.

## I.      Factual Background and Prior Proceedings

<u>Defendant Arrives in the U.S. from Mauritania and is in Removal Proceedings:</u>

The facts regarding the defendant's immigration status are set forth in detail in the

previously filed Response in Opposition to Defendant's Motion to Dismiss, and in the Joint

Stipulations filed by the parties (Docket Entries 21, 41, 42). These docket entries are

1

incorporated herein by reference. To summarize, the defendant is a native of Morocco and a

citizen of Mauritania. He came to the United States on December 29, 2013, on a six-month non-

immigrant B2 visa. His visa expired on June 28, 2014. On February 13, 2014, the defendant filed

an Application for Asylum. The matter was deemed not credible before and after the defendant

filed additional information. The defendant is now in removal proceedings, with the matter

scheduled to be heard by an immigration judge in the future.

<u>The Defendant Worked Without Authorization</u>[1]

At the November 20, 2018, hearing the government will present evidence showing that

the defendant first received work authorization from the USCIS for a one-year period beginning

on March 20, 2015, and ending on March 19, 2016.  He did not receive authorization to work

prior to or after these dates.  The evidence will also show that the defendant worked in the

wholesale cigarette business as both a subcontractor and an owner at various times beginning in

2014 and continuing up until May 2017 (when he was incarcerated in Virginia on cigarette

trafficking charges).

The evidence will show that between May 19, 2014, and July 7, 2015, the defendant

deposited approximately $216,744.00 into a Bank of America account that he opened in his

name. Between February 18, 2014, and July 6, 2015, he deposited $321,206.00 into another

---

[1] This Court concluded that, "[I]f Horma began to drive for Uber before he received his work authorization, then his situation cannot be distinguished from that faced by the defendants in *Al Sabahi, Latu, Elrawy, and Bazargan*. In that case, Horma's immigration status would be illegal, as discussed *supra*, and he would have accrued unlawful presence time because the tolling provision in 8 U.SC. § 112(a)(9)(B)(iii)(II) would not apply."  *United States v. Horma*, 2018 WL 4214136, *9-10.

Bank of America account opened in his name.[2]  The defendant has been associated with multiple tobacco wholesale businesses, some that he registered with the Virginia State Corporation Commission, and some registered in the names of other people (but used by the defendant to purchase wholesale cigarettes). In January 2017, the defendant and another individual opened a Virginia tobacco wholesale business they named Tobacco Sahara Corp.  Between January 31, 2017, and March 13, 2017, the defendant and his partner deposited approximately $30,000.00 into a Tobacco Sahara bank account the defendant opened. In March 2017, he and his business partner were observed by law enforcement leaving a Sam's Club where they had just purchased hundreds of cartons of cigarettes at wholesale pricing.

The Defendant is Arrested in Maryland and Charged with a Felony:

On July 13, 2016, the defendant was arrested in Howard County, Maryland, while in possession of 717 *cartons* of unstamped cigarettes. He was indicted in Maryland state court on July 27, 2016, on two criminal charges: (1) transportation of cigarettes on which the tobacco tax has not been paid (a felony) and (2) possession of unstamped cigarettes (a misdemeanor).  *See* Md. Code Ann., Tax-Gen. § 13-1014(a)(3), 13-1015 (a misdemeanor).

---

[2] The defendant advised the courts in Maryland and the Court in the Eastern District of Virginia, Richmond Division that he was employed as an Uber driver. He advised the Maryland court that he was an Uber driver for a six month period of time leading up to his arrest (i.e. from February 2016 to July 13, 2016).  Information received from Uber confirms that this is false information. The defendant also indicated to the Maryland courts and to the Court in the Eastern District of Virginia that he worked at "The Italian Kitchen," a restaurant in Washington DC, for one year. The restaurant has no records indicating that the defendant has ever worked there.

3

<u>Defendant Receives Firearms While Under Indictment:</u>

On or about September 21, 2016, while his Maryland felony indictment was still pending, (and after the defendant's nonimmigrant visa and work authorization had both expired), the defendant went to a Richmond shooting range, rented a Ruger SR9C 9mm handgun bearing serial number 336-40978. He paid for the gun with his credit card. There is a video showing the defendant shooting the firearm.

