IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Number: 3:18CR18-MHL |
| ) | Hon. M. Hannah Lauck |
| MOHAMED ABDELLAHI HORMA, ) | |
| Defendant. ) | |
| ) | |
| ) | |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE**

Mr. Horma, through counsel, stands on his motion to dismiss counts three and four of the indictment, and submits the following remarks by way of reply to certain issues raised in the government's response.

**I.       Historical Exceptions to the Right to Bear Arms**

The government first argues that a ban on receipt of firearms for those under *indictment* for a felony falls within one of the longstanding exceptions to the Second Amendment, such as bans on possession by *convicted* felons and the mentally ill. Doc. 58 at 8. The government appears to argue that the historical exception allowing regulation of gun rights of criminals applies to those under indictment. Doc. 58 at 8-9. In fact, all of the authorities it cites speak of those with criminal *convictions*. *See, e.g.*, Doc. 58 at 9 ("citizens have a personal right to bear arms 'unless for crimes *committed*, or real danger of public injury.'") (citations omitted, emphasis added).

1

But the government's argument begs the question. The government does have the power to disenfranchise felons or the mentally ill, but not without a *prior* determination that the person is, in fact, a felon or mentally ill. An indictment, based on probable cause (not proof beyond a reasonable doubt), issued after an *ex parte* proceeding with no notice to the defendant, is not proof that the person is what the government alleges – a criminal. Thus, the root of the problem with the government's argument is that it ignores the presumption of innocence. "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895); *see id.* at 455 ("If it suffices to accuse, what will become of the innocent?")(citations omitted). Even the Bail Reform Act, which allows firearms disenfranchisement on an *individual* basis after considering risk to the public, recognizes the presumption of innocence to those under indictment. *See* 18 U.S.C. § 3142(j).

The rule the government argues for is frightening in its breadth. If it may wedge into the definition of the "unvirtuous (i.e. criminals)," Doc. 58 at 9, those facing accusations, then why even the need for an indictment? Under the government's rationale, it may disenfranchise individuals based only on an accusation, without waiting for a final adjudication or allowing an opportunity to respond, if it is true that an allegation divorced from an adjudication suffices to infringe a fundamental constitutional right.

In support of its historical argument, the government invokes the Firearms Act of 1938. But that Act did not ban receipt of firearms by those under indictment – only those who had been convicted of a crime of violence or was a fugitive from justice. See 52 Stat. 1251 (attached as

exhibit).[1] The first ban on the receipt of firearms by those under indictment does not appear to have been enacted until 1968. *See* Gun Control Act of 1968, P.L. 90-618, § 922(h)(1). The handgun ban struck down in *Heller* was not much older. *See* D.C. Stat. § 7-2502.2 (2001) (enacted 1976, amended 1978). And in either case, the timeframe is too short. Novel legislation from the middle of this century is simply not evidence of any longstanding historical practice informing the understanding of the right to bear arms at the time the Second Amendment was adopted. *See Heller*, 554 U.S. at 584 (consulting "founding-era sources"). And the government points to no authority from around that timeframe that supported a ban on firearms for those only under indictment. In summary, those under indictment are, due to the historical respect for the presumption of innocence, simply not within the class of those *adjudicated felons* that define and limit the scope of that historical exception to the Second Amendment.

## II. "Illegal" Aliens

Mr. Horma argued in his motion that his situation was distinguishable from the defendant in *Carpio-Leon*. In particular, he pointed out that Mr. Carpio-Leon had entered the country surreptitiously and in fact, pled guilty to illegal entry in that case. The government does not confront or address this argument in its briefing.

Instead, the government focuses its attention on whether Mr. Horma was employed without authorization, such that his presence in the United States was counted against a time bar

---

[1] It did ban shipment in interstate commerce to or from those under indictment, but not receipt or possession.

for future applications based on "unlawful presence" under 8 U.S.C. § 1182(a)(9), which, in turn, it argues, is determinative of whether he falls within the protections of a constitutional amendment enacted in 1793.

The government does not dispute that, whether or not he was employed without authorization, such employment did not provide any grounds for removal from the United States, as Mr. Horma argued. Doc. 53 at 12 ("§ 1182(a)(9)(B)'s description of time counted and excluded as 'unlawful presence' does *not* correspond to the government's authority to remove a person from the United States[.]").

Even if employment authorization were determinative of Second Amendment rights, the government fails to accurately define the scope of illegal employment. United States law does not forbid the alien from being employed; it only forbids employers from hiring those without work authorization. That is, Congress chose to punish only one side of the employer-employee relationship. *See* 8 U.S.C. § 1324a(a) ("It is unlawful for a person or other entity – to *hire*, recruit or refer for a fee" an unauthorized alien). Second, the statutes and their implementing regulations forbid employment by another person, not self-employment. *See* 8 C.F.R. § 274a.1(c) ("The term hire means the actual commencement of employment of an employee for wages or other remuneration.").

