## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA

v.

Criminal No. 3:18cr18

MOHAMED ABDELLAHI MOHAMED HORMA,

Defendant.

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Mohamed Abdellahi Mohamed Horma's Motion to Dismiss Counts Three and Four of the Indictment (the "Second Motion to Dismiss"). (ECF No. 53.) The United States responded, (ECF No. 58), and Horma replied, (ECF No. 59). On November 20, 2018, the Court held an evidentiary hearing and heard arguments on the Second Motion to Dismiss (the "November 2018 Evidentiary Hearing"), during which the parties referred to stipulations and presented exhibits provided to the Court. Each of the parties also filed post-hearing memoranda. (ECF Nos. 72, 73.) The Second Motion to Dismiss is ripe for disposition. For the reasons discussed below, the Court will deny the Second Motion to Dismiss.

## I. Factual Background[1]

The Court assumes familiarity with its September 4, 2018 Memorandum Opinion and Order ("*Horma I*"), (ECF Nos. 45, 46), in which it denied Horma's Motion to Dismiss Counts One Through Four of the Superseding Indictment (the "First Motion to Dismiss"), (ECF No. 14). *United States v. Horma* ("*Horma I*"), No. 3:18cr18, 2018 WL 4214136 (E.D. Va. Sept. 4, 2018).

### A. Immigration Background

Horma, born in Morocco and a citizen of Mauritania, came to the United States on December 29, 2013,[2] at the age of nineteen. He entered on a valid six-month B-1/B-2 tourist visa, which expired on June 28, 2014. On February 4, 2014, more than four months before his tourist visa expired, Horma filed an Application for Asylum (the "Asylum Application") with the United States Citizenship and Immigration Services (the "USCIS"). The USCIS received the Asylum Application on February 13, 2014.

On April 16, 2014, the Asylum Office Director sent Horma a "Notice of Intent to Deny" (the "NOID"), expressing an intent to deny Horma's Asylum Application and articulating why.

---

[1] A district court may not make factual determinations on a criminal motion to dismiss that "should have been developed at trial." *United States v. Engle,* 676 F.3d 405, 415 (4th Cir. 2012). However, "a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." *United States v. Weaver*, 659 F.3d 353, 355 n. * (citing *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005)). The Government "does not dispute the ability of the court to reach the motion," *Weaver*, 659 F.3d at 355 n.*, and both parties had the opportunity to present evidence at the November 2018 Evidentiary Hearing. In making its finding on the Second Motion to Dismiss, this Court relies on facts proffered by the Government and not disputed by Horma.

[2] The parties filed joint stipulations, (ECF No. 42), and exhibits, (ECF No. 41), following the July 9, 2018 Hearing on Horma's Motion to Dismiss Counts One through Four (the "First Motion to Dismiss"). During the November 2018 Evidentiary Hearing, the parties agreed that this Court could consider these joint stipulations and exhibits in ruling on the Second Motion to Dismiss.

On May 13, 2014, Horma, through counsel, submitted a rebuttal responding to the reasons articulated in the NOID for the intended denial, and including additional information. On September 17, 2015, Horma received a Notice to Appear to demonstrate why he should not be removed from the United States. The Notice to Appear included notification to Horma that he was "removable" as a non-citizen who overstayed his tourist (nonimmigrant) visa and remained in the United States "without authorization." (Not. Appear 1, ECF No. 41-4.) The Notice to Appear also ordered Horma to "appear before an immigration judge" to show cause why he should not be removed from the United States, but it did not set a date for Horma's hearing, noting it only as "TBD," or to be determined. (*Id.*)

On September 21, 2015, USCIS issued a Referral Notice stating that, "after careful consideration," Horma's Asylum Application was not deemed credible. (Stip. 8; Referral Not. 1.) The Referral Notice also advised Horma that his Asylum Application was referred to an immigration judge who would independently consider it. The Referral Notice stated in bold: **"This is not a denial of your asylum application."** (Referral Not. 1.) On May 5, 2016, USCIS sent Horma a Notice of Hearing in Removal Proceedings in Immigration Court informing Horma that an immigration judge would hear his matter on March 2, 2021. Nothing in the record suggests that Horma has ever appeared before an immigration judge.

B.    **Horma's Work History**

Pursuant to 8 U.S.C. § 1158(d)(2),[3] Horma could not have been granted employment authorization "prior to 180 days after the date of filing" of the Asylum Application. 8 U.S.C.

---

[3] Section 1158(d)(2) provides that

[a]n applicant for asylum is not entitled to employment authorization, but such authorization may be provided under regulation by the Attorney

§ 1158(d)(2).  On September 21, 2015, USCIS notified Horma that he was eligible to apply for

work authorization.  On March 20, 2015, well after the June 2014 expiration of his tourist visa,

USCIS granted Horma work authorization for one year, ending March 19, 2016.

On July 13, 2016, Horma claimed to work as a driver for Uber and that he previously

worked at the "Itialian [sic] Kitchen Restaura[nt]." (Gov't Ex. 14 "District Court of Maryland

for Howard County Initial Appearance Questionnaire" 1.)  Although it appears Horma never

worked for either of these establishments, the evidence shows that he worked in the cigarette

wholesale business.[4]

---

> General. An applicant who is not otherwise eligible for employment
> authorization shall not be granted such authorization prior to 180 days
> after the date of filing of the application for asylum.