Approximately seven weeks later, on November 12, 2016, while the Maryland felony Indictment remained pending, the defendant and another identified individual traveled to the War Store, a federally licensed firearms dealer located in the Eastern District of Virginia.  The individual who traveled with the defendant to the War Store purchased a Smith & Wesson M&P 9mm handgun bearing serial number HVK3499. The two men then returned to the defendant's apartment with the firearm. In a post-*Miranda* interview with law enforcement, the defendant admitted that he came up with the idea to purchase the firearm, but because he did not have a "green card," he needed a U.S. Citizen to acquire the firearm. The defendant at first denied going into the War Store, but after he learned that there was a video of him inside the store, he eventually admitted that he went inside the store with the straw purchaser. The defendant told law enforcement that once they arrived back at his apartment, he took the firearm away from the [straw] purchaser and put it in his bedroom dresser.

<u>Defendant Pleads Guilty to the Maryland Felony Charge</u>

On November 15, 2016, three days after purchasing the firearm, the defendant pled guilty to the pending Maryland felony charge of transporting untaxed cigarettes. He was sentenced to

11 months' incarceration, with all of that time suspended. A fine was also imposed, and he was placed on 2 years of unsupervised probation.

<u>Defendant is Arrested in Virginia on Cigarette Trafficking Charges</u>

In the days and weeks preceding November 16, 2016, the defendant was under surveillance by members of the Henrico County Police Department, who suspected the defendant was engaged in cigarette trafficking. On November 16, 2016, the day after the defendant pled guilty to cigarette trafficking in Maryland, he and another individual (the firearm straw purchaser) were arrested in Albemarle County, Virginia. At the time, two cars registered to the defendant – a 2011 BMW and a 2015 Toyota Corolla (records show the defendant purchased the Toyota on October 22, 2016, in Maryland for $14,743 in cash) were in the Sam's Club parking lot. The cars were searched and a receipt for the firearm that had been straw purchased on November 12, 2016, from the War Store was recovered from the glove compartment of the defendant's Toyota. In addition, thousands of dollars in cash and hundreds of cartons of cigarettes were recovered from his two vehicles.

A search warrant for the defendant's residence was obtained on November 16, 2016. The firearm that had been purchased from the War Store on November 12, 2016 was recovered. The firearm was located in the defendant's bedroom dresser along with papers bearing his name.  As noted, the defendant later admitted that he had gone to the War Store with the (straw) purchaser and then took the gun and put it in his (the defendant's) bedroom dresser.

<u>Defendant is Indicted and Pleads Guilty to Three Felonies in Three Virginia Jurisdictions:</u>

On March 3, 2017, the defendant was indicted in Richmond, Virginia on charges of felony Possession of Cigarettes with the Intent to Distribute. On April 6, 2017, he was indicted in Albemarle County, Virginia, on charges of felony Possession of Cigarettes with the Intent to Distribute. On September 18, 2017, he was indicted in Chesterfield County, Virginia, on charges of felony Possession of Cigarettes with the Intent to Distribute.

The defendant pled guilty to the Albemarle County cigarette trafficking felony on August 8, 2017; he pled guilty to the Richmond cigarette trafficking felony on September 28, 2017; and he pled guilty to the Chesterfield County cigarette trafficking felony on December 4, 2017. He was incarcerated on these state charges from May 2017 until January 2018.[3]

---

[3] Cigarette trafficking offenses have attracted increasing attention.  The Virginia State Crime Commission's 2016 Annual Report: Cigarette Trafficking Update, noted in the Executive Summary at page 1: "Cigarette trafficking remains widespread in the Commonwealth ... has resulted in Virginia becoming the primary source state for black market cigarettes.... Organized criminal enterprises have brought violent activity to the Commonwealth while amassing large profits by purchasing cigarettes cheaply in Virginia and then selling them illegally in other states. Some of the profits from this illegal activity are also sent overseas. The federal government has identified links between cigarette trafficking and the funding of terrorist groups."  Moreover, "Many of these cases involved the establishment of fraudulent businesses to purchase large quantities of cigarettes solely for the purpose of trafficking.  Business registrations and sales tax exempt certificates are easily obtained online and are immediately available to the applicant." *Id*.