The regulations do place independent contractor relationships within the ambit of 8 U.S.C. § 1324a. *See* 8 C.F.R. § 274a.1(j) ("The use of labor or services of an independent contractor are subject to the restrictions in Section 274A(a)(4) [8 U.S.C. § 1324(a)(4)] of the Act and § 275a.5 of this part;"). However, again, the law only punishes the employer/contractor, and not the alien providing labor. *See* 8 U.S.C. § 1324a; 8 C.F.R. §274a.10 ("Penalties"). And self-employment, or independent contractor relationships for goods as opposed to services (including

4

the buying of goods or property at one price and selling at a different price) is not forbidden anywhere in the statute or regulations.[2]

Thus, even should the government prove its allegations surrounding Mr. Horma's economic activities, it has not identified any consequence under federal immigration law aside from precluding a *future* application for admission within 3 or 10 years under 8 U.S.C. § 1182(a)(9)(B)(i) and (iii)(II) *if* Mr. Horma is removed or departs from the United States at some point in the future. This limited, hypothetical, conditional consequence is not enough to place him within the category of "illegal aliens" discussed in *Carpio-Leon*, nor to deprive him of Second Amendment rights that he otherwise would have.

## III. Scrutiny

Last, the government argues that § 922(n) satisfies at least intermediate scrutiny. In regards to Mr. Horma's as-applied challenge, the government characterizes "trafficking in contraband cigarettes" as a dangerous crime, invoking the spectre of organized crime and (yes, even) terrorism. Doc. 58 at 6 n.3 and 17. But Mr. Horma was not under indictment for trafficking in contraband cigarettes generally. He was under indictment for a Maryland tax offense, carrying a 2-year statutory maximum, which punishes transporting tobacco products on which the tobacco tax had not been paid. Md. Tax-Gen. Code § 13-1015. The government does

---

[2] The government does not appear to argue that the illegal nature of the cigarette-related activity, under state law, affects the analysis in this case. This seems correct – counsel for Mr. Horma could not identify any federal immigration consequences under Title 8 or the regulations that flow from a conviction under the cigarette and tax provisions under which Mr. Horma was convicted in state court.

not mention the 2-year statutory maximum or the elements of the offense for which the indictment established probable cause. And it nowhere alleges that Mr. Horma had any sort of ties to violent criminal organizations or terrorism. Its focus on cigarette smuggling in general is too broad for Mr. Horma's as-applied challenge.

Next, the government cites statistics regarding rates of violations of pre-trial release conditions. Doc. 58 at 19-22. The data it does present is again too broad to establish either that Mr. Horma presented any danger to the public (for his as-applied challenge) or that indictees as a class do (for the facial challenge). And the reports the government cites contain crucial information that it did not mention.

First, the data is not properly narrowed. The government notes that 33% of state court defendants were *charged* with "misconduct" while on pre-trial release. How many were found to have actually violated? What type of violations were present in what proportion? Violations of pre-trial release vary from failure to timely report an anticipated change of address to new and dangerous criminal conduct. But the data does not separate those violations showing a risk of violence from those without such implications.

And certain data actually rebut the government's claim that the burden on the Second Amendment is low. For example, a full reading of the Bureau of Justice Statistics report that the government cites, Doc. 58 at 20, shows that a full *forty percent* of state defendants released on pre-trial release were acquitted or had their cases dismissed. And those released on bond "waited a median 127 days from time of arrest until adjudication." -- that's not the limited, fleeting impingement on Second Amendment rights, it is a full half-year of infringement on a fundamental constitutional right under § 922(n) without any individualized determination.

6

Mr. Horma does not dispute that the government has a legitimate and substantial interest in keeping firearms out the hands of dangerous individuals. But the debate in this case is whether an indictment (so, an *ex parte* finding of probable cause) – or, worse, an information filed without a grand jury on the say-so of a prosecutor, *see* 18 U.S.C. § 921(a)(14) (defining indictment to include information) – is sufficient to place a person within that class of dangerous individuals. The government does not confront that question squarely.

The government errs when it equates those under indictment, for Second Amendment purposes, with those convicted of misdemeanor domestic violence offenses, those subjected to domestic violence restraining orders, and those who are unlawful users of controlled substances. Doc. 58 at 15. But tellingly, the provisions to which it compares §922(n) *do* require such individualized determinations complying with due process. For example, *ex parte* restraining orders do not qualify to disenfranchise an individual – only a restraining order "issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate." 18 U.S.C. § 922(g)(8)(A). Even those presenting arguably the highest risk of gun violence – the mentally ill – are only forbidden from firearms possession if they have been "adjudicated" mentally ill or "committed to a mental institution." 18 U.S.C. § 922(g)(4). Even those accused of possessing a firearm while an unlawful user of drugs cannot be deprived of their firearms until the accusation has been proven to either a preponderance or clear and convincing standard in civil forfeiture proceedings. *See* 18 U.S.C. § 924(d)(1) (allowing forfeiture for knowing violations of certain provisions of § 922 or intended violations "where such intent is demonstrated by clear and convincing evidence").