8 U.S.C. § 1158(d)(2).

[4] As the Court noted in *Horma I*, Horma stated during his November 15, 2016 trial in the Circuit Court for Howard County, Maryland ("the Howard County Court") that he worked as an Uber driver.  At the time this Court decided *Horma I*, neither the exhibits, nor the stipulated facts submitted by the parties, established the essential fact of whether Horma received work authorization before working as an Uber driver.

In his Second Motion to Dismiss, Horma states that "[a] screening questionnaire from the Maryland case, dated July 13, 2016, indicates that Mr. Horma's current employer was 'Uber' and that he had been so employed for 6 months." (2d Mot. Dismiss 4.)  The Government submitted the questionnaire into evidence at the November 2018 Evidentiary Hearing.  The questionnaire lists Horma's employer as "Uber" and his last occupation as "Driver." (District Court of Md. For Howard County Initial Appearance Questionnaire 1.)  It also indicates that Horma's last employer was "Itialian [sic] Kitchen Restaura[nt]." (*Id.*)

In its Response to the Second Motion to Dismiss, the United States asserted that although Horma "advised the Maryland court that he was an Uber driver for a six month period of time leading up to his arrest . . . [i]nformation received from Uber confirms that this is false information." (Resp. 3 n.2.)  Additionally, the United States claims that Horma never worked at "The Italian Kitchen," a restaurant in Washington, D.C. (*Id.*)  The United States submitted an October 15, 2018 letter from Uber indicating that Horma never worked for Uber, (Gov't Ex. 12), and "records from Washington, D.C. in response for wage information for the time period 2013 through 2017 . . . showing no record of any wages earned by" Horma, (Gov't Ex. 13).

During the November 2018 Evidentiary Hearing, the United States presented the testimony of Federal Bureau of Investigation forensic accountant Stacy Young, who testified that Horma[5] opened multiple bank accounts between 2014 and 2017.[6] Ms. Young testified that between December 1, 2013 and March 19, 2015 (before Horma received work authorization), Horma deposited $441,340.82 into these bank accounts. Also, during the period of March 20, 2016 to approximately April 29, 2017,[7] after Horma's work authorization expired, Horma deposited $112,145.05 into his bank accounts.

During the same November 2018 Evidentiary Hearing, Lieutenant Bodenhamer of the Henrico Police Department testified to his knowledge of Horma and the businesses with which Horma had associated himself.[8] The evidence shows that Horma considered himself an owner of Tobacco Sahara Corporation because on February 2, 2017, Horma listed himself as the "Company Contact" for Tobacco Sahara Corporation when opening a Sam's Club membership. (Tr. 113; Gov't Ex. 17 1.) Horma possessed and used Sam's Club membership cards in other

---

It appearing that Horma worked as a cigarette subcontractor and owner in the cigarette wholesale business without work authorization from USCIS, the Court need not resolve whether Horma worked for Uber or The Italian Kitchen when resolving the Second Motion to Dismiss.

[5] Ms. Young testified that Horma maintained accounts in the names "Mohamed Horma" and "Mohamed Yahya." (Tr. 7, 12–13.) Ms. Young testified that she determined Mohamed Horma and Mohamed Yahya were the same person by examining Horma's passport, (Gov't Ex. 8), and ID card, (Gov't Ex. 9a). Based on Ms. Young's testimony and the evidence submitted by the Government, the Court finds that Mohamed Horma also used the name "Mohamed Yahya."

[6] Ms. Young testified that prior to receiving his work authorization, Horma opened bank accounts at "Bank of America, BB&T, Capital One Bank, and Wells Fargo." (Tr. 11–12.) During the time in which Horma possessed a valid work authorization, he maintained accounts at Bank of America, BB&T, Capital One Bank, First Community Bank, Sona Bank, and Wells Fargo Bank.

[7] Horma's arrest took place close to April 29, 2017. He has been in custody since then.

[8] These businesses include Dunn Express, Tobacco Sahara, Tobacco Town 5, Tobacco Shop, Western Wholesale, and Vatoum Shop.

businesses' names, establishing his association with those businesses as well. (*See* Gov't Exs.

6b, 6c, 9b.) Lt. Bodenhamer prepared three charts showing specific cigarette purchases Horma

made at Sam's Club using the businesses' membership cards. (*Id.*; Tr. 92–94.) Photographic

evidence also shows Horma leaving a Sam's Club on September 19, 2016 after purchasing 210

cartons of cigarettes under the business name "Tobacco Shop." (Gov't Ex. 21; Tr. 97.)

### C. A Grand Jury in Howard County, Maryland, Charged Horma with Two Counts; Horma Later Pled Guilty to a Felony

On July 13, 2016, while Horma's Asylum Application was pending, he was arrested in

Howard County, Maryland, and charged with: (1) shipping, importing, selling into or within, or

transporting into Maryland cigarettes or other tobacco products on which the tobacco tax had not

been paid, in violation of Maryland Tax Code § 13-1015(a)[9] (the "Maryland Tax Statute"); and,

(2) unlawful and willing possession, sale, or attempt to sell unstamped or improperly stamped

cigarettes, in violation of Maryland Tax Code 13-1014.[10] (Stip. 10; Md. Compl., ECF No. 41-6.)

On July 27, 2016, a grand jury in Howard County indicted Horma on both of those charges (the

"Maryland Indictment"). On September 2, 2016, Horma was arraigned in the Howard County

Court. At the arraignment, the Howard County Court informed Horma of the charges against

---

[9] The Maryland Tax Statute provides that

> [a] person who willfully ships, imports, sells into or within, or transports within, [Maryland] cigarettes or other tobacco products on which the tobacco tax has not been paid in violation of [various regulations governing the sale and transportation of cigarettes] is guilty of a felony and, on conviction, subject to the penalties set forth in subsections (b) and (c) of this section.