In "A Guide to the Illicit Tobacco Trade," multiple federal agencies published an overview of the global illicit tobacco trade and the threat to national security that this criminal activity presents. The publication notes: "The illicit trade in tobacco products remains a lucrative revenue stream for many criminal actors and illicit networks ... funding illegal activity.  The trade is both domestic and international in scope.  The writers point out that, "For decades, cigarette smuggling has been a sizable and dependable revenue stream for organized crime. Estimates for the annual state and local U.S. tax loss by the illicit trade in tobacco products ranges from $2.95 billion to $6.92 billion. "The Global Illicit Trade in Tobacco: A Threat to

The pending superseding Indictment charges the defendant with two counts of **receipt** of a firearm while under indictment (Counts Three is for the firearm he received at the range, and Count Four is for the firearm he received from the straw purchaser after leaving the War Store). He is also charged with aiding and abetting the straw purchase of a firearm (Count Five). These charges constitute violations of 18 U.S.C. § 922(n) and §§ 922(a)(6) and 2, respectively.

## II.     Argument

Horma mounts as-applied and facial challenges to 18 U.S.C. § 922(n) under *District of Columbia v. Heller*, 554 U.S. 570 (2008). Under the approach dictated by Fourth Circuit precedent, which the defendant does not challenge, the Court first asks whether a challenged law imposes a burden on conduct falling within the scope of the Second Amendment.  If the Court finds that it does not, the Second Amendment challenge fails at the threshold, without requiring further analysis. If a court finds that the regulation implicates conduct protected by the Second Amendment, it then turns to the second step of the analysis, determining the appropriate level of constitutional scrutiny and asking whether the law satisfies that scrutiny.  *See Woollard v. Gallagher*, 712 F.3d 865, 874-75 (4th Cir. 2013).

Section 922(n) is constitutional under that precedent.  First, because the law is among the longstanding regulations of firearm acquisitions that fall outside the scope of the Second Amendment, the defendant's challenge fails at the first step of the Fourth Circuit's analysis.  The

---

National Security at pp. 2, 7 (December 2015).  See also Terrorism and Tobacco: Extremists, Insurgents turn to Cigarette Smuggling" by Kate Wilson, June 29, 2008, updated May 19, 2014 (discussing cigarette smuggling and ties to terrorist organizations) found at https://www.publicintegrity.org/2009/06/29/6338/terrorism-and-tobacco.

Court need go no further to decide this motion.  But, even if it proceeded beyond the first step, the law satisfies the intermediate scrutiny standard required by Fourth Circuit precedent.  To satisfy that standard, the government must show that "there is a reasonable fit between the challenged regulation and a substantial government objective." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (quoting *Bd. Of Trs. Of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). Section 922(n) meets this standard because it significantly advances the government's substantial interest in keeping firearms out of the possession of non-law-abiding and irresponsible individuals and is not significantly broader than necessary.

*Chester* Step One

Defendant's challenge to Section 922(n) can be rejected at the first step of the Fourth Circuit's analysis, because the law does not implicate "the right of law-abiding, responsible citizens to use arms."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  The Supreme Court in *Heller* stated that "nothing in [its] opinion should be taken to cast doubt" on "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27. The Court described these "permissible" measures as falling within "exceptions" to the protected right to bear arms.  *Id.* at 635.

Section 922(n)'s prohibition on acquiring new firearms while under indictment for a felony fits within such longstanding regulations of the acquisition and use of firearms.  "*Heller* identified . . . as a 'highly influential' 'precursor' to the Second Amendment the Address and

8

Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604).  That report expressly recognized the permissibility of imposing a firearms disability on serious criminals, stating that "citizens have a personal right to bear arms 'unless for crimes committed, or real danger of public injury.'"  *Id.* (quoting 2 Bernard Schwarz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).  "[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'"  *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010)) (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995)); *see United States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012) (same).

The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and it "'does not preclude laws disarming the unvirtuous (i.e. criminals.)'"  *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (quoting  Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *NRA v. ATF*, 700 F.3d 185, 201 (5th Cir. 2012) (same); *United States v. Rene E.,* 583 F.3d 8, 15-16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as . . . . limited to those members of the polity who were deemed capable of exercising it in a virtuous manner.") (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in*

9

*Second Amendment Scholarship,* 29 N. Ky. L. Rev. 657, 679 (2002)).  And, indeed, the Fourth

Circuit has already recognized that "conviction of a felony necessarily removes one from the

class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment."

*Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017).