No other provision of § 922 allow disenfranchisement of an individual based purely on a prosecutor's *accusation*, *see* § 921(a)(14) (including information in the definition of indictment) or at best an *ex parte* determination of probable cause.

The thrust of Mr. Horma's challenge was that § 922(n) lacks an individualized determination. Doc. 53 at 16-17 (discussing *United States v. Arzberger*, 592 F. Supp. 2d 590 (S.D.N.Y. 2008). The problem with § 922(n), and which the government never confronts, is that it provides no opportunity for an individualized determination at *any* point. So an individual who is presumed innocent (and could be within the 40% of state felony defendants who are never convicted) is deprived of a fundamental constitutional right for an indefinite period with no recourse – no individual opportunity to rebut any allegations of dangerousness, establish need for the firearm or point out weakness or ambiguity in the evidence. Deprivations of fundamental constitutional rights require a more targeted approach, as heightened scrutiny recognizes. The government's claim that a blanket, irrefutable presumption of dangerousness, sufficient to defeat fundamental Second Amendment rights, is somehow fitted to its purpose is wrong.

The government's argument under the tailoring prong also fails to account for the Bail Reform Act that, Mr. Horma noted, allows deprivation of firearms as a discretionary, individualized condition. Doc. 53 at 25; 18 U.S.C. § 3142(c)(1)(B)(viii). Congress therefore contemplated a narrowly tailored procedure whereby individual determinations on the risk of gun violence for felony defendants is made by a neutral judicial officer after an opportunity to respond. It is also important to note that § 922(g)(2) prohibits the possession of firearms by a "fugitive from justice" – that is, one who "has fled from any State to avoid prosecution for a

crime[.]"³  So those who flee proceedings are covered by a different provision.  Therefore the class of people on whom § 922(n) primarily operates are those who actually appear in court before a judge who is capable of making an individualized determination of the risk that person poses if allowed to receive a firearm.  This further undermines the idea that a blanket irrebuttable ban on receipt by indictees is a narrowly tailored means of vindicating the government's interest.

The government points to the limited timeframe during which Second Amendment rights are burdened.  Doc. 58 at 16 (noting 922(n) operates "while the government determines whether such an offense in fact occurred.").⁴  While a temporary deprivation of certain other fundamental rights has been approved due to an individual's indictment alone, those deprivations are always accompanied by an individualized determination at a prompt hearing.  For example, an arrest on an indictment requires that the person be brought before a magistrate "without unnecessary delay."  Fed. R. Crim. P. 5.  And detention must be determined at the initial appearance, unless serious aggravating factors are present, in which case the hearing can be held, at most, three days later.  *See* 18 U.S.C. § 3142.  And further restrictions on, for example, the right to travel or to associate with others can be abrogated only upon an individualized determination that the condition is the "least restrictive means" to further weighty government interests in public safety and the trial process.  *Id*.  Thus, Congress has chosen a means – prompt individualized

---

³ Mr. Horma appeared as ordered in his Maryland case and was never a fugitive from justice.
⁴ Generally, it is a jury or court that determines whether an offense has occurred such that the charges are disposed of, not "the government."  But the government's phrasing betrays its perspective on those roles.

determinations – that balances the government's interest in public safety on the one hand with the individual's fundamental rights and the presumption of innocence on the other.  Section 922(n) is unconstitutional precisely because it is a blanket, not individualized ban, and precisely because it does not allow procedures to permit the exercise of Second Amendment rights under appropriate conditions.

          Respectfully Submitted,
          MOHAMED ABDELLAHI HORMA

By:      /s/
          Joseph S. Camden
          Va. Bar No. 92143
          Assistant Federal Public Defender
          Office of the Federal Public Defender
          701 E. Broad St., Ste. 3600
          Richmond, VA 23219
          (804) 565-0830
          Fax (804) 648-5033
          joseph_camden@fd.org

**CERTIFICATE OF SERVICE**

        I hereby certify that on November 9, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to:

Angela Mastandrea-Miller
US Attorney Office (Richmond)
SunTrust Building
919 East Main Street
Suite 1900
Richmond, VA 23219

                                                  /s/
                                       Joseph S. Camden
                                       Va. Bar No. 92143
                                       Assistant Federal Public Defender
                                       Office of the Federal Public Defender
                                       701 E. Broad St., Ste. 3600
                                       Richmond, VA 23219
                                       (804) 565-0830
                                       Fax (804) 648-5033
                                       joseph_camden@fd.org