Md. Code, Tax-Gen. § 13-1015(a).

[10] Section 13-1014 of the Maryland Tax Code provides that "[a] person who willfully possesses, sells, or attempts to sell unstamped or improperly stamped cigarettes in [Maryland] in violation of [various regulations governing the sale and transportation of cigarettes] is guilty of a misdemeanor." Md. Code, Tax-Gen. § 13-1014(a)(1).

him and their maximum possible penalties.  Just over two months later, on November 15, 2016, Horma pled guilty to felony transportation of untaxed cigarettes, in violation of the Maryland Tax Statute.  Horma was sentenced to eleven months' imprisonment, all suspended; a fine of $107,550, with all but $2,000 suspended; and two years of unsupervised probation.

### D.    Evidence Regarding Firearms[11]

The evidence shows that, on September 21, 2016, Horma visited Colonial Shooting Academy[12] in Richmond, Virginia.  He rented a Ruger SR9C 9mm handgun using a credit card,[13] and then fired the gun at the shooting range.  Before Horma left, he returned the gun.  Prior to receiving the gun, Colonial Shooting Academy provided Horma with a form that "asked whether he had been convicted of a felony, or if there was any other reason that prohibited him from possessing a firearm, but did not advise him that he could not possess a firearm while under indictment."[14]  (2d Mot. Dismiss 3.)

---

[11] Horma and the United States presented this evidence in support of their arguments regarding the constitutionality of § 922(n).  Horma sought to lay a record that any interest he may have shown toward firearms would have stemmed from a need for self-defense.  Because the Court concludes that Horma presents as an illegal alien for purposes of the Second Amendment, the Court does not consider this evidence, in any form, including for the purpose the parties presented it.

[12] Colonial Shooting Academy operates a public shooting range, sells firearms, and provides training.  Horma asserts that "Range Safety Officers are present at all times on the shooting range."  (2d Mot. Dismiss 3.)
During the November 2018 Evidentiary Hearing, Horma presented the testimony of Lee Hush, an investigator with the Richmond Office of the Federal Public Defender for the Eastern District of Virginia.  Investigator Hush confirmed that range safety officers were present at the shooting range when Investigator Hush visited Colonial Shooting Academy.

[13] The United States submitted evidence showing that Horma spent $409.65 at Colonial Shooting Academy between March 20, 2016 and the present.

[14] Horma submitted into evidence Colonial Shooting Academy's Rules of the Range, Range Use & Gun Rental Agreement (the "Range Use & Gun Rental Agreement"), and Waiver and Release from Liability for Shooting Range.  (Def. Ex. F.)  The Court admitted Exhibit F,

The evidence also shows that, on November 12, 2016, Horma and another individual, Malik Sidya, traveled to the War Store. During that visit, both men entered the store and Sidya bought a Smith & Wesson M&P 9 mm handgun bearing serial number HVK3499. After the purchase, the men returned to Horma's apartment with the firearm.[15]

Finally, in November 2016, police executed a search warrant for Horma's residence. During execution of the warrant, police found the Smith & Wesson handgun in Horma's bedroom dresser with papers bearing his name. Horma admitted in a post-*Miranda* interview that the gun belonged to Sayid "and he didn't trust [Sayid] with the gun, so [Horma] put it in his room." (Tr. 123; *see also* 2d Mot. Dismiss 4.) Horma also admitted that "he came up with the idea to purchase the firearm," but could not do so himself because "he did not have a 'green card.'"[16] (*Id.*; Tr. 122–23.)

---

over the Government's objection, for the limited purpose of establishing what information the Range Use & Gun Rental Agreement contains. The Range Use & Gun Rental Agreement includes a yes or no question that asks "Have you ever been convicted of a felony?" (Range Use & Gun Rental Agreement 2.) It also asks a yes or no question: "Is there any legal reason that prohibits you from possessing a firearm?" (*Id.*)

[15] Horma describes his residence as "a townhouse-style apartment in Richmond, Virginia." (2d Mot. Dismiss 3.) He also states that "[t]here is no available private are[a] where the use of a firearm can be practiced safely and shooting a firearm at the residence is prohibited." (*Id.*) Horma introduced photographs of his apartment complex, (Def. Exs. A, B, C, E), which confirm this description.

[16] A green card, or a Permanent Resident card, "allows [the holder] to live and work permanently in the United States." USCIS, *Green Card*, https://www.uscis.gov/greencard (last visited Jan. 15, 2019).

## II. Procedural Background

### A. Horma's First Motion to Dismiss

On February 20, 2018, a federal grand jury in the Eastern District of Virginia returned a five-count Indictment, (ECF No. 9), and on May 15, 2018, returned a five-count Superseding Indictment,[17] (ECF No. 28). The Superseding Indictment charges Horma as follows:

**Count One:** Possession of a Firearm by an Illegal Alien, in violation of 18 U.S.C. § 922(g)(5)(A), on September 21, 2016.

**Count Two:** Possession of a Firearm and Ammunition by an Illegal Alien, in violation of 18 U.S.C. § 922(g)(5)(A), on November 12, 2016.

**Count Three:** Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), on September 21, 2016.

**Count Four:** Receipt of a Firearm by a Person Under Indictment, in violation of 18 U.S.C. §§ 922(n) and 924(a)(1)(D), on November 12, 2016.