Congress's decision to temporarily prohibit those who are under indictment for such

crimes from acquiring *new* firearms while the indictment is pending flows directly from this

historical understanding of the Second Amendment right.  Originally codified in the Federal

Firearms Act of 1938, 76 Cong. Ch. 850 §2(e), 52 Stat. 1250, 1251 (repealed), the law prohibited

individuals under indictment, as well as violent felons, misdemeanants, and fugitives from

justice from possessing firearms.  The longstanding prohibitions were passed as a package to

keep "firearms out of the hands of those who demonstrated their unfitness to be entrusted with

such dangerous instrumentalities."  *Cases v. United States*, 131 F.2d 916, 921 (1st Cir. 1942);

S.Rep. NO. 82, 75th Cong., 1st Sess. 2 (1937).

Section 922(n) is also consistent with also traditional limitations imposed on the liberty

of individuals under indictment for serious crimes.  In many circumstances, an individual under

indictment has long been subject to detention pending trial, *see, e.g.*, Bail Reform Act of

1984, 18 U.S.C. § 3141 *et seq.*; may be subject to various conditions of pre-trial release

(including restrictions on rights to firearms), see *Berry* v. *District of Columbia*, 833 F.2d 1031,

1036 (D.C.Cir.1987);[4] or may be subject to other collateral consequences like disqualification

---

[4]  A survey of cases handled by the magistrate judges in the Richmond Division of the
Eastern District of Virginia show that judges routinely include, as part of pretrial release

from public housing, *see, e.g.,* 24 C.F.R. § 966.4(*l*)(5)(iii)(A).  A temporary prohibition on acquiring new firearms falls within these historical restrictions on the liberty of indicted individuals.  It does not meaningfully burden the rights of law of abiding and responsible citizens to keep and bear arms within the historical understanding of that right.

The facts of this case are illustrative.  Defendant Horma is not a U.S citizen. He is not law abiding. He was under indictment for felony contraband cigarette trafficking, an offense associated with violent crime. While under indictment, he received two firearms. One day after pleading guilty and telling the Maryland judge that he would never engage in cigarette smuggling again (See Joint Stipulation, p. 2, ¶ 15, Government Exhibit 5, at pp. 18-19), the defendant was arrested in Albemarle County and subsequently charged in three separate Virginia jurisdictions with cigarette trafficking. As noted, he pled guilty to each of these three new felony charges. The defendant was clearly not dissuaded from continuing to engage in illegal activity while under indictment and after pleading guilty. Moreover, it is undisputed that he knew he was under indictment, but disregarded the law when he received the two firearms. One of the firearms he received was fired outside the home (at a gun range). The other firearm he received was illegally (straw) purchased at his request. This defendant cannot show by his conduct that he is a law-abiding, responsible citizen. *See United States v. Moore*, 666 F.3d 313, 315 (4th Cir. 2012).

---

conditions, the condition that defendants refrain from possessing any firearms (a much greater restriction than receiving new firearms after indictment).  Judges also routinely order family members to whom the defendant is released to remove all firearms from the home.

Section 922(n) also does not burden any of the defendant's Second Amendment rights for an additional reason.  In *Heller*, the Supreme Court explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible **citizens** to use arms in defense of hearth and home." *Chester*, 628 F.3d at 676 (quoting *Heller*, 554 U.S. at 635) (emphasis added). As the United States briefed in its Supplemental Response, (Docket Entry 38), in *United States v. Carpio-Leon*, 701 F.3d 974 (4th Cir. 2012), the Fourth Circuit held that illegal aliens do not enjoy the protection of the Second Amendment.  The Fourth Circuit began its analysis by applying Part I of the *Chester* test. The Court concluded that the first part of the test had not been satisfied because "the Second Amendment right to bear arms does not extend to illegal aliens."  *Carpio-Leon*, 701 F.3d at 982. As a result, the court rejected the defendant's Second Amendment constitutional challenge without even proceeding to the second step of *Chester*.

The same result should obtain here.  In *Carpio-Leo*n, the Fourth Circuit held that "illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given," and "*illegal aliens* do not fall in the class of persons who are classified as law-abiding members of the political community for the purpose of defining the Second Amendment's scope."  701 F.3d at 981.  Because Horma is in the United States illegally, he does not enjoy the protection of the Second Amendment and his invocation of it to mount a challenge to §922(n) fails.

This Court has already concluded that Horma's immigration status has become illegal. *See* Memorandum Opinion, Doc. 45, at p. 15.  This Court has also noted that an alien must also

12

comply with the requirements of his or her visa, including the date by which he or she must leave the country.  If the alien does not comply with these requirements, such as by overstaying his or her visa, then his or her immigration status changes from legal to illegal. *Id*.  The filing of an extension of status or change of status application does not create a "bridge" of continuing legal status.  This Court has further found that as of June 29, 2014, the day after his visa expired, Horma's status became illegal. *Id*.