**Count Five:**[18] False Statements in the Acquisition of a Firearm, and Aiding and Abetting that Crime, in violation of 18 U.S.C. §§ 922(a)(6) and (2), on November 12, 2016.

On March 27, 2018, Horma moved to dismiss Counts One through Four of the Superseding Indictment in the First Motion to Dismiss. As to Counts One and Two, Horma contended that the charges should be dismissed because he does not qualify as "an alien . . . illegally or unlawfully in the United States," as set forth in 18 U.S.C. § 922(g)(5)(A) because he "has only ever been present in the United States on a valid visa, or later under a period of authorized stay due to a pending bona fide asylum application." (1st Mot. Dismiss 1–2, ECF No.

---

[17] The Superseding Indictment contains only typographical changes. It charges Horma with the same five crimes and conduct as did the original Indictment.

[18] Horma did not challenge Count Five in the either the First Motion to Dismiss or the Second Motion to Dismiss.

14.) As to Counts Three and Four, Horma argued that the Maryland Indictment could not support a charge under 18 U.S.C. § 922(n) because the crime for which he was under indictment did not constitute "a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(n), as that phrase is defined in 18 U.S.C. § 921(a)(20). (*Id.*) Horma argued in the alternative that § 922(n) was void for vagueness and that it amounted to an unconstitutional infringement of his rights under the Second Amendment to the United States Constitution.

On September 4, 2018, this Court denied the First Motion to Dismiss. The Court concluded that Horma's challenge to Counts One and Two failed because the parties did not brief the proper legal issues or provide determinative factual evidence. Title 18, Section 922(g)(5)(A) prohibits someone who "is illegally or unlawfully in the United States" from possessing a firearm. 18 U.S.C. § 922(g)(5)(A). USCIS policies and provisions distinguish between a person's immigration status and the lawfulness of his or her presence in the United States.

Because the parties failed to identify this critical distinction, they also neglected to develop the record necessary to make this fact-specific determination. Despite the Court's specific request to identify the date of Horma's work authorization, the parties did not include that information in the record they placed before the Court. The determination of Horma's lawful or unlawful presence turns on that date.

In *Horma I*, the Court found that Horma's immigration *status* became illegal the day after he overstayed his visa. However, the Court declined to determine on that factual record whether Horma was unlawfully *present* in the United States. 2018 WL 4214136 at *9–*10. The Court decided that if Horma was in illegal immigration *status*, but had not accrued any unlawful *presence*, 18 U.S.C. § 922(g)(5)(A) may have been ambiguous as applied to Horma. For that

10

reason, the Court denied without prejudice the First Motion to Dismiss as to Counts One and Two.[19]

As to the challenges to § 922(n) in Counts Three and Four, Horma's argument that the Maryland Tax Statute does not constitute "a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(n), as defined in 18 U.S.C. § 921(a)(20), failed. His vagueness challenge to § 922(n) also did not succeed. The Court denied those aspects of Horma's challenge with prejudice. But, given the parties' briefing and relevant precedent from the United States Court of Appeals for the Fourth Circuit, the Court declined to reach Horma's Second Amendment challenge. The Court denied without prejudice that aspect of Horma's First Motion to Dismiss Counts Three and Four under the Second Amendment.[20]

---

[19] Specifically, the Court surmised that 18 U.S.C. § 922(g)(5)(A) may be ambiguous to Horma because:

> If, in fact, Horma did not work without authorization, then his situation may be distinguishable from the defendants in *Al Sabahi, Latu, Elrawy,* and *Bazargan.* Specifically, each of those defendants presented as in illegal immigration status and either accruing or having accrued some amount of unlawful presence. In those cases, Title 18 U.S.C. § 922(g)(5)(A) clearly applies. If Horma began to drive for Uber before he received his work authorization, then his situation cannot be distinguished from that faced by the defendants in *Al Sabahi, Latu, Elrawy,* and *Bazargan.* In that case, Horma's immigration status would be illegal . . . and he would have accrued unlawful presence time because the tolling provision in 8 U.S.C. § 1182(a)(9)(B)(iii)(II) would not apply.

*Horma I,* 2018 WL 4214136 at *9.

[20] In declining to rule on Horma's Second Amendment challenge to 18 U.S.C. § 922(n), the Court found that it had an inadequate factual and legal record before it. *Horma I,* 2018 WL 4214136 at * 17. Regarding the factual record, the Court found that "the applicable law of the case may change materially based on the Court's decision about Horma's illegal immigration status versus his lawful or unlawful presence." *Id.* The Court stated:

> Because the parties premise their arguments on their opposing positions regarding Horma's immigration status, they brief past each other. The Court now has

**B.** **Horma's Second Motion to Dismiss**

On September 13, 2018, the Court held a status hearing, during which the United States orally moved to dismiss Counts One and Two of the Superseding Indictment. The Court granted the motion later that same day. (ECF No. 49.) The Court also set a briefing schedule for the Second Motion to Dismiss. On October 11, 2018, in accordance with the briefing schedule, Horma filed the Second Motion to Dismiss.[21] Horma now challenges only the constitutionality of 18 U.S.C. § 922(n), claiming that it violates the Second Amendment both as applied to him and on its face.

After an October 18, 2018 Status Conference, the Court scheduled the November 2018 Evidentiary Hearing and granted the United States' oral motion for an extension of time to file its response to the Second Motion to Dismiss. (ECF No. 55.) On October 31, 2018, the United States again asked for additional time to file its response to the Second Motion to Dismiss, (ECF No. 56), and the Court granted the request, (ECF No. 57). On November 5, 2018, the

---

concluded that Horma may lie somewhere between these two positions: he may not be unlawfully present for the purposes of § 922(g)(5)(A), but neither has his immigration status remained legal.... In light of the distinction between immigration *status* and *presence*, and given that the Court lacks a record to determine the issue of presence or the constitutionality of the statue, much of the parties' briefing does not address the Second Amendment issue this Court must decide.