This Court, however, also found that it could not determine the legality of Horma's *presence* on the record it had before it. The Court specified in its Memorandum Opinion that an exception to any possible tolling of the defendant's accrual of unlawful presence would not apply if the defendant worked at any time without authorization.  See *Id*. at 16.  This Court concluded that if he had worked without authorization, his immigration status would be illegal, and he would have accrued unlawful presence as well because the tolling provision would not apply.

The defendant worked without authorization. The United States will present evidence at the November 20, 2018, hearing demonstrating that the defendant was employed before, during, and after his work authorization was granted. The United States will also introduce evidence at the November 20, 2018, hearing showing that the defendant received work authorization for a one-year time period beginning on March 20, 2015 and ending on March 19, 2016, but that he worked before and after these dates.

The United States will present evidence showing that the defendant worked as an independent contractor for multiple cigarette wholesalers, and that he opened up multiple businesses, sometimes in partnership with other individuals. The evidence will show that he

13

worked from mid-2014 until May 2017, and that for all but one year, he worked without authorization.

The United States will call witnesses who will summarize the defendant's financial statements (bank records and business records), which will show that the defendant deposited more than $500,000 into multiple bank accounts between 2014 and 2017, when he worked in the cigarette wholesale business. Per this Court's Memorandum Opinion, then, the defendant's status is illegal, *and* he has accrued unlawful presence by working without authorization. Under *Carpio-Leon*, the defendant therefore does not possess Second Amendment rights and his challenge to Section 922(n) fails.

    *Chester* Step Two:

Because Section 922(n) does not implicate the defendant's Second Amendment rights at all, the defendant's challenge to Section 922(n) fails at the first step and the Court's analysis need go no further.  If this Court finds, at the first step of the two-part inquiry, that a challenged law does in fact burden conduct protected by the Second Amendment, circuit precedent requires it to apply "an appropriate form of means-end scrutiny."  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2013).

The Fourth Circuit has said that the level of scrutiny in the Second Amendment context depends on the nature of the conduct being regulated, and the degree to which the challenged law burdens the right. *Chester* at 682.  Section 922(n) temporarily prohibits those who are under indictment for a serious crime (i.e. punishable by a term of imprisonment exceeding one year), from receiving a firearm *after* the person has been indicted, and after they learn that they have

14

been indicted.  It is therefore quite limited in scope in that it applies only to those persons who have been charged in state or federal court with a felony and thereafter *receive* a firearm. A person who lawfully receives a firearm *before* a felony indictment is not required to disarm himself. Moreover, once the indictment has resolved, § 922(n) no longer applies. Congress has further narrowed the reach of § 922(n) in that persons who are under indictment for antitrust violations, unfair trade practices, and restraints of trade are excluded from § 920(n). *See* 18 U.S.C. § 921(a)(20)(A). Thus, the prohibition created by § 922(n) does not come close to creating a ban on the possession of firearms in the home, as the defendant suggests.

The Fourth Circuit has upheld firearm offenses that apply to a longer time period and operate as a broader prohibition on firearm possession. Specifically, the Fourth Circuit has upheld under intermediate scrutiny (i) Section 922(g)(3), prohibiting possession of a firearm by an unlawful user of controlled substances, *see United States v. Carter,* 750 F.3d 462 at 464 (4th Cir. 2014) ("*Carter II*"); (ii) Section 922(g)(9), prohibiting possession by a person convicted of misdemeanor domestic violence, *see United States v. Staten*, 666 F.3d 154, 157 (4th Cir 2011); and (iii) Section 922(g)(8), prohibiting possession by a person subject to a restraining order for domestic violence, *see United States v. Chapman*, 666 F.3d 220, 227-32 (4th Cir. 2012).  These binding precedents, which the defendant does not challenge, require the Court, if it reaches the second step of the *Chester* analysis, to evaluate Section 922(n) under intermediate scrutiny.