*Id.* at *20 (emphasis added).

[21] The next day, on October 12, 2018, Horma filed a Notice of Correction (the "Notice"). (ECF No. 54.) In the Second Motion to Dismiss, Horma asserted that he received an "additional 600+ pages of discovery provided within the last week." (2d Mot. Dismiss 2 n.1.) In the Notice, he states that the additional discovery contained only 163 pages and that "Counsel inadvertently confused the bate stamps [sic] numbers with the number of pages produced in that batch of discovery." (Not. 1, ECF No. 54.) While the Court appreciates Horma's transparency, this discrepancy does not affect the Court's decision.

government filed its response to the Second Motion to Dismiss, and on November 9, 2018, Horma replied.

After the November 2018 Evidentiary Hearing, agreed-upon briefing ensued. On December 14, 2018, Horma filed his Supplemental Post-Hearing Memorandum. On December 28, 2018, the United States filed its Supplemental Post-Hearing Memorandum. The matter is now fully ripe.

## III. Analysis

Counts Three and Four of the Superseding Indictment charge Horma with receiving a gun while under indictment, in violation of 18 U.S.C. § 922(n). In his Second Motion to Dismiss, Horma asserts that the Court must find 18 U.S.C. § 922(n) unconstitutional, both as applied to him and on its face, because it violates his Second Amendment right to keep a firearm for self-defense. (2d Mot. Dismiss 5.)

Relevant here, the Fourth Circuit in *Carpio-Leon* held "that the Second Amendment right to bear arms does not extend to *illegal* aliens." *United States v. Carpio-Leon*, 701 F.3d 974, 982 (4th Cir. 2012) (emphasis in original). Because, as explained below, the record now fully establishes that Horma presents as an illegal alien, the Court must deny the Second Motion to Dismiss. *Carpio-Leon*, 701 F.3d 974.

### A. Applicable Legal Standards: Section 922(n) and the Second Amendment in the Fourth Circuit

Title 18 Section 922(n) of the United States Code (the "Non-Receipt Statute") provides that "[i]t shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to . . . receive any firearm or ammunition which has

been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(n).[22] Horma

challenges the constitutionality of the statute, claiming that it violates his Second Amendment

rights.

The Second Amendment provides that "[a] well regulated militia, being necessary to the

security of a free state, the right of the people to keep and bear arms, shall not be infringed."

U.S. CONST. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the

Second Amendment granted individuals the right to keep and bear arms.[23] *Heller*, 554 U.S. 570,

595 (2008) ("There seems to [be] no doubt, on the basis of both text and history, that the Second

Amendment conferred an individual right to keep and bear arms."). The Supreme Court did not

define the entire scope of the Second Amendment but recognized that it "surely elevates above

all other interests the right of law-abiding, responsible *citizens* to use arms in defense of hearth

and home."[24] *Id.* at 635 (emphasis added). Even in that landmark case, the Supreme Court

recognized limits on individuals' Second Amendment rights.[25] *Id.* at 627–28.

---

[22] In *Horma I*, the Court found that the Maryland Indictment qualified as an "indictment for a crime punishable by imprisonment for a term exceeding one year." *See* 18 U.S.C. § 922(n). The Court also held that § 922(n) was not void for vagueness.

[23] The Supreme Court in *Heller* considered whether several District of Columbia laws, when considered together, violated the Second Amendment as an improper ban on the possession of firearms in the home for self-defense. *See* 554 U.S. at 574–76.

[24] This right has come to be known as the "core" right of the Second Amendment. *See Kolbe v. Hogan*, 849 F.3d 114, 131 (4th Cir. 2017).

[25] The Supreme Court did not set forth the "full scope of the Second Amendment" in *Heller* but listed several prohibitions that it found "presumptively lawful." 554 U.S. at 627–28 n. 26. The Supreme Court stated that it provided the list only as a set of examples, and that it "[did] not purport to be exhaustive." *Id.* Specifically, the *Heller* court found that

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

The Supreme Court in *Heller* "declin[ed] to establish a level of scrutiny for evaluating Second Amendment restrictions" *id.* at 634, concluding instead that the firearm regulation at issue in that case failed "[u]nder any of the standards of scrutiny [the Supreme Court has] applied to enumerated constitutional rights," *id.* at 628. "Because '*Heller* left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply,'" the Fourth Circuit was left to "select between strict scrutiny and intermediate scrutiny" when assessing a challenge to a law that burdened Second Amendment conduct. *Kolbe*, 849 F.3d at 133 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)). The Fourth Circuit consequently established "a two-part approach to Second Amendment claims." *Chester*, 628 F.3d at 680.

A court within the Fourth Circuit evaluating a Second Amendment challenge first asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* "This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification." *Id.* "If it was not, then the challenged law is valid" and the inquiry ends. *Id.* (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)); *see also Carpio-Leon*, 701 F.3d at 982.