Under that standard, "the government bears the burden of showing 'a reasonable fit between the challenged regulation and a substantial government objective.'" *Staten*, 666 F.3d at 159.  In other words, Section 922(n) survives the Fourth Circuit's intermediate scrutiny analysis

15

if it significantly advances a substantial governmental interest and does not sweep substantially more broadly than necessary to serve that interest.  The government's interests in disarming non-law-abiding, irresponsible citizens is indisputably a substantial governmental interest.  *See Woollard*, 712 F.3d at 877.  The question, then, under binding circuit precedent is whether there is a reasonable fit between the restriction by those who are under indictment from receiving new firearms and the government's objectives.

There is such a reasonable fit between Section 922(n) and the government's interest in keeping firearms out of the hands of non-law abiding, irresponsible citizens.  As noted, Section 922(n) applies only to individuals who have been indicted for a felony, as historically understood--i.e. a crime punishable by more than a year imprisonment, *see* 1 Wayne R. LaFave, *Substantive Criminal Law* § 1.6(a) (3d ed. 2017).  If convicted of such crimes, those individuals forfeit their rights altogether.  *See Pallozzi*, 848 F.3d at 626.  Moreover, Section 922(n) is limited to prohibiting the acquisition of *new* firearms; it does not prohibit the continued possession or use of firearms already in the individual's possession at the time of indictment.  And it applies only during the period that the felony indictment is pending.  In other words, the provision prevents individuals for whom there is probable cause that they have committed a serious crime from obtaining additional firearms while the government determines whether such an offense in fact occurred.

In support for his "as-applied" challenge, the defendant claims that his indictment was for a nonviolent felony.  But Congress appropriately declined to hinge section 922(n)'s prohibition on an open-ended crime-by-crime evaluation of federal and state criminal codes.  The problems

16

inherent in such an approach are illustrated by the Supreme Court's recent decisions striking down statutory definitions of violent crimes as unconstitutionally vague. *See Johnson v. United States*, 135 S. Ct. 2551, 2558 (2015) (striking down Armed Career Criminal Act's residual clause, while citing the Court's "repeated attempts and repeated failures to craft a principled and objective standard" for defining what crimes qualify as violent); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1223 (2018) (striking down similar provision in the Immigration Nationality Act); see also id. at 1232 (Gorsuch, J., concurring) (observing that such inquiries have no "obvious answers" and "leav[e] the people to guess about what the law demands—and leav[e] judges to make it up").

        In any event, defendant's factual assumptions are off the mark.  Trafficking in contraband cigarettes is far from benign. *See* S. Rep. No. 95–962, at 6 ("Cigarette bootlegging has often been viewed as a victimless crime, but both research and testimony of witnesses forcefully refuted this notion by pointing out the violent activity associated with organized crime infiltration and take-over operations."); *Id.* at 6 ("The truly innocent victims of the activities of organized crime in this area are the thousands of legitimate businessmen, wholesalers, retailers, drivers, packers, and sales people who have lost their jobs and businesses as a result of the takeover."); H. R. Rep. No. 95–1778, at 7 (finding that there is a "causal relationship between the flow of cigarettes into interstate commerce to be sold in violation of state laws and the rise of racketeering in the United States"). *See also* 18 U.S.C. § 2342 (a), trafficking in contraband cigarettes is a Federal felony and under 18 U.S.C. § 1961 (1), a Federal racketeering activity.  *Cf. United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) ("application of the felon-in-

17

possession prohibition to allegedly non-violent felons like Pruess does not violate the Second Amendment").

The defendant claims that because his receipt of a firearm was in the "controlled setting" of a gun range, § 922(n) cannot be constitutionally applied to him. First, the Fourth Circuit has previously rejected the "gun range" excuse. In *United States v. Mahin*, 668 F.3d 119, 127 (4th Cir. 2012), the defendant "contend[ed] that the rental of a firearm in the controlled setting of a firing range is a far cry from posing any danger." The Fourth Circuit noted, "[A]s the district court found, once Mahin possessed the firearm he possessed the power to use the firearm against others in the vicinity." *Id*. The Court pointed out, "It is of no moment that in this particular instance Mahin did not exit the store with the handgun in tow." *Id*.

Finally, because Section 922(n) is constitutional as applied to the defendant, his facial challenge plainly fails. The Supreme Court has held that in order to succeed in a facial challenge, a movant "must establish that no set of circumstances exists under which the Act would be valid. *United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016); *United States v. Salerno,* 481 U.S. 739, 745 (1987). Because Section 922(n) is constitutional as applied to the defendant, he cannot prove that there are no circumstances in which the Act could be validly applied.