A court must only proceed to the second step of a *Chester* analysis "[i]f the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically

---

carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 627–28. This list of presumptively lawful prohibitions does not include a prohibition on receiving a firearm by a person indicted, but not yet convicted of, a felony, as provided in 18 U.S.C. § 922(n). *See id.* But that does not preclude this Court's holding. *Heller* supports this Court's decision today because *Heller* recognizes that the Second Amendment "elevates above all other interests the right of law-abiding, responsible *citizens* to use arms in defense of hearth and home." *Id.* at 635 (emphasis added). Horma is not a citizen; he presents as an illegal alien.

understood." *Chester*, 628 F.3d at 680. In that circumstance, a court would apply "an appropriate form of means-end scrutiny." *Id.* But if a court finds that "the conduct at issue was [not] understood to be within the scope of the right at the time of ratification," then it need not determine whether the challenged law survives either form of scrutiny, because the "challenged law is valid." *Id.*

As identified earlier, the Fourth Circuit has concluded in *Carpio-Leon* "that illegal aliens do not belong to the class of law-abiding members of the political community to whom the protection of the Second Amendment is given." *Carpio-Leon*, 701 F.3d at 981. The *Carpio-Leon* court reached this conclusion after conducting a historical inquiry.[26] Because a court in the Fourth Circuit must first decide whether "the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood" prior to applying the "appropriate form of means-end scrutiny," *Chester*, 628 F.3d at 680, *Carpio-Leon* mandates that if the person seeking Second Amendment protection is an illegal alien, then a court does not reach the second step of the Second Amendment analysis. *Chester*, 628 F.3d at 680. In that circumstance, the "challenged law is valid." *Id.*

---

[26] In reaching its conclusion, the Fourth Circuit looked to a variety of historical sources. For instance, it found that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Carpio-Leon*, 701 F.3d at 979 (quoting *United States v. Yancy*, 621 F.3d 681, 684–85 (7th Cir. 2010)). The *Carpio-Leon* court also evaluated legislative history and found that "several early proposals for the Bill of Rights demonstrate the understanding that the core protection of the Second Amendment belongs to law-abiding citizens." *Id.* at 980. Finally, the Fourth Circuit concluded that "the prefounding English right to bear arms supports this limitation of Second Amendment rights." *Id.*

### B. Horma Presents as an Illegal Alien Because His Immigration Status Has Changed to Illegal and He Is Unlawfully Present in the United States

#### 1. In *Horma I*, the Court Discussed the Difference Between Immigration *Status* and Unlawful *Presence* and Found Horma's Immigration *Status* to be Illegal

In *Horma I*, this Court discussed the difference between illegal immigration status and the accrual of unlawful presence at length. This Court concluded that Horma's immigration status became illegal the day after he overstayed his valid B-1/B-2 visa on June 29, 2014. *See Horma I*, 2018 WL 4214136 at *7–*9. However, this Court could not determine in *Horma I* whether Horma had accrued unlawful presence, pursuant to 8 U.S.C. § 1182(a)(9)(B)(ii).[27] *Id.* at *7–*9. Specifically, if Horma had worked without authorization, the tolling provisions of 8 U.S.C. § 1182(a)(9)(B)(iii)(II)[28] would not apply, meaning that Horma would be unlawfully *present* in the United States. The combination of illegal *status* and unlawful *presence* would remove any ambiguity as to whether Horma remained in the United States illegally.

But, on the earlier record, the Court could not determine whether Horma had worked without authorization. Because the record here demonstrates that Horma worked without authorization, the Court now finds that he is also unlawfully *present* in the United States. For the

---

[27] Title 8, Section 1182(a)(9)(B)(ii) defines unlawful presence as the time that passes "if the alien is present in the United States after the expiration of the period of stay authorized by the Attorney General or is present in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii).

[28] Title 8, Section 1182(a)(9)(B)(iii)(II) states:

No period of time in which an alien has a bona fide application for asylum pending under section 1158 of this title shall be taken into account in determining the period of unlawful presence in the United States under clause (i) unless the alien during such period was employed without authorization in the United States.

8 U.S.C. § 1182(a)(9)(B)(iii)(II). If an alien works without authorization during the pendency of her or his asylum application, then she or he will become unlawfully present in the United States.

reasons stated below, the Court must find that Horma presents as an illegal alien within the Fourth Circuit's holding in *Carpio-Leon*. The Court's inquiry thus ends at the first step of the *Chester* process.

### 2.    Based on the More Developed Factual Record, the Court Concludes that Horma is Unlawfully *Present* in the United States

On December 29, 2013, Horma lawfully entered the United States on a valid six-month B-1/B-2 visa. Horma filed his Asylum Application more than four months before his visa expired. Because his Asylum Application pended before USCIS, pursuant to 8 U.S.C. § 1182(a)(9)(B)(iii)(II), Horma was not necessarily unlawfully present at the time his visa expired. Under 8 U.S.C. § 1182(a)(9)(B)(iii)(II), whether Horma was unlawfully *present* turns on whether he worked without authorization.

On March 20, 2015, Horma received his work authorization from USCIS. The work authorization allowed Horma to work with authorization for one year, until March 19, 2016, without accruing any unlawful presence. But during the November 2018 Evidentiary Hearing, the United States introduced ample evidence that Horma worked as a cigarette wholesaler without authorization. Because Horma's unauthorized work deprives him of the benefit of the applicable tolling provisions in 8 U.S.C. § 1182(a)(9)(B)(iii)(II), Horma is unlawfully present in the United States.