* * * * *

Based on the foregoing, the government submits that Section 922(n) is constitutional as applied to the defendant without resort to statistical evidence on its effect on public safety. Nevertheless, at this Court's request in interpreting Fourth Circuit precedent, we also submit the

18

following statistical evidence concerning the acquisition and use of firearms by individuals under

indictment for felonies:

Statistical Evidence Regarding Indictees Attempting to Acquire New Firearms:

The National Instant Criminal Background Check System (NICS), mandated by the

Brady Handgun Violence Prevention Act of 1993, was launched by the FBI on November 30,

1998. NICS is used by Federal Firearms Licensees to instantly determine whether a prospective

buyer is eligible to acquire firearms. Between 1998 and 2018, **51,545** people attempted to

purchase a firearm while their felony indictment was pending.

Statistics on Pretrial Misconduct by Federal Felony Defendants:

The following table summarizes the behavior of federal felony defendants (indictees)

who are released on pretrial supervision:

| Lead Offense | Total Defendants | Released Defendants | Percent of Total | At Least 1 Violation | Technical Violations | Release Revoked |
|---|---|---|---|---|---|---|
| All | 92,852 | 26,270 | 28.3% | 17.8% | 16.2% | 9.8% |
| Violent Crime | 3,118 | 782 | 25% | 23.1% | 21.8% | 14.1% |
| Drugs | 24,090 | 7,568 | 31.4% | 26% | 23.9% | 14.7% |
| Weapons | 6,367 | 1,419 | 22.3% | 33% | 29.5% | 20% |

Source:  Federal Justice Statistics – Statistical Tables March 2017, Section 2, Tables 3.1 and 3.3

As the table shows, 75% of all violent offenders are held pending trial, 78% of all

weapons offenders are held pending trial, and 69% of all drug offenders are held pending trial.

Of the 22.3% of defendants charged with felony weapons offenses who were released to federal

pretrial supervision, 33% incurred at least one violation, and 20% had their pretrial release

revoked.  Of the 31% of drug offenders (drug trafficking is the lead charge, but may include

19

weapons offenses among these offenders) who were released under federal pretrial supervision, 26% had incurred at least one violation of the terms and conditions of their release, and nearly 15% had their release revoked.  Of the violent offenders arrested, the majority (75%) were detained.  Of the remaining 25% of violent offenders who were released to federal pretrial supervision, 23.1 percent had at least one violation, and nearly 15% ended up having their pretrial release revoked.

<u>Statistics on Misconduct by State Defendants While on Pretrial Release</u>:

From 1990 through 2004, 33% of defendants in state courts were charged with committing one or more types of pretrial misconduct *after* being released but prior to the disposition of their case.  *See* https://www.bjs.gov/content/pub/pdf/prfdsc.pdf.  Notably, the defendant in this case was on state pretrial release when he engaged in criminal activity that resulted in three new felony convictions for cigarette trafficking. And, he is obviously also pending trial for receiving weapons while under indictment and aiding and abetting a straw purchase of a firearm – all of which occurred while he was on state pretrial release and/or state probation.

CONCLUSION

Based on the points and authorities set forth herein, it is clear that the defendant's as-applied and facial challenges to 18 U.S.C. § 922(n) fail. First, defendant's status as an alien forecloses his claim to Second Amendment protection.  Second, because the defendant was under indictment for a felony, Section 922(n) does not implicate whatever Second Amendment

rights he may have.  Third, even if it did, the law satisfies the intermediate scrutiny analysis that

is required by Fourth Circuit precedent, both facially and as-applied.

G. ZACHARY TERWILLIGER
UNITED STATES ATTORNEY

By:     _____/s/_____
        Angela Mastandrea-Miller
        Assistant United States Attorney
        United States Attorney's Office
        919 East Main Street
        Suite 1900
        Richmond, Virginia 23219-2447
        Telephone-804-819-5400
        Fax-804-771-2316
        Email: Angela.Miller3@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2018, I electronically filed the foregoing Motion to

Continue with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to:

Joseph S. Camden
Assistant Federal Public Defender
Office of the Public Defender
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
Email: *joseph_camden@fd.org*

Robert J. Wagner
Assistant Federal Public Defender
Office of the Public Defender
701 East Broad Street
Suite 3600
Richmond, Virginia 23219
Email: *robert_wagner@fd.org*

_____/s/_____
Angela Mastandrea-Miller
Assistant United States Attorney

22