First, the Government submitted Ms. Young's testimony, which established that during the periods both before Horma received work authorization and after his work authorization expired, Horma deposited hundreds of thousands of dollars into various bank accounts in his name. Second, the Government presented the testimony of Lt. Bodenhamer, who testified that Horma associated himself with at least six business, even listing himself as the company contact when applying to open a Sam's Club membership for one of those businesses on February 2,

18

2017. Lt. Bodenhamer also presented three charts showing Horma's cigarette purchases using the businesses' membership cards with dates ranging from October 2015, while he held a valid work authorization, to March 2017, well after his work authorization expired.[29] This evidence includes purchases both during the time Horma held a valid work authorization and after his work authorization expired.

The United States also presented the testimony of William Chin, Jr., a deportation officer with Immigration and Customs Enforcement. Agent Chin testified that "[i]f somebody comes here on a tourist visa, a non-immigrant visa, they're not authorized to work in any way, shape, or form unless they're authorized by the government in advance." (Tr. 72.) He stated that if a person admitted on a non-immigrant visa works without authorization, then "[t]hey would be out of their status." (*Id.*) Although Agent Chin testified that Horma's work authorization was valid from March 20, 2015 until March 19, 2016, he also testified that Horma did not receive a renewal of his work authorization.

In *Horma I*, the Court found Horma to be in illegal immigration *status*. 2018 WL 4214136 at *7–*8. Based on the extant expanded record, the Court must also find that Horma has accrued unlawful *presence* because he worked without authorization. *See* 8 U.S.C. § 1182(a)(9)(B)(iii)(II); *Horma I*, 2018 WL *8–*9. Given both his illegal *status* and unlawful *presence*, the Court concludes that no ambiguity exists as to whether Horma presents as an illegal alien, and not a citizen, for purposes of his Second Amendment constitutional challenge.[30]

---

[29] Horma's work authorization expired on March 19, 2016.

[30] Horma contends that whether he has accrued unlawful presence pursuant to 8 U.S.C. § 1182(a)(9)(B) does not control the scope of the Second Amendment. He asserts that the accrual of unlawful presence affects only an immigrant's ability to re-enter the country at a later date. Additionally, he maintains that "[t]he definitions in § 1182(a)(9)(B)(ii) do not automatically mean that a person who violates them is subject to removal." (2d Mot. Dismiss

Fourth Circuit law mandates that the protections of the Second Amendment do not extend to

him. *Carpio-Leon*, 701 F.3d at 981.

### C. The Court Will Deny Horma's Constitutional Challenge Because Second Amendment Protections Do Not Extend to Horma as an Illegal Alien

Horma claims that the Court must find 18 U.S.C. § 922(n) unconstitutional both as

applied to him and on its face. But Horma's status as an illegal alien materially affects his

constitutional challenge to 18 U.S.C. § 922(n). Because the Court finds that the Second

Amendment's protections do not extend to Horma as an illegal alien, the Court need not address

Horma's facial challenge,[31] in which he argues that 18 U.S.C. § 922(n) amounts to an

---

11.) In support of his argument, Horma states that whether he worked without authorization does not affect his asylum application. Citing to *Wang v. Ashcroft*, 341 F.3d 1015, 1017 (9th Cir. 2003), Horma claims that USCIS may grant an immigrant's asylum application even if the immigrant worked without authorization.

Horma's argument misses the mark. Here, the Court must determine whether Horma is an illegal alien to whom the protections of the Second Amendment do not extend. Whether USCIS may later grant his Asylum Application does not affect this inquiry. Even were the Court amenable to distinguishing Horma's situation from Carpio-Leon's, Horma provides no legal basis for doing so.

[31] When a challenger fails in his or her as-applied challenge, a court need not address his or her facial challenge. *See United States v. Masciandaro (Masciandaro I)*, 648 F. Supp. 2d 779, 786 (E.D. Va. 2009). The *Masciandaro I* court stated that when

> a party brings both as-applied and facial constitutional challenges, it is appropriate to determine first whether the law is constitutional as applied to the challenging party's conduct, and then only if the as-applied challenge fails, to determine whether it is necessary to consider the facial challenge. This is so "for reasons relating both to the proper functioning of courts and to their efficiency," as addressing facial challenges unnecessarily "would convert use of the overbreadth doctrine from a necessary means of vindicating the plaintiff's own right not to be bound by a statute that is unconstitutional into a means of mounting gratuitous wholesale attacks upon state and federal laws."

*Id.* (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989) and citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502–04 (1985)), *aff'd*, 638 F.3d 458 (2011). Furthermore, because "a party ordinarily 'can only succeed in a facial challenge by

unconstitutional blanket ban.[32]

The Supreme Court in *Heller* found that individuals possess a right to keep and bear

arms. *See Heller*, 554 U.S. at 592. But *Heller* does not grant an unlimited right to all persons to

possess firearms for all purposes. *See Carpio-Leon*, 701 F.3d at 977 ("[T]he Second

Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of*

*weapon*, to possess at *every place*, or to possess by *every person*" (citing *Chester*, 628 F.3d at

---

"establish[ing] that *no set of circumstances exists* under which the [law] would be valid," *i.e.*, that the law is unconstitutional in *all* of its applications,'" if a defendant fails to establish that a challenged law is unconstitutional as applied to *him*, that will often also, *a priori*, decide the facial challenge. *Masciandaro I*, 648 F. Supp. 2d at 792.

[32] Horma contends that under *City of Los Angeles v. Patel*, 135 S.Ct. 2443 (2015), the Court may proceed directly to his facial challenge of 18 U.S.C. § 922(n). Horma posits that even if he were an illegal alien, that would not affect the Court's analysis regarding the constitutionality of the statute on its face. In support of his position, Horma argues that 18 U.S.C. § 922(n) constitutes an overly broad blanket ban, which does not survive even intermediate scrutiny.
　　First, Horma misreads the Supreme Court's decision in *Patel*. The petitioners in *Patel* did not raise an as-applied challenge to the statute. *Patel*, 135 S.Ct. at 2447. The "questions presented [to the Supreme Court were] whether facial challenges to statues can be brought under the Fourth Amendment and, if so, whether [a] . . . provision of the Los Angeles Municipal Code is facially invalid." *Id.* The Supreme Court did not have an occasion to consider whether a court reviewing a statute must first determine whether the statute survives an as-applied challenge before addressing a facial challenge.
　　Second, while the *Patel* court found that "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant," *id.* at 2451, this language does not support Horma's contention. Section 922(n), which prohibits those under indictment for a felony from possessing a firearm, applies to Horma. Therefore, Horma falls within the group "for whom the law is a restriction." *Id.* at 2451.
　　Even were the Court to consider Horma's facial challenge, it would likely fail. As the United States maintained at the November 2018 Evidentiary Hearing, § 922(n) has five important limitations: (1) "the person has to be indicted for a serious crime, which is a felony," (2) "a person has to know they have been indicted," (3) if a person has been indicted, then a grand jury has made a determination of probable cause, (4) the statute includes "a limited exception for certain indictments for . . . business . . . related crimes," and (5) the probation exists "only for the duration of the indictment." (Tr. 182–83.) Because, as Counsel for Horma conceded, the Government has an important interest in safety, and these five limitations limit the statute in time and scope, the Court would likely find that 18 U.S.C. § 922(n) does not amount to an unconstitutional blanket ban.

21

676)). Building on *Heller,* the Fourth Circuit, in *Chester,* established a two-step inquiry, in which a court first asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" as historically understood. *Chester,* 628 F.3d at 680. If the conduct does not fall within that protected scope, then the "challenged law is valid," and the inquiry ends. *Id.* In such a case, a court need not proceed to the second step of the inquiry, "applying an appropriate form of means-end scrutiny." *Id.* Here, Horma's challenge fails at *Chester*'s first step.

*Carpio-Leon* controls the Court's decision because § 922(n) does not "impose[] a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* After conducting a historical inquiry, the *Carpio-Leon* court concluded that the protections of the Second Amendment do not extend to illegal aliens. *Id.* at 981. Similar to Carpio-Leon, Horma stands before the Court as an illegal alien to whom the protections of the Second Amendment do not extend.[33] Because Horma cannot claim the protections of the Second Amendment, the Court

---

[33] Horma asserts that he does not fall within the definition of "illegal alien" used by the Fourth Circuit in *Carpio-Leon.* (2d Mot. Dismiss 7.) Horma contends that *"Carpio-Leon*'s discussion of 'illegal aliens' refers to those aliens who entered without inspection, or are present without the knowledge or supervision of immigration authorities." (*Id.*) He claims exemption because he "entered the country regularly, with inspection at a port of entry, on a valid visa . . . has submitted to the immigration authorities, attend[ed] interviews, submit[ed] to biometrics, and [kept] his address update – for every moment of his presence . . . [and] is forbidden from leaving" because of his pending asylum application. (*Id.* 9.) These factual differences do not alter the Court's analysis here.

Although the Fourth Circuit in *Carpio-Leon* referred to the fact that "the crime of illegal entry inherently carries this additional aspect that leaves an illegal alien's status substantially unprotected by the Constitution in many respects," it did so because of the facts before it. *See* 701 F.3d at 975, 981. Nothing in that decision expressly limits the definition of illegal aliens to those who have entered the country illegally. The Court will not adopt such a narrow interpretation of *Carpio-Leon.* Horma falls within the definition of illegal alien as set forth by the Fourth Circuit in *Carpio-Leon* because his immigration status changed to illegal and he became unlawfully present.

ends its *Chester* inquiry and finds that his Second Amendment constitutional challenge fails. *See id.* at 982; *Chester*, 628 F.3d at 680.

## IV. Conclusion

For the reasons stated above, the Court will deny the Second Motion to Dismiss.

An appropriate Order shall issue.

/s/
M. Hannah Lauck
United States District Judge

Date: 1/16/2019
Richmond, Virginia

---

To preserve his position for further review, Horma also argues that the Fourth Circuit erred when it held that the Second Amendment protections do not extend to illegal aliens. Horma believes that the United States Court of Appeals for the Seventh Circuit correctly held that an illegal alien "who had entered the United States voluntarily and resided here 20 years, since age four or five, was included within the scope of the Second Amendment." (*Id.* 7 (citing *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015)).) Of course, Seventh Circuit decisions do not bind this Court.

Moreover, Horma's situation differs materially from the defendant in *Meza-Rodriguez*. In *Meza-Rodriguez*, the Seventh Circuit found that the defendant "has extensive ties with this country, having resided here from the time he arrived over 20 years ago at the age of four or five until his removal. He attended public schools in Milwaukee, developed close relationships with family members and other acquaintances, and worked (though sporadically) at various locations." *Meza-Rodriguez*, 798 F.3d at 670–71. Horma cannot claim such connections. Horma entered the United States at the age of nineteen, just over six years ago. Nothing in the record suggests that Horma attended school in the United States or developed the type of ties that the Seventh Circuit found persuasive in *Meza-Rodriguez*. *See Meza-Rodriguez*, 798 F.3d at 670-72 (finding that Meza-Rodriguez had "substantial connections with this country."). Instead, Horma overstayed his visa and worked without authorization.